UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

     V.

                                CRIMINAL NO.
                                20-10263-PBS

JIM BAUGH and
DAVID HARVILLE
    Defendants.

**MEMORANDUM AND ORDER RE:**
**DEFENDANT DAVID HARVILLE'S MOTION TO COMPEL**
**DISCOVERY (DOCKET ENTRY # 73); DEFENDANT**
**JIM BAUGH'S MOTION TO COMPEL DISCOVERY**
**(DOCKET ENTRY # 77)**

**December 1, 2021**

**BOWLER, U.S.M.J.**

Pending before this court are two motions to compel, one filed by defendant David Harville ("Harville") and the other filed by defendant Jim Baugh ("Baugh"). (Docket Entry ## 73, 77). The government opposes both motions. (Docket Entry ## 82, 83). After conducting a hearing, this court took the motions under advisement. As stated during the hearing, Baugh also joins in Harville's motion to compel (Docket Entry # 73).

BACKGROUND

A 15-count Indictment charges Baugh and Harville ("defendants") with: (1) conspiracy to commit stalking of two married individuals ("the victims") through interstate travel and facilities of interstate travel in violation of 18 U.S.C. § 371

(Count One); (2) stalking through interstate travel "with the intent to harass, intimidate, and place under surveillance with the intent to harass and intimidate" each victim in violation of 18 U.S.C. § 2261A(1)(B) ("section 2261A(1)") (Counts Two to Five); (3) stalking each victim through facilities of interstate travel in violation of 18 U.S.C. § 2261A(2)(B) (Counts Six to Nine); (4) witness tampering by "knowingly engag[ing] in misleading conduct toward" an eBay Internal Investigator and, as to Baugh, also a Natick Police Department ("NPD") Detective, with the "intent to hinder, delay, and prevent" communication to a United States law enforcement officer "relating to the commission and possible commission of a Federal offense" in violation of 18 U.S.C. § 1512(b)(3) ("section 1512(b)(3)") (Counts Ten to 12); and (5) as to Baugh only, destroying, altering, and falsifying records in a federal investigation in violation of 18 U.S.C. § 1519 (Counts 13 to 15). (Docket Entry # 33).

The conspiracy charge covers the time period from August 5 to September 6, 2019, and the remaining charges cover various time periods in August 2019. (Docket Entry # 33). At the time of the charged conspiracy, Baugh was eBay's senior director of safety and security and ran the company's global security and resiliency ("GSR") business, a division responsible for "the physical security of eBay's employees and facilities worldwide." (Docket Entry # 33, ¶ 1). Harville, "eBay's Director of Global

Resiliency," reported to Baugh.  (Docket Entry # 33, ¶ 2).
Defendants lived in California whereas the victims lived in
Natick, Massachusetts and operated an online newsletter covering
"ecommerce companies, including eBay."  (Docket Entry # 33, ¶¶ 1-
2, 8-9).  Other individuals involved in the conspiracy include
Stephanie Popp ("Popp"), Stephanie Stockwell ("Stockwell"),
Veronica Zea ("Zea"), Brian Gilbert ("Gilbert"), and Philip Cooke
("Cooke").[1]  (Docket Entry # 33, ¶ 11).  Throughout the relevant
time period, these individuals worked at eBay in the GSR
division.  (Docket Entry # 33, ¶¶ 3-7).

     In 2019, senior leadership at eBay "disliked the
Newsletter's content" as well as comments posted by the
newsletter's readers.  (Docket Entry # 33, ¶ 10).  Defendants as
well as "others at eBay were aware that senior leadership
perceived the Newsletter as a threat to eBay's public image."
(Docket Entry # 33, ¶ 10).  The purposes of defendants'
"harassment campaign" against the victims included efforts to
distract them from publishing the newsletter and "alter the
Newsletter's coverage of eBay."  (Docket Entry # 33, ¶ 12).  The
campaign took the form of "hostile Twitter messages, deliveries

---

     [1] The government charged Gilbert, Popp, Stockwell, and Zea
in a separate case.  United States v. Gilbert et al., Criminal
No. 20-10098-WGY.  All four individuals pled guilty and the
government filed plea agreements for each individual.  United
States v. Gilbert et al., Criminal No. 20-10098-WGY (Docket Entry
## 30, 33, 42, 43).

of unwanted" and disturbing "items to the Victims' home, and travel to Massachusetts to" physically surveil the victims. (Docket Entry # 33, ¶ 11).  The unwanted items included "live spiders," a bloody pig mask, live cockroaches, and a funeral wreath.  (Docket Entry # 33, ¶ 16h, 16k, 16t, 16u) (Docket Entry # 3-1, ¶ 75).  As stated in the Indictment, "[t]he purposes of the conspiracy were to engage in a clandestine campaign to harass and intimidate the Victims, and thereby interrupt and change the Newsletter's coverage, while avoiding law enforcement detection and prosecution."  (Docket Entry # 33, ¶ 14).

On or about August 15, 2019, Baugh, Harville, "and Zea flew from California to Boston" and the following day proceeded to conduct surveillance of the victims by repeatedly driving past their home in a rented vehicle.  (Docket Entry # 33, ¶¶ 16z, 16ff).  They also unsuccessfully attempted to install a GPS tracking device on the victim's car.  (Docket Entry # 33, ¶ 16bb).  Concerned that one the victims spotted their surveillance on August 16, 2019, Baugh returned the vehicle to the rental car agency.  (Docket Entry ## 16hh, 16ii).  On or about August 18, 2019, Baugh, Popp, and Zea followed the same victim in a different rental vehicle "as he drove in Natick, which enabled" the victim to photograph the vehicle's license plate.  (Docket Entry # 33, ¶ 16qq).  A few days later, an NPD Detective arrived at the "team's hotel to investigate Zea and Harville's connection

4

to the cyberstalking campaign."  In connection thereto, Baugh
made false statements to the Detective.  (Docket Entry # 33, ¶
16vv).

On or about August 21, 2019, Baugh requested and Stockwell
created a document "to deflect attention from Zea" for Gilbert to
use in a meeting the next day with the NPD.  On or about August
22, 2019, Gilbert and "another eBay employee met with three NPD
officers at the NPD."[2]  (Docket Entry # 33, ¶ 16ggg).  During the
meeting, Gilbert falsely stated to the officers that Zea and
Harville "had come to Boston to attend a conference."  (Docket
Entry # 33, ¶ 16ggg).  The following day, Harville "falsely told
eBay investigators that he had traveled to Boston to attend a
conference" and "had not had any interaction with the Victims or
the NPD."  (Docket Entry # 33, ¶ 16iii).  Baugh, in turn,
"falsely told eBay investigators his team was not responsible for
harassing message or deliveries."  (Docket Entry # 33, ¶ 16jjj).
"On or about August 26, 2019, Baugh, Harville, Popp, Zea," and
Gilbert deleted data from their mobile telephones that evidenced
the conspiracy.  (Docket Entry # 33, ¶ 16lll).  Additional facts

---

[2]  "Both immediately before and just after the meeting, NPD
officials had contacted and briefed the FBI regarding the
harassment targeting the Victims and the possible involvement
of eBay personnel."  (Docket Entry # 3-1, ¶ 175).  The FBI
thereafter opened a federal investigation.  (Docket Entry # 3-1,
¶ 175).  That said, however, "[n]othing in [section 1512(b)(3)]
implies that a federal investigation must be imminent or underway
at the time of the actus reus."  United States v. Bailey, 405
F.3d 102, 108 (1st Cir. 2005).

are set out when addressing the specific motion.

I.   Harville's Motion to Compel

    Harville moves to disclose two categories of materials: one involving cooperating witnesses and the other involving unindicted coconspirators.  (Docket Entry # 73, ¶¶ 4-5).  The government opposes production.  (Docket Entry # 84).

A.   Cooperating Witnesses

    Regarding the former category, Harville seeks all "'302' reports" of cooperating witnesses the government "interviewed pursuant to a proffer agreement."  (Docket Entry # 73, ¶ 4).  He reasons that "because cooperation agreements tied to plea agreements amount to a promise, reward, or inducement," which are exculpatory under LR. 116.2(a)(3), the cooperating witnesses' statements in the 302 reports are subject to immediate disclosure as "*Brady/Giglio* material."  (Docket Entry # 74, pp. 5-6); see generally Brady v. Maryland, 373 U.S. 83, 87 (1963); Giglio v. United States, 405 U.S. 150, 154 (1972).  Further, the government "should also produce the '302' reports" as "*Brady/Giglio* material" insofar as "they contain any evidence that a prospective witness is biased or prejudiced against" Harville "or has a motive to falsify or distort his or her testimony," according to Harville.  (Docket Entry # 74, p. 5).  Relying on United States v. Snell, 899 F. Supp. 17, 21, 24 (D. Mass. 1995), Harville contends he is not bound by the timing strictures of the

6

Jencks Act, 18 U.S.C. § 3500(a).  (Docket Entry # 74, pp. 5, 7).

The government produced promises, rewards, and/or inducements given to cooperating witnesses (Docket Entry # 73-2, p. 6), as required under LR. 116.2(b)(1)(C), and submits it is not required to produce the additionally requested statements and the materials evidencing bias or prejudice because it assessed the 302 reports and did not identify any additional Brady material.  (Docket Entry # 83, pp. 2-3).  The government argues that Harville conflates Giglio impeachment material, such as the requested evidence in the 302 reports of the witnesses' bias or prejudice, with Brady material.  (Docket Entry # 83, p. 2).  The former material is subject to production 21 days before trial under LR. 116.2(b)(2)(A) whereas the latter Brady material is subject to production 28 days after arraignment under LR. 116.2(b)(1)(A), according to the government.  Hence, it submits that, "in the absence of *Brady* materials," the cooperating witnesses' statements "are either *Jencks* materials, or, if they do contain impeachment information, 21-day materials."  (Docket Entry # 83, p. 2).

## DISCUSSION

Brady requires the prosecutor "'to disclose evidence in its possession that is favorable to the accused and material to guilt or punishment.'"  United States v. Simon, 12 F.4th 1, 51 (1st Cir. 2021) (citation omitted).  Materiality entails considering

7

"the favorable, undisclosed evidence along with the evidence presented at trial, and determin[ing] whether it 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" DeCologero v. United States, 802 F.3d 155, 161 (1st Cir. 2015) (quoting Kyles v. Whitley, 514 U.S. 419, 435 (1995)). "Evidence is favorable to the accused if it is either exculpatory or impeaching in nature and material if there is a reasonable probability that, had it been disclosed, the result of the proceeding would have been different," United States v. Cruz-Feliciano, 786 F.3d 78, 87 (1st Cir. 2015) (internal quotation marks omitted), i.e., a likelihood of a different result "'great enough to "undermine confidence in the proceeding's outcome."'" United States v. Tsarnaev, 968 F.3d 24, 74 (1st Cir. 2020) (quoting Smith v. Cain, 565 U.S. 73, 75 (2012)), cert. granted, 141 S.Ct. 1683 (U.S. Mar 22, 2021) (No. 20-443); accord United States v. Paladin, 748 F.3d 438, 444 (1st Cir. 2014) (quoting Cain, 565 U.S. at 75). "[E]xculpatory evidence includes evidence that casts doubt on the credibility or accuracy of any witness the government anticipates calling at trial or any evidence the government expects to proffer at trial." United States v. Moon, Criminal No. 11-10223-DJC, 2012 WL 2178923, at *2 (D. Mass. June 13, 2012) (citing United States v. Bagley, 473 U.S. 667, 678 (1985), and Giglio, 405 U.S. at 154); see Bagley, 473 U.S. at 676 ("prosecutor failed to disclose

8

evidence that the defense might have used to impeach the Government's witnesses by showing bias or interest" and "[i]mpeachment evidence . . . as well as exculpatory evidence, falls within the *Brady* rule").

The First Circuit in <u>Paladin</u> elucidates the distinction between impeachment evidence that is immaterial and impeachment evidence which creates the necessary reasonable probability "'great enough to "undermine confidence in the outcome of the trial."'" <u>Paladin</u>, 748 F.3d at 444 (citation omitted). "Evidence is immaterial" that "impeaches a witness on a collateral issue" or "has little probative value" because "additional evidence strongly corroborates the witness's testimony the suppressed evidence might have impeached." <u>Id.</u> (citation omitted). Withholding evidence "whose impeachment value is merely marginal is manifestly insufficient to place the trial record in 'such a different light as to undermine confidence in the verdict.'" <u>Id.</u> (citation omitted).

The government recognizes this distinction because it cites to <u>Paladin</u> as "evaluating impeachment information for materiality" (Docket Entry # 83, p. 3). <u>See</u> <u>also</u> <u>United States v. Castro-Ward</u>, 324 F. Supp. 3d 263, 266 (D.P.R. 2018) (denying defendant's motion to compel and stating "Court is confident that the United States is aware of its duty to disclose impeachment or exculpatory information timely, and of the consequences of

9

failing to do so").  Moreover, the government posits *correctly*
that Harville already understands aspects of "the cooperating
witness' anticipated testimony" due to a 51-page affidavit
(Docket Entry # 3-1) filed in support of a criminal complaint
(Docket Entry # 3).  The record as a whole overwhelmingly
supports the conspiracy charge and the roles the cooperating
witnesses played which, presumably, their statements in the 302
reports concern.  See, e.g., Paladin, 748 F.3d at 448-49.  Placed
in context, the impeachment value of immediately disclosing the
entirety of the 302 reports of the cooperating witnesses as
opposed to delaying the disclosure of the impeachment evidence,
if any, therein until 21 days prior to trial provides, at best, a
marginal benefit.  See id. at 444.  Ample evidence in the record
regarding the cooperating witnesses's conduct and roles reduces
the value of the impeachment information in the requested 302
reports.  The foregoing therefore renders a different result
sufficient to undermine confidence in the outcome less likely to
result from the government's delay of not disclosing the material
in the 302 reports until the cooperating witnesses take the stand
and testify on direct examination, 18 U.S.C. § 3500(a)-(b), or
until 21 days prior to trial if the requested material is
impeachment information.  See LR. 116.2(b)(2)(A) (requiring
production 21 days before trial for "information that tends to
cast doubt on the credibility or accuracy of any witness"); LR.

116.2(b)(2)(D) (requiring production 21 days before trial for "information reflecting bias or prejudice against the defendant by" anticipated government witness).

"The government is primarily responsible for deciding what evidence it must disclose to the defendant under *Brady*." United States v. Prochilo, 629 F.3d 264, 268 (1st Cir. 2011). The government states that it reviewed the 302 reports and they do not contain content "discoverable under *Brady*." (Docket Entry # 83, pp. 2-3). The government further represents "[i]t will continue to assess the 302s (and all other information in its possession) for potential *Brady* materials as the case develops, and disclose evidence in accordance with its discovery obligations." (Docket Entry # 83, p. 2). Subject to the government's revaluation as the case progresses, this court agrees with the government that the undisclosed statements in the 302 reports "are either *Jencks* materials, or, if they do contain impeachment information, 21-day materials" (Docket Entry # 83, p. 2). Production of the requested material regarding cooperating witnesses as "*Brady/Giglio* material" (Docket Entry # 74, pp. 5-7) at this time is therefore denied.

The decision in Snell does not convince this court otherwise. As explained in Snell in discussing the interplay between the Jencks Act and Brady, "[i]f the evidence at issue is conceded to be *Brady* material, then it must be turned over

immediately." <u>Snell</u>, 899 F. Supp. at 19.  The decision, however, also noted "there may be impeachment evidence that is too attenuated to fit within the *Brady* obligation" or "that is not material to the defense case, as . . . defined in the case law," although "the evidence requested by the defendants [did] not fit within that category." <u>Id.</u> at 23.  Here, the government is not refusing to provide <u>Brady</u> material and is not conceding that the undisclosed information is <u>Brady</u> material.  Rather, it reviewed the 302 reports and concluded the withheld information was not <u>Brady</u> material.  (Docket Entry # 83, p. 2).

To the extent Harville seeks production of the material under Fed. R. Crim. P. 16(a)(1)(E) ("Rule 16(a)(1)(E)") (Docket Entry # 74, p. 2), the rule requires, inter alia, a showing that the "item is material to preparing the defense."  Fed. R. Crim. P. 16(a)(1)(E)(i).  A showing of materiality under Rule 16(a)(1)(E) necessitates "'some indication' that pretrial disclosure of the information sought 'would have enabled the defendant significantly to alter the quantum of proof in his favor.'" <u>United States v. Goris</u>, 876 F.3d 40, 44 (1st Cir. 2017).  The defendant "bears the burden of showing materiality." <u>Id.</u> at 45 (citations omitted).

Rule 16(a)(1)(E)(i) does not require immediate production of the entirety of the requested 302 reports.  First, because the government identifies the cooperating witnesses "as potential

trial witnesses" (Docket Entry # 83, p. 1), their statements in the 302 reports are not subject to "discovery or inspection . . . except as provided in 18 U.S.C. § 3500," i.e., the Jencks Act. Fed. R. Civ. P. 16(a)(2); see United States v. Murray, Case No. 3:18-cr-30018-MGM, 2019 WL 1993785, at *4 (D. Mass. May 6, 2019). Second, a showing of materiality under Rule 16(a)(1)(E) necessitates "'some indication' that pretrial disclosure of the information sought 'would have enabled the defendant significantly to alter the quantum of proof in his favor.'" United States v. Goris, 876 F.3d 40, 45 (1st Cir. 2017). The defendant "bears the burden of showing materiality." Id. (citation omitted). In light of the wealth of evidence in the record regarding the conduct of the cooperating witnesses and the government's assessment that the undisclosed impeachment material, if any, in the 302 reports is not Brady material,[3] production of the requested material in the 302 reports *at this time* will not significantly "alter the quantum of proof" in Harville's (or Baugh's) favor. Goris, 876 F.3d at 45. In short,

---

[3] At a minimum, there is an overlap between Brady material and Rule 16(a)(1)(E)(i) material such that the absence of Brady material reduces the material that falls within the reach of Rule 16(a)(1)(E)(i). See United States v. Bulger, 928 F. Supp. 2d 305, 324 (D. Mass. 2013) (noting that "materiality standard for Rule 16 'essentially tracks the Brady materiality rule,' though some courts have found that materiality under Rule 16 is broader than under *Brady*") (citation omitted); accord United States v. Akula, Case No. 3:19-cr-30039-MGM, 2020 WL 1853632, at *3 (D. Mass. Apr. 13, 2020) (citing Bulger, 928 F. Supp. 2d at 324).

Harville fails to discharge his burden to show materiality.

B.  <u>Unindicted Coconspirators</u>

In addition to the material regarding cooperating witnesses, Harville requests, at a minimum, "early production of *Jenks* material" for "unindicted coconspirators" the government identifies in its automatic discovery letter dated December 21, 2020.  (Docket Entry # 73, ¶ 5) (Docket Entry # 74, p. 5) (Docket Entry # 60, Request No. 4).  In the sealed automatic discovery letter, the government identified unindicted coconspirators in accordance with LR. 116.1(c)(1)(E).  (Docket Entry # 73-2, p. 5).

Significantly, the government represents it does not anticipate calling as witnesses "the four unindicted coconspirators for whom Harville seeks early production of Jencks materials."[4]  (Docket Entry # 83, p. 4, n.1).  As non-testifying and unindicted individuals, the government correctly states that "[t]heir prior statements are accordingly neither *Jencks* nor *Giglio* materials."  (Docket Entry # 83, p. 4, n.1).  The government also represents it has not "identified *Brady* evidence within" their prior statements.  (Docket Entry # 83, p. 4, n.1).  Given these circumstances, production is not required.  <u>See</u> <u>United States v. Soto-Beníquez</u>, 356 F.3d 1, 39 (1st Cir. 2003)

---

[4] Although the government's automatic discovery letter identifies eight individuals (Docket Entry # 73-2, p. 5), at the hearing on the motion Harville did not controvert the government's representation that the request pertains to four unindicted coconspirators (Docket Entry # 83, p. 4, n. 1).

(rejecting <u>Brady</u> claim and noting "analysis might have been
different if the government had ultimately called Rodríguez-López
as a witness at trial" because "his earlier lies to the
government would certainly have constituted a basis for
impeaching him").  Harville's request for "early production of
Jenks material" for the unindicted coconspirators identified in
the government's December 21, 2020 letter (Docket Entry # 73-2,
p. 5) is denied.

II.  <u>Baugh's Motion to Compel</u>

Baugh seeks to compel documents identifying his activities
"authorized by or in support of U.S. government intelligence or
law enforcement agencies or operations from 2014 to 2018" and his
agreements with "U.S. government agencies" relating to these
activities.  (Docket Entry # 77, p. 6).  He also requests
documents concerning any written instructions or warnings he
received regarding these activities.  (Docket Entry # p. 6).

Without providing evidentiary support,[5] Baugh states he was
a United States "government agent involved in national security
activities" and, subsequently, worked "as a private sector
security contractor."  (Docket Entry # 77, pp. 1, 5).  As a

---

[5]  The government does not confirm "that Baugh was a
government source" but accepts the "characterization of his
service" solely for purposes of the motion to compel.  (Docket
Entry # 82, p. 1, n.1).  Adhering to the government's and Baugh's
position, this court likewise accepts Baugh's characterization of
his prior service for purposes of resolving the motion.

private contractor, Baugh assisted United States government
intelligence or law enforcement agencies "via a 'handler' from
the FBI."  (Docket Entry # 77, pp. 1, 5).  Baugh's activities
during the 2014 to 2018 time period included "physical and
electronic surveillance," trespass, and use of fake identities
"all in support of certain national security objectives" or "in
service of a greater good."  (Docket Entry # 77, pp. 1, 5, 8).
Drawing analogies to his surveillance of the victims and other
conduct detailed in the Indictment, Baugh contends he worked
under the direction of eBay's senior leadership, specifically
Senior Vice President Steve Wymer ("Wymer").  (Docket Entry # 77,
p. 6).  Senior leadership believed the newsletter "posed an
existential threat to" eBay and a personal safety threat to them
and their families.  (Docket Entry # 77, p. 3).

    In light of Baugh's history engaging in similar conduct
(such as physical surveillance, trespass, and use of fake
identities and the instructions by his FBI handler to maintain
his cover story), Baugh argues that he believed his conduct was
justified "and necessary to avoid greater harms."  (Docket Entry
# 77, p. 7).  He maintains the requested documents are subject to
immediate production because they are material and favorable to
the accused under Brady and LR. 116.2(a).  (Docket Entry # 77).
They are also "material" under Rule 16(a)(1)(E)(i).  See LR.
116.1(c)(1)(A) (requiring production 28 days after arraignment

for Rule 16(a)(1) information).  Specifically, the documents are
exculpatory and material to negate his intent or mens rea to
engage in stalking under section 2261A(1) and witness tampering
under section 1512(b)(3).[6]  (Docket Entry # 77, pp. 1, 8).  They
are also exculpatory and material because they will enable him to
establish an affirmative defense of necessity and help him
demonstrate "good faith."  (Docket Entry # 77, pp. 1, 11-12).
Baugh additionally seeks disclosure of items "obtained from or
belong[ing] to" him which he signed in accordance with Rule
16(a)(1)(E)(iii).  (Docket Entry #  77, pp. 9-10).

     The government argues that "[p]ast government service is not
a license to commit crimes forever, or to fish through sensitive
files when caught."  (Docket Entry # 82, p. 1).  It maintains
that Baugh's previous "covert activities under *government*
supervision" bear "no relation to his later intent to harass,
intimidate, and obstruct as a *private citizen*."  (Docket Entry #
82, pp. 1-2) (emphasis added).  The extended time between the end
of Baugh's government service in 2018 and Baugh's misconduct in
August 2019, during which he had no FBI handler, is too large to
bridge an exculpatory connection, according to the government.

_____

     [6]  Baugh does not adequately develop the argument that the
documents are exculpatory regarding *all* of "the charged offenses"
(Docket Entry # 77, p. 1) as the memorandum sufficiently
addresses only the section 2261A(1) and section 1512(b)(3)
charged offenses (Docket Entry # 77, pp. 9-11).  See United
States v. Oladosu, 744 F.3d 36, 39 (1st Cir. 2014) ("[b]ecause
the argument is underdeveloped, it is waived").

Moreover, Baugh inaptly likens his prior government-authorized work serving national security interests to his eBay work ostensibly to protect eBay executives from harm, according to the government. The government points out that, unlike Baugh's private sector work for eBay, the FBI undergoes a series of procedures before authorizing a confidential source to commit "otherwise illegal activity" in the course of a government investigation. (Docket Entry # 82, pp. 4-5). In addition to other arguments, the government maintains the requested documents are not material or relevant to any of the four elements of a necessity defense. (Docket Entry # 82, pp. 7-9).

Adding to the facts previously summarized, in July and early August 2019, members of eBay's executive leadership team increased pressure on Baugh to address the newsletter. (Docket Entry # 3-1, ¶ 29). On August 1, 2019, Baugh texted an eBay executive that Baugh had a plan that will take about two weeks to execute. (Docket Entry # 3-1, ¶ 39). During the week of August 5, 2019, Baugh informed Popp and Gilbert that eBay's leadership supported Baugh's efforts. (Docket Entry # 3-1, ¶¶ 46, 49). Baugh also forwarded Popp and Gilbert an August 6, 2019 email from an eBay executive to Baugh and others complaining about one of the newsletter's authors and another individual who wrote

18

negative messages in a Twitter account.[7]  (Docket Entry # 3-1, ¶¶ 49, 58).  In pertinent part, the email states:

> I genuinely believe these people are acting out of malice and ANYTHING we can do to solve it should be explored. Somewhere, at some point, someone chose to let this slide. It has grown to a point that is *absolutely unacceptable*. It's the "blind eye toward graffiti that turns into mayhem" syndrome and I'm sick about it. *Whatever. It. Takes.*

(Docket Entry # 3-2, pp. 15, 17, ¶¶ 49, 58) (emphasis added).

DISCUSSION

## I.   Material to Preparing the Defense

As noted, Baugh argues that the documents identifying his government activities from 2014 to 2018 are "material to preparing the defense" under Rule 16(a)(1)(E)(i) (Docket Entry # 77, p. 9) and, specifically, his intent to "'harass, or intimidate'" or place under surveillance with the intent to "harass, or intimidate" each victim under section 2261A(1)[8] or "*knowingly* and *corruptly*" persuade or engage in misleading conduct to hinder federal law enforcement under section 1512(b)(3).  (Docket Entry # 77, p. 10).  Baugh further argues that he requires the documents to support a necessity defense.

---

[7]  Baugh asserts and this court accepts for purposes of the present motion (Docket Entry # 77) that Wymer wrote the email. (Docket Entry # 77, p. 6).

[8]  Although Baugh quotes section 2261A's additional language proscribing the "intent to kill, or injure" (Docket Entry # 77, p. 10), the Indictment only charges that Baugh "travel[ed] in interstate commerce with the intent to harass, intimidate, and place under surveillance with intent to harass and intimidate" each victim.  (Docket Entry # 33, ¶ 20).

19

The government contends the requested documents lack relevance to the charges and to the necessity defense.  (Docket Entry # 82).

Baugh bears the burden to establish materiality.  <u>Goris</u>, 876 F.3d at 44.  Pretrial disclosure at this time must enable him "'significantly to alter the quantum of proof in his favor.'" <u>Id.</u> at 45.  When a defendant grounds a discovery request "in a speculative theory," the district court does not abuse its discretion in denying the request.  <u>Id.</u>

A.  <u>Section 2261A(1)</u>

Section 2261A(1) requires that defendant act "with the intent to . . . harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate" another person.[9]  18 U.S.C. § 2261A(1).  The focal point of the requisite intent is on a particular victim.  <u>See</u> <u>United States v. Shrader</u>, 675 F.3d 300, 311 (4th Cir. 2012) (interpreting section 2261A(2)).  As such, the statute "permits a variety of intentions to suffice: 'to kill, injure, harass, or intimidate'" with the element of the crime that the defendant "have intended harm to a

---

[9]  Section 2261A(2) has the same language such that cases interpreting the intent required under section 2261A(2) are instructive in interpreting the intent required under section 2261A(1).  <u>See</u> <u>United States v. Miers</u>, 686 F.App'x 838, 843 (11th Cir. 2017) (citing <u>United States v. Al-Zubaidy</u>, 283 F.3d 804, 809 (6th Cir. 2002)); <u>see</u> <u>also</u> <u>Powerex Corp. v. Reliant Energy Services, Inc.</u>, 551 U.S. 224, 232 (2007) ("identical words and phrases within the same statute should normally be given the same meaning").

20

particular victim." Id. (interpreting section 2261A(2)); accord United States v. Petrovic, 701 F.3d 849, 859 (8th Cir. 2012) (section 2261A(2)(A) conviction requires three elements, one being a "malicious intent by the defendant toward a victim in another jurisdiction"); see United States v. Rentz, 777 F.3d 1105, 1117 n.1 (10th Cir. 2015); see also United States v. Gonzalez, 905 F.3d 165, 185-86 (3d Cir. 2018).

The plain language requires the government to show, inter alia, that defendant "travel[ed] in interstate" commerce with the intent to harass or "intimidate, or place under surveillance with intent to harass or intimidate" each victim. 18 U.S.C. § 2261A(1); United States v. Walker, 665 F.3d 212, 224 (1st Cir. 2011). The government must therefore show that Baugh "traveled to" Massachusetts "with the intent to" harass or intimidate or place under surveillance with the intent to harass or intimidate each victim. See Walker, 665 F.3d at 224-226.

The record evidencing Baugh's intent to harass or intimidate each victim or place under surveillance with the intent to harass or intimidate each victim is substantial and, in fact, overwhelming. During the week of August 5, 2019, and prior to his interstate travel to Massachusetts, Baugh gathered Popp, Stockwell and another individual for a meeting during which they "planned to send a series of anonymous tweets and Twitter" messages to each victim. (Docket Entry # 3-1, ¶¶ 46-47). Baugh

21

approved Popp's use of a skull for the Twitter account profile to
further intimidate the victims.  (Docket Entry # 3-1, ¶ 47).  On
or about August 6, 2019, Baugh, Stockwell, Popp, Zea and others
met at eBay's headquarters "to plan the delivery" of the
"unwanted and disturbing items" to the victims' home in order to
distract them from publishing the newsletter.  (Docket Entry #
33, ¶ 16b) (Docket Entry # 3-1, ¶¶ 41-43).  "Beginning on August
7, 2019, . . . the Victims began to experience what Baugh had
directed," namely, the stream of harassing and disturbing
deliveries to the victims' home, including the mask of "a bloody
pig face."  (Docket Entry # 3-1, ¶¶ 66, 73) (Docket Entry # 33, ¶
16k).  On August 9, 2019, Stockwell ordered "live spiders and fly
larvae for delivery to the Victims' home."  (Docket Entry  # 33,
¶ 16h).  On the same day, "one or more members of the conspiracy
ordered a subscription of pornographic magazines in the name of"
the victims "be sent to the Victims' neighbors."  (Docket Entry #
33, ¶ 16i).  On August 12, 2019, Baugh instructed Popp,
Stockwell, Zea and others to "double" their efforts on the
deliveries for the next two days and then stop the deliveries on
August 15, 2019.  (Docket Entry # 33, ¶ 16p).

In early August 2019, Baugh recruited Harville and Zea to
travel to Massachusetts to physically surveil the victims.
(Docket Entry # 3-1, ¶ 51) (Docket Entry # 33, ¶ 16n).  On or
about August 14, 2019, Baugh held a meeting with Harville, Popp,

Zea, and Gilbert during which "Baugh displayed a map of Natick on the wall and discussed surveillance planning." (Docket Entry # 3-1, ¶ 62) (Docket Entry # 33, ¶ 16w). The group also discussed installing "a GPS tracking device on the Victims' car" for surveillance. (Docket Entry # 33, ¶ 16w). In fact, Baugh "practiced installing the device on a car in" the eBay parking lot similar to the car the victims drove. (Docket Entry # 3-1, ¶ 61).

On August 15, 2019, Baugh, Harville, and Zea flew to Boston and attempted unsuccessfully to install the GPS tracking device on the victims' car. (Docket Entry # 33, ¶¶ 16z, 16bb). They rented a vehicle the following day and proceeded to surveil the victims by repeatedly driving past their home and following one of the victims "as he drove around Natick." (Docket Entry # 33, ¶¶ 16ff, 16hh). On or about August 16, 2019, after Baugh returned the rental vehicle, he directed the resumption of the harassing deliveries to the victims' home. (Docket Entry # 33, ¶¶ 16ii, 16jj).

The forgoing provides a wealth of evidence indicative of Baugh's intent to harass or intimidate, or place under surveillance with intent to harass or intimidate each victim under section 2261A(1). The above pre-travel conduct by Baugh convincingly shows he traveled across state lines to Massachusetts with such intent. See, e.g., Walker, 665 F.3d at

23

226.

Placed against this backdrop, it is unlikely that Baugh's prior participation in "government-sponsored covert operations," including his FBI handler's instructions to "maintain a false 'cover story'" and Baugh's use of similar means to engage in "these covert government operations" (such as physical surveillance, trespass, and use of fake identities) (Docket Entry # 77, pp. 5-11), would enable him to significantly "alter the quantum of proof" on his intent to harass or intimidate the victims or to place them under surveillance with such intent. Goris, 876 F.3d at 45.  The requested documents were generated from 2014 to 2018 under different circumstances when Baugh was assisting *government*-sponsored covert operations.  In August 2019, Baugh was a private citizen addressing the concerns of eBay's senior leadership.  Baugh had no FBI handler in August 2019.  A federal government official did not direct him to harass or intimidate the victims or place them under surveillance such that a public authority defense (which Baugh does not raise) might apply.  See Bulger, 928 F. Supp. 2d at 323 n.10 (setting out elements of public authority defense); see also United States v. Daniels, Docket No. 2:18-cr-00063-GZS, 2019 WL 6999112, at *3 (D. Me. Dec. 20, 2019).  Moreover, "Wymer's direction to Baugh" to do whatever it takes (Docket Entry # 77, p. 6) does not "tip[] the balance" in Baugh's favor regarding his intent.  Id. at 46.

24

Even accepting Baugh's additional assertion that eBay's General Counsel advised him "that ordinary legal tools were unlikely to be effective in addressing issues posed by the Newsletter" (Docket Entry # 77, p. 6), Baugh fails in his "burden of showing materiality."[10]  Id. at 44.

B.  Section 1512(b)(3)

The same result pertains to the documents as a means to negate his intent vis-à-vis section 1512(b)(3).  As discussed below, Baugh fails to show materiality.

Section 1512(b)(3) imposes criminal liability on an individual who "*knowingly* uses intimidation, threatens, *or* corruptly persuades another person, or attempts to do so, *or engages in misleading conduct* toward another person, with intent to . . . (3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a federal offense."[11]  18 U.S.C. § 1512(b) (emphasis added).  "[T]he *mens*

_____

[10]  Baugh's argument that he "previously engaged in surveillance and other arguably unlawful activities believing them to be justified, supports the inference that he did so here" (Docket Entry # 77, p. 12) (citing United States v. Lee, 790 F.3d 12, 16-17 (1st Cir. 2015)), is not convincing.

[11]  The Indictment charges the third theory that Baugh "did knowingly engage in misleading conduct toward" the victims "with intent to hinder, delay, and prevent the communication to a law enforcement official of the United States."  (Docket Entry # 33, ¶ 28); see United States v. LeMoure, 474 F.3d 37, 41-42 (1st Cir. 2007).

*rea* required by" section 1512(b)(3) entails "a showing of 'consciousness of wrongdoing.'" United States v. Byrne, 435 F.3d 16, 24 (1st Cir. 2006); see LeMoure, 474 F.3d at 42 (explaining that "[i]n our case the term 'knowingly' was included in the instructions but not with the gloss ("consciousness of wrongdoing") later supplied by *Arthur Andersen*").[12]  "[M]isleading conduct" is defined "as 'knowingly making a false statement' or 'intentionally omitting information from a statement and thereby causing a portion of such statement to be misleading, or intentionally concealing a material fact, and thereby creating a false impression by such statement.'" United States v. DeCologero, 530 F.3d 36, 65 (1st Cir. 2008) (quoting subsections 1515(a)(3)(A)-(B)).

As previously indicated, the Indictment charges Baugh with witness intimidation on the basis that he "knowingly engage[d] in misleading conduct toward" the NPD Detective and an eBay internal investigator "with intent to hinder, delay, and prevent communication to a law enforcement officer of the United States of information" relating to commission of a federal offense, namely, the charged conspiracy.  The relevant facts include that on or about August 21, 2019, Baugh made "false statements to" the NPD Detective who came to the team's hotel to investigate Zea and

---

[12]  Arthur Andersen, LLP v. United States, 544 U.S. 696 (2005).

Harville.  (Docket Entry # 33, ¶ 16vv).  That morning, Baugh sent a:

> text message to Popp, Gilbert, and Cooke: "Natick detective
> is in lobby looking for Zea.  I've taken her away from hotel
> [and am] headed to airport. . . . Detective called her cell.
> I answered just now as her husband and played dumb."

(Docket Entry # 33, ¶ 16ww).  On August 26, 2019, Baugh deleted and/or attempted to delete data from his mobile telephone evidencing the conspiracy, and he "directed Popp, Gilbert, Zea, Stockwell, and Harville to delete their WhatsApp communications and phone data."  (Docket Entry # 3-1, ¶ 185) (Docket Entry # 33, ¶ 16lll).  Baugh's conduct delineates misleading conduct in the sense of a consciousness of wrongdoing.  See LeMoure, 474 F.3d at 42 (upholding jury instruction that omitted "'consciousness of wrongdoing'" language and noting that neither defendant "could conceivably have thought that urging witnesses to lie in official proceedings was lawful").  Baugh's intent to delay or hinder the investigation is unmistakable inasmuch as he removed Zea from the hotel, impersonated her husband, and "'played dumb.'"  (Docket Entry # 33, ¶ 16ww).  Further, on August 26, 2019, he directed the group to delete their telephone data.  (Docket Entry # 33, ¶ 16lll) (Docket Entry # 3-1, ¶ 185).

On or about August 23, 2019, Baugh falsely told eBay investigators that "his team was not responsible for" the "harassing messages or deliveries."  (Docket Entry # 33, ¶ 16jjj).  On or about August 28, 2019, he made a similar false

statement to eBay investigators.   (Docket Entry # 33, ¶ 16nnn).
These eBay investigators "were responding to NPD requests for
eBay's assistance," and by this time the NPD had contacted and
briefed the FBI, which thereafter opened an investigation.
(Docket Entry # 33, ¶ 15p) (Docket Entry # 3-1, ¶ 185).  Here
again, Baugh's intent is readily evident.

Given these circumstances, it is difficult to conclude that
the requested documents identifying Baugh's work assisting covert
government operations via an FBI handler from 2014 to 2018 would
significantly alter the quantum of proof regarding his "state of
mind" to "engage in misleading conduct" (Docket Entry # 77, p.
7), with the intent to "hinder, delay, or prevent the
communication" to a law enforcement officer in August 2019.  18
U.S.C. § 1512(b)(3).  As previously explained, the public
authority defense does not apply, Baugh had no FBI handler in
August 2019, and he was not engaged in covert government-
sponsored service of national security objectives.  Rather, he
was a private citizen working for eBay as opposed to assisting
the federal government with undercover operations via an FBI
handler.  In the context of the significant evidence of his
intent vis-à-vis a section 1512(b)(3) violation, his use of
methods similar to those he purportedly used in prior government
work (physical surveillance, trespass, and fake identities) to
serve national security objectives (Docket Entry # 77, p. 5) does

not tip the balance on the issue of intent in his favor.  In
short, he fails to satisfy his burden to show the requested
documents are material to preparing his defense.

Baugh further argues that he needs access to the documents
"now" to "meaningfully weigh whether to *consider* a plea."
(Docket Entry # 77, p. 7).  Local Rule 116.2(b)(4), however, only
requires the government to provide Baugh "a written summary of"
information which "tends to diminish the degree of his
culpability" before any plea.  LR. 116.2(b)(4).  The request to
access all the documents is overbroad and, in any event,
premature.

C.  Necessity Defense

Baugh also seeks the documents to establish the necessity or
perceived necessity of his conduct such that he chose the lesser
of two evils.  (Docket Entry # 77, pp. 11-12).  The government
disagrees and succinctly explains why the documents lack
relevance to each of the four elements of a necessity defense.
(Docket Entry # 82, pp. 7-9).

The "affirmative defense of necessity requires proof that
the defendant '(1) was faced with a choice of evils and chose the
lesser evil, (2) acted to prevent imminent harm, (3) reasonably
anticipated a direct causal relationship between his acts and the
harm to be averted, and (4) had no legal alternative but to
violate the law.'"  United States v. Lebreault-Feliz, 807 F.3d 1,

29

4 (1st Cir. 2015) (quoting United States v. Maxwell, 254 F.3d 21, 27 (1st Cir. 2001)).  Baugh, who bears the burden of showing materiality, see Goris, 876 F.3d at 44, fails to discharge that burden.

Examining the materiality of the discovery in the context of these elements seriatim,[11] the Ninth Circuit's decision in Contento-Pachon, cited by the First Circuit in Lebreault-Feliz, 807 F.3d at 5, to show a lack of imminent harm, also addresses the first element.  United States v. Contento-Pachon, 723 F.2d 691, 695 (9th Cir. 1984).  The court explains that the justification to serve the greater good "is usually invoked when the defendant acted in the interest of the general welfare."  Id. The cited examples illustrate this point:

> For example, defendants have asserted the defense as a justification for (1) bringing laetrile into the United States for the treatment of cancer patients, *Richardson*, 588 F.2d at 1239; (2) unlawfully entering a naval base to protest the Trident missile system, *United States v. May*, 622 F.2d 1000, 1008-09 (9th Cir.), *cert. denied*, 449 U.S. 984, 101 S.Ct. 402, 66 L.Ed.2d 247 (1980); (3) burning Selective Service System records to protest United States military action, *United States v. Simpson*, 460 F.2d 515, 517 (9th Cir. 1972).

Contento-Pachon, 723 F.2d at 695.

Here, Baugh articulates a choice to engage in the lesser

---

[11] The findings regarding the elements of a necessity defense, as well as other findings in this opinion, are made solely to resolve the discovery motions.  They are not intended to govern or apply to the substantive merits of the defense under the law of the case or otherwise.

evil of harassing the victims with unwanted deliveries, engaging
in the surveillance, and sending the hostile messages via
Twitter.  (Docket Entry # 77, pp. 3, 11).  He identifies the
greater evil he chose to avoid as the incitement to physical
violence posed to eBay personnel by the newsletter's false and
inflammatory content, which preoccupied eBay's executives.
(Docket Entry # 77, pp. 3, 11).  As support, he reasons that the
"open eBay 'campus'" in San Jose, California consists of
"multiple buildings . . . viewed as particularly vulnerable" and
that eBay's annual open "conference was held at the Mandalay Bay,
the same site where one of the nation's worst mass shooting
incidents had taken place in 2017."  (Docket Entry # 77, p. 3).
Baugh does not indicate that any such incident took place at the
2019 conference.  Documents regarding his prior government-
sponsored conduct serving the greater good of national security
do not translate to his later work serving eBay's interests and
protecting eBay personnel from the speculative harm of physical
violence incited by the newsletter's content.  In August 2019,
Baugh was not choosing the lesser evil of serving national
security objectives.  He had no FBI handler and was no longer
assisting the federal government in covert operations.  The
"evil" he sought to avoid was speculative and, alternatively,
falls outside the interest of the general welfare the necessity
defense is designed to serve.  See Contento-Pachon, 723 F.2d at

31

695 (listing examples).

As to the second element, an "'imminent harm' connotes a real emergency, a crisis involving immediate danger to oneself or to a third party." United States v. Maxwell, 254 F.3d 21, 27 (1st Cir. 2001).  Adhering to this principle, the harm posed "of incitements to violence against eBay personnel" (Docket Entry # 77, pp. 3, 11) by the newsletter's content was far from imminent. See also Lebreault-Feliz, 807 F.3d at 4-5 (providing example of lack of imminence 18 hours after threatened harm).  Rather, as noted, the harm was remote and speculative.  See generally Goris, 876 F.3d at 45 (district court does not abuse its discretion by denying discovery "grounded in a speculative theory").  The 2014 to 2018 documents would not enable Baugh to significantly alter the quantum of proof in his favor that he acted to prevent an "*imminent* harm." Lebreault-Feliz, 807 F.3d at 4.

Relative to the third element's causal link, Baugh does not indicate that any incident took place at eBay's 2019 annual conference.  Moreover, there is no indication that the newsletter incited physical violence to eBay executives or employees in the past, i.e., prior to August 2019.  Overall, the harm "in the form of incitements to violence against eBay personnel" purportedly posed by the newsletter and the victims (Docket Entry # 77, p. 11) is remote and speculative.  Baugh's conduct of harassing and intimidating the victims to distract them from publishing the

32

newsletter lacks a "direct causal relationship," <u>Lebreault-Feliz</u>, 807 F.3d at 4, to the speculative harm of averting the incitement of physical violence against eBay executives and personnel.  More precisely, it was not objectively reasonable to anticipate a causal relationship between Baugh's conduct and the avoidance of physical harm to eBay employees by individuals incited to commit such harm by the newsletter's content.  <u>See</u> <u>United States v. Gottesfeld</u>, 319 F. Supp. 3d 548, 554 (D. Mass. 2018).  The requested discovery does not tip the balance on this issue in Baugh's favor.

Turning to the fourth element, "[t]he fact that a defendant is 'unlikely to effect the changes he desires through legal alternatives does not mean, ipso facto, that those alternatives are nonexistent.'" <u>Id.</u> at 555 (quoting <u>Maxwell</u>, 254 F.3d at 29). The government points out, and this court agrees, that "Baugh could have, for example, called his FBI handler, or any sworn law enforcement officer, and reported that eBay's executives [or personnel] were in harm's way."  (Docket Entry # 82, p. 8).

In sum, Baugh fails in his burden to show that the requested documents are material to preparing a necessity defense. Accordingly, the documents are not subject to inspection under Rule 16(a)(1)(E)(i).

II.  <u>Exculpatory and Material under Brady</u>

Baugh also argues that the documents are subject to

33

immediate production under <u>Brady</u>.  (Docket Entry # 77, pp. 1, 8).
As previously noted, <u>Brady</u> requires the prosecutor "'to disclose
evidence in its possession that is favorable to the accused and
material to guilt or punishment.'"  <u>Simon</u>, 12 F.4th at 51.
Materiality entails considering "the favorable, undisclosed
evidence along with the evidence presented at trial, and
determin[ing] whether it 'could reasonably be taken to put the
whole case in such a different light as to undermine confidence
in the verdict.'"  <u>DeCologero</u>, 802 F.3d at 161 (citation
omitted).

     "The materiality of undisclosed evidence" turns on factors
such as "its evidentiary strength," <u>Paladin</u>, 748 F.3d at 444,
which in the case at bar is decidedly marginal with respect to
the mens rea or required intent under both 2261A(1) and section
1512(b) for reasons stated above.  Based on the entire record,
the strength of the evidence against Baugh, which is also weighed
in the assessment, <u>see</u> <u>DeCologero</u>, 802 F.3d at 165, is
substantial, as indicated previously.  Moreover, as noted, "[t]he
materiality standard for Rule 16 'essentially tracks the <u>Brady</u>
materiality rule,'" and materiality is lacking under Rule
16(a)(1)(E).  <u>United States v. Cadden</u>, Criminal No. 14-10363-RGS,
2016 WL 10879574, at *2 (D. Mass. Jan. 8, 2016) (quoting <u>Bulger</u>,
928 F. Supp. 2d at 324).  Lastly, the government is primarily
responsible for assessing the evidence it must disclose under

                              34

Brady, see Prochilo, 629 F.3d at 268, and it represents the documents Baugh requests are not exculpatory (Docket Entry # 82, p. 1).  Accordingly, Brady does not warrant immediate production or inspection of the documents at this time.

III.   Belonging to Baugh

Baugh argues that the requested documents are subject to immediate disclosure as items "obtained from or belong[ing] to" him within the meaning of Rule 16(a)(1)(E)(iii).  (Docket Entry # 77, pp. 9-10).  He submits that, "to the extent the requests include agreements, warnings, and other documents that [Baugh] actually *signed*, they constitute materials 'obtained from' him" under Rule 16(a)(1)(E)(iii).  (Docket Entry # 77, pp. 9-10) (emphasis added).  Beyond this statement and underlining Rule 16(a)(1)(E)(iii), Baugh does not address the argument.  Baugh therefore limits the argument to documents that he signed.

The language of Rule 16(a)(1)(E)(iii) is straight forward and has not garnered extensive case law interpreting its parameters.  "Upon a defendant's request, the government must permit the defendant to inspect" and copy items, including documents, "within the government's possession, custody, or control" if "the item was obtained from or belongs to the defendant."  Fed. R. Crim. P. 16(a)(1)(E).  Accordingly, to the extent not already produced, the government is ordered to allow Baugh to inspect and/or copy the requested documents "obtained

35

from or belonging to [Baugh]" within its "possession, custody, or control," Fed. R. Cim. P. 16(a)(1)(E)(iii), which Baugh signed.

<u>CONCLUSION</u>

In accordance with the foregoing discussion, Harville's motion to compel (Docket Entry # 73) is **DENIED**.  Baugh's motion to compel (Docket Entry # 77) is **DENIED** except that the government is ordered to allow Baugh to inspect and/or copy the requested documents obtained from or belonging to him within the government's possession, custody, or control which the government has not produced to date and which Baugh signed.


    /s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge