IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

JIM BAUGH, *et al.*

No. 20-cr-10263-PBS

**DEFENDANT JIM BAUGH'S OBJECTION TO MAGISTRATE JUDGE'S ORDER ON HIS MOTION TO COMPEL DISCOVERY**

Pursuant to Fed. R. Crim. P. 59(a), Defendant Jim Baugh respectfully objects to the Magistrate Judge's (Bowler, M.J.) Order (the "MJ Order") [D.E. 122] denying, in substantial part, his Motion to Compel Discovery [D.E. 77] concerning his work, while in the private sector, assisting U.S. government intelligence and/or law enforcement agencies with various undercover operations. Mr. Baugh asks the Court to set aside the Magistrate Judge's Order insofar as it denied his Motion to Compel Discovery, incorporated by reference here, and to direct the government to produce the requested discovery.[1]

**Background**[2]

The Charges

The prosecution alleges that Defendant Jim Baugh along with other eBay employees and contractors, harassed, intimidated, and surveilled a couple ("Victims 1 and 2"), who published an

---

[1] Mr. Baugh understands that co-defendant David Harville, through counsel, joins in this motion. Mr. Baugh also joins in Harville's Objection to the Magistrate Judge's denial of Harville's Motion to Compel Discovery [D.E. 147].

[2] This background narrative is presented for the purpose of this Motion only. It is substantially based on the charging documents and materials produced by the government in discovery. Mr. Baugh does not concede that any particular facts or allegations, many of which are outside his personal knowledge, are true or accurate.

1

online newsletter ("Newsletter") about eBay and other ecommerce companies. The alleged objectives of the charged conspiracy, according to the Indictment, were "to distract the Victims from publishing the Newsletter, to alter the Newsletter's coverage of eBay, and to gather information that the defendants and their co-conspirators could use to discredit the Victims and the Newsletter." D.E. 33 (Indictment) ¶ 12.

Specifically, the fifteen-count Indictment charges that, in violation of 18 U.S.C. § 371, Mr. Baugh conspired (i) to travel in interstate commerce to stalk the Victims and (ii) to use the facilities of interstates commerce to cyber-stalk them (Count I). It also charges the substantive offense of stalking in violation of 18 U.S.C. § 2261(A)(1)(B) (Counts II and III) and cyber-stalking in violation of 18 U.S.C. § 2261(A)(2)(B) (Counts VI and VII). Further, the Indictment charges that, in violation of 18 U.S.C. § 1512(b)(3), Mr. Baugh committed witness tampering by making false statements to a Natick Police Department ("NPD") detective (Count X) and eBay investigators (Count XI). Finally, it charges that, in violation of 18 U.S.C. § 1519, Mr. Baugh obstructed a federal investigation into the charged conspiracy by directing a colleague to "falsify" a document (Count XIII) and by destroying data on his cellphone (Count XIV).[3]

At the time of the alleged conspiracy, in August and September 2019, Mr. Baugh served as eBay's Director of Safety and Security and, in that capacity, oversaw Global Security and Resiliency ("GSR"), a division responsible for the physical security of eBay's employees and facilities. D.E. 33 ¶ 1. He also worked with other employees and contractors, including co-defendant David Harville (eBay's Director of Global Resiliency) and separately charged defendants Brian Gilbert, Philip Cooke, Stephanie Popp, Stephanie Stockwell, and Veronica Zea.

---

[3] The Superseding Indictment includes parallel counts against Harville for all but two of the substantive charges (Counts IV, V, VIII, IX, XII, and XV).

Gilbert and Cooke were retired police captains working in GSR who were responsible for various security operations. *Id*. ¶¶ 6-7. Popp, Stockwell, and Zea operated eBay's Global Intelligence Center ("GIC"), an intelligence and analytics group within GSR that supported the company's overall security operations. *Id*. ¶¶ 3-5.

eBay's senior corporate leadership, including CEO Devin Wenig and SVP Steve Wymer, believed the Victims and their Newsletter posed an existential threat to the company as well as a personal safety threat to executives and their families because of the Newsletter's contents, the comments that its readers posted online, and the hostility toward the company and its executives the Newsletter and comments provoked. *Id*. ¶ 10.

Concerns that false, misleading, personal, and inflammatory content in the Newsletter could incite actual physical violence preoccupied eBay's executives—and, as a result, Mr. Baugh and his eBay security team, too. In the wake of the April 2018 mass shooting at YouTube headquarters, the large, open eBay "campus" comprised of multiple buildings in San Jose was viewed as particularly vulnerable. And the eBay "Open" conference, which draws a large, often-fractious collection of eBay sellers to Las Vegas every year, was also viewed as high-risk. Indeed, the 2019 conference was held at the Mandalay Bay, the same site where one of the nation's worst mass shooting incidents had taken place in 2017.

In an effort to distract the Victims from publishing the Newsletter, to alter its coverage, and to gather information that might discredit the Victims, Mr. Baugh allegedly conspired with eBay colleagues to "harass and intimidate the Victims" by sending "repeated and hostile Twitter messages" to the Victims and "deliveries of unwanted – and in some instances disturbing – items" to their home. *Id*. ¶¶ 11-12. In addition, Mr. Baugh allegedly conspired with his co-defendants to

3

place the Victims "under surveillance" by travelling from California to Massachusetts to "conduct physical surveillance." *Id.*

On or about August 15, 2019, Mr. Baugh travelled from California to Massachusetts with Harville and Zea. *Id.* ¶ 16z. Later that same day, all three drove to Natick in a rental car. The plan was to install a GPS tracking device on the Victims' car, but the car was locked in their garage. *Id.* ¶ 16bb. Then, on August 16, 2019, Mr. Baugh, Harville, and Zea returned to Natick, repeatedly drove past the Victims' home, and followed Victim 2 as he drove around town. *Id.* ¶¶ 16ff, 16hh. On or about August 18, 2019, Mr. Baugh, Popp (who had travelled to Boston on August 17, 2019, and replaced Harville on the "surveillance team"), and Zea drove to Natick and, again, followed Victim 2 in his car. Mr. Baugh and the others were spotted again, and Victim 2 was able "to take a photograph of the surveillance team's license plate." *Id.* ¶ 16qq. Shortly thereafter, on August 20, 2019, Mr. Baugh texted Popp, Cooke, and Brian Gilbert to report that two different rental cars had been "burned." *Id.* ¶ 16rr.

On or about August 21, 2019, an NPD detective came to the Boston hotel where Mr. Baugh, Popp, and Zea were staying, "to investigate Zea and Harville's connection" to the alleged "cyberstalking campaign." *Id.* ¶ 16vv. Mr. Baugh also learned that the NPD detective was looking into the purchase of prepaid debit cards in Santa Clara, California, to order pizzas for delivery to the Victims. *Id.* ¶ 16ddd. Mr. Baugh and Popp then "directed" Stockwell to create "a list of eBay 'Persons of Interest' in the San Francisco Bay Area" that Gilbert could use in talking with the NPD to "deflect attention from Zea." *Id.* ¶ 16eee.

The charged conspiracy failed to accomplish its alleged objectives. Rather than distract the Victims or change the content of their Newsletter, it prompted a local police investigation in Massachusetts. After an NPD detective followed several clues back to eBay's headquarters in

4

California, Mr. Baugh and other eBay employees and contractors allegedly lied to "eBay investigators," destroyed records on "eBay-issued cellphones," and removed computers from eBay's offices. *Id.* ¶¶ 13, 16jjj, 16lll, 16mmm, 16ooo.

<u>Mr. Baugh's Prior Covert Operations as a Security Contractor</u>

As the prosecution knows, earlier in his career, Mr. Baugh was a U.S. government agent involved in clandestine activities. Later, while working as a private sector security contractor, Mr. Baugh was enlisted from time to time by U.S. government agencies, via a "handler" from the FBI, to conduct and assist those agencies with certain covert operations. These activities involved conducting physical and electronic surveillance, engaging in physical trespass, using false pretenses and fake identities, and gaining unauthorized access to private corporate computer systems, documentation, and resources, all in support of some greater good.

For example, in one covert government operation, Mr. Baugh used private corporate resources to facilitate installation of surveillance devices at a hotel to monitor a visiting head of state and accompanying delegation from a hostile foreign power; he then secretly funneled the government-provided cash back into the corporation's finance system to reimburse the costs. In another operation, Mr. Baugh surreptitiously obtained falsified corporate credentials, without the company's consent, to permit a government agent to attend meetings between corporate employees and a visiting foreign delegation. In yet another operation, Mr. Baugh used false pretenses to help arrange meetings between a suspected foreign agent (target) and an undercover federal agent who pretended to be a business consultant retained by Mr. Baugh, in order help the undercover agent form a close relationship with, and obtain compromising information about, the target.

5

Mr. Baugh was consistently instructed by his FBI handler to stick with his false "cover story" if confronted or questioned by local law enforcement or corporate representatives about his actions in connection with these covert government operations.

eBay executives were well aware of Mr. Baugh's background, and they expected he would use strategies and tactics that he learned in service of the U.S. government to address what they characterized as the existential threat posed by the Newsletter. eBay's General Counsel, Marie Huber, had advised executives and Mr. Baugh that ordinary legal tools were unlikely to be effective in addressing issues posed by the Newsletter and a Twitter account believed to be associated with the Victims. Executives therefore turned to Mr. Baugh to solve the problem by less conventional means. SVP Wymer's direction to Mr. Baugh, cc'ed to GC Huber, could not have been more clear:

> I genuinely believe these people are acting out of malice and ANYTHING we can do to solve it should be explored. Somewhere, at some point, someone chose to let this slide. It has grown to a point that is absolutely unacceptable. It's the "blind eye toward graffiti that turns into mayhem" syndrome and I'm sick about it. Whatever. It. Takes.

D.E. 3-2 (Cmplt. Aff.) ¶ 49.

The Requested Discovery.

By letter dated June 29, 2021, Mr. Baugh requested, *inter alia*, the following items in discovery:

- Documents sufficient to identify activities performed by Mr. Baugh authorized by or in support of U.S. government intelligence or law enforcement agencies or operations from 2014 to 2018.

- Documents concerning or comprising any agreements between Mr. Baugh and U.S. government agencies relating to the activities referenced in the previous request.

- Documents concerning or comprising written instructions or warnings provided to Mr. Baugh relating to the activities referenced in the previous two requests.

D.E. 62 ¶¶ 6-8.

The prosecution, "[w]ithout confirming or denying the existence of any of the described activities, agreements, instructions, or warnings for the period between 2014 and 2018, … decline[d] to produce such records." D.E. 67 at 3-4. It asserted the information is "irrelevant because it predates the existence of the conspiracy alleged in the Indictment." *Id*. at 4. Moreover, implicitly admitting that the information, at minimum, would be relevant to the "degree of the defendant's culpability" under Local Rule 116.2(b)(4), the prosecution argued that the information is not discoverable *yet*: "To the extent you seek information in the government's possession that, assuming it existed, would tend to diminish the degree of the defendants' culpability, Local Rule 116.2(b)(4) requires only that a written summary of any information be provided before the earlier of a plea or the defendant's submission of objections to a Presentence Investigation Report." *Id*.[4]

The Motion to Compel and the Magistrate Judge's Order

Mr. Baugh filed a Motion to Compel on August 16, 2021 [D.E. 77]. He argued that the requested items were exculpatory and material to his state of mind: did he "*intend*" to "*harass*" the alleged victims, using various means including physical surveillance, as the federal stalking statute requires? Did he "*corruptly*" engage in misleading conduct as the witness tampering statue requires? Or, instead, did he act in good faith, believing his actions to be appropriate and necessary to avoid greater harms? Even if such a belief may appear erroneous or unreasonable today, with the benefit of hindsight, Mr. Baugh argued that he is entitled to discovery of evidence bearing on his state of mind. Evidence concerning Mr. Baugh's prior participation in U.S. government-sponsored covert operations that employed physical surveillance and other arguably unlawful means in service of a greater good (that is, to avoid greater perceived or potential harm), and any

---

[4] Notably, the government did not invoke the declination provision of Local Rule 116.6.

7

instructions or warnings that his official handlers may have provided (*e.g.*, to maintain a false "cover story" in response to inquires from local law enforcement or corporate representatives) would be exculpatory and material as evidence that tends to show good faith, negate specific intent and/or support an affirmative defense of actual or perceived necessity. Mr. Baugh also argued that, to the extent the government had conceded the information was discoverable under Local Rule 116.2(b)(4) (information diminishing the defendant's culpability), it should be produced immediately, and that any documents Mr. Baugh actually signed (*e.g.*, agreements with government agencies or handlers) should be produced under Local Rule 116.2(a)(iii) (items "obtained from" the defendant).

By Order dated December 1, 2021, the Magistrate Judge substantially denied Mr. Baugh's Motion to Compel [D.E. 122]. Relying on language from *United States v. Goris*, 876 F.3d 40 (1st Cir. 2017), the MJ Order concluded that requested information was not "material to the defense" because it would not "enable [Mr. Baugh] to significantly 'alter the quantum of proof' on his intent to harass or intimidate the victims," D.E. 122 at 24, or "proof regarding is 'state of mind' to 'engage in misleading conduct' with the intent to 'hinder, delay or prevent the communication' to a law enforcement officer." *Id*. at 28. The MJ Order also concluded that the requested discovery was not relevant to the elements of a necessity defense. *Id* at 29-33. Finally, the MJ Order concluded that the requested discovery was not exculpatory under *Brady* because, in light of the "strength of the evidence against" Mr. Baugh, it would not "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id*. at 34 (quoting *DeCologero v. United States*, 822 F.3d 155, 161 (1st Cir. 2015)).

The MJ Order did require the prosecution to permit Mr. Baugh to inspect and/or copy responsive documents that Mr. Baugh had actually signed. D.E. 122 at 35-36. The MJ Order also

8

recognized that the government is obliged to provide Mr. Baugh with "a written summary" of requested information under L.R. 116.2(b)(4).

**Argument**

Fed. R. of Crim. P. 59(a) permits parties to "object[]" to a Magistrate Judge's determination of non-dispositive matters. Under the Rule, the District Court "must… modify or set aside any part of the order that is contrary to law or clearly erroneous." *Id*. Here, those portions of the MJ Order denying Mr. Baugh's Motion to Compel were "contrary to law." The MJ Order misstated the standards governing production of information that is "exculpatory" and/or "material to the defense," and it misapplied those standards to the discovery requests and charges at issue in this case. Accordingly, the Magistrate Judge's decision denying Mr. Baugh's motion should be set aside, and the Court should order the government to produce the requested discovery.

**I.     The MJ Order Misstated the Applicable Legal Standards**

    **A.     Exculpatory Information**

The prosecution has a constitutional "duty to disclose evidence in its possession that is favorable to the accused and material to guilt or punishment." *United States v. Prochilo*, 629 F.3d 264, 266 (1st Cir. 2011) (citing *Brady v. Maryland,* 373 U.S. 83 (1963)). The Local Rules further provide:

> [e]xculpatory information includes, *but may not be limited to*, all information that is material and favorable to the accused because it tends to:
> (1) Cast doubt on defendant's guilt as to any essential element in any count of the indictment or information;
> (2) Cast doubt on the admissibility of evidence that the government anticipates offering in its case-in-chief, that might be subject to a motion to suppress or exclude . . . .;
> (3) Cast doubt on the credibility or accuracy of any evidence that the government anticipates offering in its case-in-chief; or
> (4) Diminish the degree of the defendant's culpability or the defendant's Offense Level under the United States Sentencing Guidelines.

Local Rule 116.2(a) (emphasis added).

Here, the Magistrate Judge erred in adjudicating Mr. Baugh's motion through the lens of *DeCologero*, which involved a *post-conviction* evaluation of whether certain exculpatory evidence would have affected the verdict and is inapplicable to a *pre-trial* motion to compel. *See United States v. Pesaturo*, 519 F. Supp. 2d 177, 189 n.7 (D. Mass. 2007) ("Trial courts considering materiality under *Brady* have identified a difficulty applying this formulation, crafted in the post-trial appellate context, to the pretrial discovery setting."). There is a "significant practical difference between the pretrial decision of the prosecutor and the post-trial decision of the judge," and "the significance of an item of evidence can seldom be predicted accurately until the entire record is complete." *United States v. Agurs*, 427 U.S. 97, 108 (1976).

A "trial prosecutor's speculative prediction about the likely materiality of favorable evidence . . . should not limit the disclosure of such evidence, because it is just too difficult to analyze before trial whether particular evidence ultimately will prove to be 'material' after trial." *United States v. Olsen*, 704 F.3d 1172, 1183 n.3 (9th Cir. 2013). As another court elaborated:

> The prosecutor cannot be permitted to look at the case pretrial through the end of the telescope an appellate court would use post-trial. Thus, the government must always produce any potentially exculpatory or otherwise favorable evidence without regard to how the withholding of such evidence might be viewed-with the benefit of hindsight-as affecting the outcome of the trial. The question before trial is not whether the government thinks that disclosure of the information or evidence it is considering withholding might change the outcome of the trial going forward, but whether the evidence is favorable and therefore must be disclosed. Because the definition of "materiality" discussed in *Strickler* and other appellate cases is a standard articulated in the post-conviction context for appellate review, it is not the appropriate one for prosecutors to apply during the pretrial discovery phase.

*United States v. Safavian*, 233 F.R.D. 12, 16 (D.D.C. 2005); *see also Pesaturo*, 519 F. Supp. 2d at 189, n.7 (citing *Safavian*).

Therefore, when deciding a motion to compel production of potentially exculpatory

10

evidence, the "*only* question before (and even during) trial is whether the evidence at issue may be 'favorable to the accused'; *if so, it must be disclosed without regard to whether the failure to disclose it likely would affect the outcome of the upcoming trial.*" *Safavian*, 233 F.R.D. at 16 (emphasis added).

### B. Information Material to the Defense

The discovery rules also require the prosecution to produce information "material to preparing the defense," Fed. R. Crim. P. 16(a)(1)(E)(iii), whether or not such information is exculpatory. *See, e.g., United States v. Marshall*, 132 F.3d 63, 68 (D.C. Cir. 1998) (holding *in*culpatory evidence also covered by Rule 16 disclosure requirements). Materiality is a low threshold. The First Circuit has observed that

> Rule 16's mandatory discovery provisions were designed to contribute to the fair and efficient administration of justice by providing the defendant with sufficient information upon which to base an informed plea and litigation strategy; by facilitating the raising of objections to admissibility prior to trial; by minimizing the undesirable effect of surprise at trial; and by contributing to the accuracy of the fact-finding process.

*United States v. Lanoue*, 71 F.3d 966, 976 (1st Cir. 1995), *abrogated on other grounds by United States v. Watts*, 519 U.S. 148 (1997). Information is material even if it does not ultimately lead to a viable defense. *See United States v. Hernandez-Meza*, 720 F.3d 760, 768 (9th Cir. 2013) ("Information is material even if it simply causes a defendant to completely abandon a planned defense and take an entirely different path.").

Here, the Magistrate Judge set too high a bar for "materiality" in connection with pre-trial discovery requests. The MJ Order cites *United States v. Goris*, 876 F.3d 40 (1st Cir. 2017), but takes the key phrase from that case out of context. The MJ Order repeatedly concludes that the materials requested by Mr. Baugh will "not significantly alter the quantum of proof" in the defendants' favor. But in *Goris*, the First Circuit made clear that a defendant need only provide

11


"some indication" of materiality, not definitive proof. *Id.* at 45. Further, the First Circuit held that the required showing could be made "in a myriad of ways, such as 'uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal.'" *Id.* (quoting *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993)). And the First Circuit's description of what would *not* suffice is also telling: "it is not enough that what is sought 'bears some abstract logical relationship to the issues in the case.'" *Id.* at 44-45 (quoting *United States v. Ross*, 511 F.2d 757, 762 (5th Cir. 1975)). In other words, so long as requested material bears more than "some abstract logical relationship," discovery is appropriate under Rule 16. That is the case, here.

*Goris* is also inapposite because it arose on appeal from a final judgment. The First Circuit simply held that the district court had not abused its discretion in denying the defendant's request for pre-trial discovery. The Court of Appeals was not willing to undue the case, after a jury trial, based on an adverse discovery ruling. But here, the question is whether to permit discovery in the first place, and this Court makes that decision *de novo*.

Finally, in adopting its materiality standard, *Goris* relied on *United States v. Ross*, 511 F.2d 757, 763 (5th Cir. 1975), which suggested that other factors, including "the extensiveness of the material which the government did produce" and "the availability of the disputed material from other sources," should factor into the decision about pre-trial discovery. *Id*. at 763. Here, the prosecution has not produced any documents about Mr. Baugh's prior service, and none of that information is currently available to him from any other source.

**II.     The MJ Order Erroneously Denied the Requested Discovery.**

The requested information is exculpatory and material to Mr. Baugh's *mens rea*, which is directly at issue in both the stalking and witness tampering charges.

In order to obtain a federal "stalking" conviction under 18 U.S.C. § 2261A, the government must prove, among other things, that Mr. Baugh travelled in interstate commerce "[with] the intent to kill, or injure, or harass, or intimidate, or place under surveillance with the intent to kill, injure, harass or intimidate, the person named in the Indictment." *United States v. Walker*, 665 F.3d 212, 224 (1st Cir. 2011); *see* 18 U.S.C. § 2261A(1); *see also* Pattern Crim. Jury Inst. for the District Courts of the First Circuit 4.18.2261A.[5] In other words, as the MJ Order acknowledged, a conviction requires "*malicious* intent by the defendant toward a victim in another jurisdiction." D.E. 122 at 21 (quoting *United States v. Petrovic*, 701 F.3d 849, 859 (8th Cir. 2012)) (emphasis added).

In order to obtain a witness tampering conviction under 18 U.S.C. § 1512(b)(3), the government must prove that Mr. Baugh *knowingly* and *corruptly* persuaded or attempted to persuade, or engaged in misleading conduct toward an identified person with the intent to hinder, delay, or prevent communication of information to federal law enforcement. Construing that statute, the Supreme Court has emphasized that "[o]nly persons conscious of wrongdoing can be said to 'knowingly . . . corruptly persuade.'" *Arthur Andersen LLP v. United States*, 544 U.S. 696, 705-06 (2005) (ellipsis in original).

As to both sets of charges, Mr. Baugh is entitled to present evidence that he did not have the requisite *mens rea*—the specific intent to *harass* the Victims, or to *corruptly* tamper with a witness. While the government always bears the burden to prove *mens rea* elements beyond a reasonable doubt, Mr. Baugh may request a "good faith" instruction. *See* Pattern Crim. Jury Inst. for the District Courts of the First Circuit § 5.02 ("Evidence has been presented of [defendant's] [.

---

[5] Available at https://www.med.uscourts.gov/pdf/crpjilinks.pdf .

. . good faith. . .]. Such [ ] may be inconsistent with [the requisite culpable state of mind]"); *United States v. Sturm*, 870 F.2d 769, 777 (1st Cir. 1989) ("Jury instructions that allow a conviction even though the jury may not have found that the defendant possessed the mental state required for the crime constitute plain error.").

The MJ Order nevertheless denied Mr. Baugh's motion on the basis that there was "overwhelming" evidence of Mr. Baugh's intent "to harass or intimidate," D.E. 122 at 21-23, and that his "intent to delay or hinder the investigation was unmistakable." *Id*. at 27. In support of those conclusions, the MJ Order recited a litany of factual allegations about Mr. Baugh's *actions*. But while a jury *could* permissibly draw an inference of the requisite "guilty" *mens rea* from those alleged actions, that is not the *only* possible conclusion. The point of the requested discovery is to develop evidence that would support an inference that Mr. Baugh had a different *mens rea*. He did not act with *malice* to *harass* the Victims; rather he acted with the intent to modify their behavior in order to protect eBay employees and executives from an imminent safety threat. He did not engage in actions to mislead investigators "corruptly"; rather, he acted to prevent a critical safety operation from being compromised. Whether those defense arguments would ultimately be successful is a matter for the jury at trial, not a question for the Magistrate Judge to pre-determine as a basis to deny a motion to compel production of information that would bear on those questions.

Relatedly, Mr. Baugh can also seek to establish the necessity or, at least, the good-faith *perceived* necessity of his conduct. That affirmative defense would require Mr. Baugh to prove that he "(1) was faced with a choice of evils and chose the lesser evil, (2) acted to prevent imminent harm, (3) reasonably anticipated a direct causal relationship between his acts and the harm to be averted, and (4) had no legal alternative but to violate the law." *United States v. Lebreault-Feliz*, 807 F.3d 1, 3-4 (1st Cir. 2015).

The circumstances here indicate that Mr. Baugh: (1) believed the Victims and the Newsletter posed a grave and imminent threat in the form of incitements to violence against eBay personnel; (2) believed the alleged actions would avert the threatened harm; (3) was told by the GC Huber that "ordinary" legal tools were ineffective to neutralize that threat; (4) had previously, at the U.S. government's direction and with its authorization, engaged in surveillance, trespassing, and misleading activities similar to those charged here, in what he understood to be necessary for the greater good. The requested discovery would show that Mr. Baugh was previously hired to engage in similar conduct by the U.S. government; he reasonably understood the conduct was lawful or, at least, necessary; and he undertook that conduct not to "harass or intimidate" or to "corruptly" mislead but to serve important national security objectives. Such evidence would help to demonstrate Mr. Baugh's good faith.

The government's argument, adopted by the Magistrate Judge, that Mr. Baugh "had no FBI handler in August 2019" and that a "federal government official did not direct him to harass or intimidate the victims," D.E. 122 at 24, tears down a straw man. Mr. Baugh is not asserting a public authority defense. The point is that by training Mr. Baugh that it was permissible to surveil, mislead, and trespass in the service of a "greater good," the government led him to believe that such conduct could be appropriate or lawful in other, private contexts, as well. And Silicon Valley companies hire former government security professionals like Mr. Baugh precisely because of this prior acculturation. *See, e.g.,* Kate Conger, *Uber Survived the Spying Scandal. Some Careers Didn't*, NEW YORK TIMES (Nov. 28, 2021) (quoting former CIA officer employed by Uber: "In the government, when you're given a mission or you're given a task, you go and you execute on the mission . . . . Your experience tells you to go execute because your boss or the leadership have given you this task, and you worry about how to do it — not whether or not you should do it,

15

because you've never had to worry about that before."). At a minimum, Mr. Baugh should be allowed to develop evidence aimed at presenting such a defense to the jury. Related words of Justice Brandeis are engraved on the wall of the Moakley Courthouse: Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example." *Olmstead v. United States*, 277 U.S. 438, 485 (1928).

Stated differently, evidence that Mr. Baugh previously engaged in surveillance and other arguably unlawful activities believing them to be justified, supports the inference that he acted in good-faith here, too. In *United States v. Lee*, 790 F.3d 12 (1st Cir. 2015), the First Circuit found that historical evidence of the defendant's abuse of his former wife was relevant (and admissible) in a § 2261A stalking prosecution, not only to show the *victim*'s state of mind but "relevant to [the defendant's] motive or intent" as well. *Id*. at 16-17 (emphasis added). If such evidence about a defendant's related, prior conduct is relevant and admissible when offered to show an inculpatory state of mind, as in *Lee*, it is similarly relevant and admissible to show an *exculpatory* state of mind.

## Conclusion

For the foregoing reasons, Mr. Baugh requests that the Court set aside the Magistrate Judge's Order insofar as it denied his Motion to Compel Discovery [D.E. 77] and direct the government to produce the requested discovery.

Respectfully submitted,

**JIM BAUGH**

by his attorneys,

*/s/ William Fick*
William W. Fick (BBO #650562)
Daniel N. Marx (BBO #674523)
Amy Barsky (BBO # 601111)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
*wfick@fickmarx.com*
*dmarx@fickmarx.com*
*abarsky@fickmarx.com*

**CERTIFICATE OF SERVICE**

I caused the foregoing document to be served, by ECF filing January 6, 2022, on the parties registered for ECF notices in this case. A courtesy copy will also be served by e-mail on counsel for eBay.

*/s/ William Fick*