1             IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS

2

3    UNITED STATES OF AMERICA,        )
                           )

4             Plaintiff      )
                           )

5        -VS-               )  Criminal No. 20-10263-PBS
                           )  Pages 1 - 106

6    JIM BAUGH, also known as James )
    Baugh, and DAVID HARVILLE,      )

7                           )
             Defendants     )

8                           )
              -AND-         )

9                           )
    eBAY INC. and             )

10   MORGAN LEWIS & BOCKIUS LLP,   )
                           )

11            Intervenors     )

12

13             **MOTION HEARING BY VIDEO**

14       BEFORE THE HONORABLE PATTI B. SARIS
            UNITED STATES DISTRICT JUDGE

15

16

17

18                  United States District Court
                  1 Courthouse Way

19                  Boston, Massachusetts  02210
                  January 28, 2022, 10:02 a.m.

20

21

22              LEE A. MARZILLI
            OFFICIAL COURT REPORTER

23        United States District Court
        1 Courthouse Way, Room 7200

24           Boston, MA  02210
            leemarz@aol.com

25

1    A P P E A R A N C E S:

2        SETH B. KOSTO, ESQ., Assistant United States Attorney,
     Office of the United States Attorney, 1 Courthouse Way,
3    Room 9200, Boston, Massachusetts, 02210, for the Plaintiff.

4        WILLIAM W. FICK, ESQ., AMY BARSKY, ESQ., and
     DANIEL N. MARX, ESQ., Fick & Marx LLP, 24 Federal Street,
5    4th Floor, Boston, Massachusetts, 02110, for the Defendant
     Jim Baugh.

6
         DANIEL K. GELB, LLP, Gelb & Gelb, LLP,
7    900 Cummings Center, Beverly, Massachusetts, 01915, for the
     Defendant David Harville.

8
         JACK W. PIROZOLLO, ESQ., KATHRYN LUNDWALL ALESSI, ESQ.,
9    and DREW A. DOMINA, ESQ., Sidley Austin LLP,
     60 State Street, 34th Floor, Boston, Massachusetts, 02109,
10   for the Intervenor eBay Inc.

11       DANIEL J. FEITH, ESQ., Sidley Austin LLP,
     1501 K Street, NW, Washington, DC 20005, for the Intervenor
12   eBay Inc.

13       SCOTT T. NONAKA, ESQ., Sidley Austin, LLP
     555 California Street, Suite 2000, San Francisco, California,
14   94104, for the Intervenor eBay Inc.

15       NATHAN J. ANDRISANI, ESQ. and TIMOTHY J. GEVERD, ESQ.,
     Morgan Lewis & Bockius LLP, 1701 Market Street, Philadelphia,
16   Pennsylvania, 19103-2921, for the Intervenor Morgan Lewis &
     Bockius LLP.

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

THE CLERK:  Good morning, Judge.

THE COURT:  Good morning.

THE CLERK:  So there's many people on here, at least forty-four at this point, and I can call the case right now.

THE COURT:  Thank you.

THE CLERK:  The Court calls Criminal Action 20-10263, United States v. Jim Baugh and Mr. Harville.  Could counsel please identify themselves for the record.

MR. KOSTO:  Good morning, your Honor.  Assistant United States Attorney Seth Kosto appearing on behalf of the government.

MR. FICK:  Good morning, your Honor.  William Fick for Mr. Baugh.  With me are my colleagues Daniel Marx and Amy Barsky.

MR. GELB:  Good morning, your Honor.  Daniel Gelb for Mr. Harville.

MR. PIROZOLLO:  Good morning, your Honor.  Jack Pirozzolo for Intervenor eBay, and with me are my colleagues Kathryn Alessi, Drew Domina, Daniel Feith, and Scott Nonaka.

MR. ANDRISANI:  Good morning, your Honor.  Nathan Andrisani on behalf of Morgan Lewis, and with me on this call is my colleague Tim Geverd.

THE COURT:  Okay, there's a lot to be done today.  Somebody, I don't know whether it was Mr. Kosto or whether it

1    was a collaborative effort, but gave me a proposed schedule,

2    and we would start with the motion to quash, move to the

3    motions to dismiss, and then deal with the appeal of the

4    Magistrate Judge's opinion.  So I roughly sketched it out,

5    since I have the morning for you.  10:00 to 1:00 is what I'm

6    thinking of as the morning.  It's perhaps -- and I just wanted

7    to make sure that this made sense to get through today's

8    business -- basically 10:00 to 11:00 for the motion to quash,

9    roughly dividing it out -- and I don't know if this is going to

10:04 10   work -- twenty minutes for the intervenors, twenty minutes for

11   the defendants, ten minutes if the government wants it, and

12   then brief opportunities for rebuttal, maybe five minutes each.

13   So that would bring us to 11:00, talk about motions to dismiss.

14   There are quite a few issues there, everything from obstruction

15   of witnesses to venue to multiplicity.  So I booked 11:00 to

16   12:00 for that.  I don't know if we need the full amount of

17   time.  We would take a break for the Court Reporter and for all

18   of us, how about essentially 12:15-ish, from 12:00 to 12:15?

19   And then from 12:15 to 12:45, essentially what we would do is

10:04 20   talk about the appeal from the Magistrate Judge's opinion, and

21   then leave the last fifteen minutes or so for what I'll call

22   "housekeeping," perhaps setting a trial date, or at least

23   understanding what the trajectory of this case is.

24          So there it is, and if you all feel that one section

25   needs less time or one needs more, please let me know.  I was

1   trying to -- I've now read everything other than the materials

2   that came in this morning, and so I think that might do it, but

3   does anyone have another game plan?  There's been so much

4   paperwork in this case that whatever isn't covered obviously

5   has been well briefed, so we can move on that sense.

6        So beginning on the motion to quash, the moving party

7   is the intervenor eBay and the intervenor Morgan Lewis, so I

8   don't know if you have another order that you thought we'd

9   follow, but I thought we'd start with them, as you proposed.

10:06 10   MR. PIROZOLLO:  Thank you, your Honor.  So on behalf

11   of eBay, Jack Pirozzolo, and I'll be arguing the motion to

12   quash for eBay.  Before I start, I know you said twenty

13   minutes.  Is it possible for me to reserve three minutes or so

14   for rebuttal?

15        THE COURT:  How much?

16        MR. PIROZOLLO:  Three to four minutes for rebuttal?

17        THE COURT:  Yes, of course.  Yes, I built in a

18   five-minute rebuttal for both of you.  It could be longer,

19   depending on how long the government wants to use, so that's

10:06 20   fair enough.

21        MR. PIROZOLLO:  All right, thank you, your Honor.

22        MR. ANDRISANI:  Your Honor, this is Nate Andrisani.

23   As you've seen from the briefing, many of my arguments, almost

24   all of my arguments are identical and mirror eBay's on behalf

25   of Morgan Lewis, so I certainly will yield time to eBay in

1   making the argument.  I will not be the whole twenty minutes

2   because I'll be adopting what eBay argues.

3        THE COURT:  Okay, and I understand the briefing

4   followed that pattern.  I just didn't want to strip it away

5   from you, since you are separate intervenors.  So, okay, thank

6   you.

7        Mr. Pirozollo, go.

8        MR. GELB:  Your Honor, Daniel Gelb for Mr. Harville.

9   Just for your time management purposes for the Court, we're

10:07 10   going to be just joining in on the arguments made by Mr. Baugh,

11   so I don't need to be heard further on the motion to quash

12   issue.

13        THE COURT:  Thank you.  That's very helpful as well,

14   Mr. Gelb.  Thank you.

15        MR. PIROZOLLO:  So thank you, your Honor.  With the

16   Court's permission, I'll just launch in?  Is that okay?

17        THE COURT:  You're up at bat.

18        MR. PIROZOLLO:  Okay, all right, thank you.  So I

19   thought I would actually start just by framing up really what

10:07 20   is and is not in dispute in terms of the requests, unless the

21   Court feels like you understand what the scope is of what the

22   parties' disagreement is.

23        THE COURT:  I do.  The only threshold question is, one

24   of the points that the defendants made is that you've agreed to

25   produce all this stuff that actually hadn't been produced as of

the time of the briefing.  Has it now been produced?

MR. PIROZOLLO:  No, so for a couple of reasons.
First, some of the materials that we've offered to produce had
been offered to be produced in the context of a meet-and-confer
process.  We may ultimately just turn them over afterwards.
But also, one of the things that we discussed that was not in
the briefing, which I don't think is in dispute but which is
relevant for purposes of this hearing, is that to the extent we
do produce anything, consistent with other case law that have
addressed protective orders under Rule 502 with regard to
anything that may be privileged, we would do that pursuant to a
court order that you would issue, your Honor, that would make
sure that there would not be a broader waiver with regard to
third parties to the extent there is --

THE COURT:  All right, so that you're saying you
haven't produced it yet, so I'm going to have to address it in
the housekeeping time period?

MR. PIROZOLLO:  Yes, your Honor.

THE COURT:  I don't want to consume today talking
about it.  As you know, I've sealed all the privilege logs.  So
I didn't read every single entry.  Conceivably there could be
one or two that genuinely deserve it, but it was a full whole
hog, and there's no way most of that was privileged.  So I
would want you to do it in a textured and thoughtful way rather
than an across-the-board "We assert privilege."  But I don't

1  want to deal with that right now.  I want to deal with the more

2  important issue as to, A, whether there's a waiver of the

3  privilege, what it means to waive subject matter, and, B,

4  whether the *Nixon* standards are met.

5      MR. PIROZOLLO:  Yes, okay.  Well, I will then start

6  there.  Before I do, though, I will say that much of the

7  defendants' briefing had been on the constitutional issue, and

8  I think, as we set forth in our papers, the *Swidler* case

9  forecloses that argument.  I'm more than prepared to address

10:10  10  that, but it sounds like you don't need further --

11      THE COURT:  I don't, no.

12      MR. PIROZOLLO:  Thank you.

13      THE COURT:  I am much more worried about the issue of

14  what's admissible in terms of what meets the *Nixon* standard,

15  and what a scope of a waiver is, and how do you decide what's

16  "in fairness" if you don't know what the documents are?  So

17  that's what I'm interested in.

18      MR. PIROZOLLO:  Okay, thank you.  Would you prefer me

19  to speak first to *Nixon* or to the privilege waiver?  And I

10:10  20  could do either one, whichever is --

21      THE COURT:  I prefer the -- well, I think -- I don't

22  care.

23      MR. PIROZOLLO:  Okay, thank you, your Honor.  Let me

24  just start with the waiver issue, and then I'll address the

25  *Nixon* factors.  I think, with regard to the *Nixon* factors, I

1    think with that, the analysis, we'll focus on each request.

2    With regard to the privilege waiver issue, there is sort of one

3    overall global waiver argument being made which I think applies

4    to many different categories of documents more or less across

5    the board, so I will start with the waiver argument, your

6    Honor.

7         So what is clear with regard to the waiver issue is

8    that under Rule 502, the test is that, where there has been

9    disclosure of some information, the test is whether or not, in

10   fairness, there should be a disclosure further of additional

11   information.  That's the basic structure.  The Advisory

12   Committee note makes it clear that it's only in unusual

13   circumstances when there would be a broader subject matter

14   waiver, and, as I'll discuss, I think a couple of the cases

15   cited in the materials provide a good guidance on how to think

16   about the waiver, and in particular how to think about the

17   scope of the waiver.

18        Mr. Fick can of course address this, but I do want to

19   focus the Court on what Mr. Fick said in his opposition to our

20   motion to quash with regard to the waiver issue.  So it's on

21   Pages 7 and 8 of his opposition brief when he's framing up his

22   argument with regard to waiver, and he says that "It's the

23   partial and selective nature of the disclosures that makes them

24   misleading and unfair."  And he says that "eBay acknowledges

25   that its counsel disclosed 14,000 pages of documents gathered

1      during the internal investigation, provided oral summaries to

2      the government of interviews with Mr. Baugh and certain others,

3      and made a PowerPoint presentation to the government."  That's

4      what he points to in his brief.

5            And then he said, "It follows from that that eBay,

6      quote, 'withheld critical underlying materials, including

7      numerous memoranda of witness interviews and contemporaneous

8      pre-investigatory communications that happened to include an

9      eBay lawyer, all of which, in fairness, to fully understand the

10:13 10     context of the investigation's conclusions and findings and to

11     evaluate the findings and conclusions, and, if appropriate, to

12     impeach them, should be produced."  That's how he frames it.

13           And the argument is that essentially because eBay

14     produced materials pursuant to an internal investigation, that

15     eBay triggered a broad waiver that allows him to seek the wide

16     range of documents that are sought for in this subpoena.

17           Now, I want to address that in a couple of different

18     pieces, so --

19           THE COURT:  Well, before we do that, I just want to

10:14 20     make sure I understand what's in play.  So how many witness

21     statements are there?

22           MR. PIROZZOLO:  So the total number of witness

23     statements are -- I think approximately 24 were produced?

24           THE COURT:  And how many did you produce to the

25     government?

1          MR. PIROZOLLO:  There were no actual interview memos

2     produced to the government.  There were, however, oral

3     downloads, I believe, of those memos, but we're not quarreling

4     over that distinction.

5          THE COURT:  Well, I don't know what an oral download

6     is.  You mean you tape-recorded them?

7          MR. PIROZOLLO:  They read them to the prosecutor.

8          THE COURT:  You read them.  All right, all right.

9          MR. PIROZOLLO:  So sometimes what happens, instead of

10:15 10    providing the actual memo, they read, they read.  And so in

11    this case, Amir Vonsover had a meeting with the government

12    where he went through certain interviews.

13         THE COURT:  And how many interviews did he either

14    describe or, as you say, orally download?

15         MR. PIROZOLLO:  I think it looks like about -- so it's

16    fewer people but call it twenty total interviews that were

17    disclosed.

18         THE COURT:  So let me just say, assuming for a minute,

19    which I'm not, that the *Nixon* standard is met, if they orally

10:15 20    described or downloaded twenty interviews, will those be

21    produced?

22         MR. PIROZOLLO:  Yes, and our position has been, and

23    our position during the meet-and-confer, is that we were

24    willing to provide those.

25         THE COURT:  All right, but they haven't been provided

1    yet?

2         MR. PIROZOLLO:  Yes.  But the hang-up there, your

3    Honor, was because that was unacceptable to Baugh.  Baugh said,

4    "No.  The interviews that were provided to the government, the

5    information that was given to the government about those

6    interviews, that's not enough.  We want everything else."

7         THE COURT:  I understand what they are willing to do,

8    but I am here to order things.  So it does strike me that if

9    you produced either in sum or substance the factual basis for

10:16 10   these statements or the oral download, I think you've got to

11   produce them.  So that does -- and I think you don't even

12   object to that.

13        MR. PIROZZOLO:  We made it clear in our papers and in

14   our meet-and-confer we were going to produce them, yes.

15        THE COURT:  Now, who are the four that are not subject

16   to that?

17        MR. PIROZOLLO:  So I just want to make sure I've got

18   the numbers here.

19        THE COURT:  I'm not tied to the four.  Who are the

10:17 20   people who you didn't orally download and you didn't describe

21   any facts about those people that you're not planning to

22   produce?

23        MR. PIROZOLLO:  So the basic breakdown is, Morgan

24   Lewis conducted interviews of a number of individuals.  I can

25   give you the list of them if you would like.

```
 1              THE COURT:  Yes, please, yes, the ones you -- once you
 2     turned over the other ones, I don't know that I need the list
 3     of those, but the four that you weren't planning to are who?
 4              MR. PIROZOLLO:  So it includes Wendy Jones.  It
 5     includes Devin Wenig.
 6              THE COURT:  Now, who's Jones again?  I'm sorry, I'm
 7     not as immersed yet in the facts.  I know Wenig.  Wenig is the
 8     CEO, right?
 9              MR. PIROZOLLO:  Correct, the former CEO.
10:18 10              THE COURT:  I'm sorry, former CEO.  Jones is?
11              MR. PIROZOLLO:  She was Mr. Baugh's direct supervisor.
12              THE COURT:  Okay.
13              MR. PIROZOLLO:  So Julianne Whitelaw.
14              THE COURT:  Who's she?
15              MR. PIROZOLLO:  She was I believe in the communications
16     area at eBay.
17              THE COURT:  Okay.
18              MR. PIROZOLLO:  Ryan Moore, who I believe also was in
19     the communications area at eBay.  Should I continue?
10:18 20              THE COURT:  Well, the ones that you're not disclosing.
21              MR. PIROZOLLO:  Yes, Michelle Echeveria, who was in
22     Mr. Baugh's security area.  Phil Cooke, who is a charged
23     individual, but there was never a readout of any of his
24     interviews.  Meagan Barret, who was also in the security area,
25     not charged.
```

             1          THE COURT:  So it's quite a few here.  One, two...

             2          MR. PIROZOLLO:  Yes, so I think when I use the word

             3   twenty-four, I think, and I just want to make sure I'm clear,

             4   and I'll get some clarification --

             5          THE COURT:  You know what, you can clarify it.  I know

             6   you don't know this subject by heart, but let's take the ones

             7   that -- with respect to each one of them, it wasn't clear --

             8   and I'll ask Mr. Kosto this as well -- did you describe facts

             9   about these people when you made the presentation to the

10:19   10   government, like, what they said or did?

            11          MR. PIROZOLLO:  Are you asking me that, or are you

            12   asking Mr. Kosto?

            13          THE COURT:  Yes.

            14          MR. PIROZOLLO:  So just so we're clear, Morgan Lewis

            15   was --

            16          THE COURT:  All right, fair enough, fair enough, I

            17   should say Morgan Lewis.

            18          MR. PIROZOLLO:  But with regard to -- so there were --

            19   just to unpack the sequencing, there's a presentation that was

10:20   20   given to the government in 2021, and that's a PowerPoint

            21   presentation, and that, again, we offered to produce that.  We

            22   don't think there's any privilege that attends to that.  But

            23   there were other instances where the government interviewed

            24   Amir Vonsover, who provided information, mostly about

            25   interviews of Baugh and Harville but not limited to that.

1          THE COURT:  So I'm just trying to get at, as you can

2     imagine, subject matter waiver.  So to the extent that you

3     described, even if it wasn't a full download, as you would say,

4     you know, verbatim recital, to the extent that you disclosed to

5     the government information -- well, you and, I'm sorry, Morgan

6     Lewis as well -- information that you learned from these

7     interviews, why isn't that part of a subject matter waiver?  It

8     may not be admissible -- I'm going to get to that -- it may not

9     be admissible, but why isn't that part of a subject matter

10:21 10     waiver?  It can't depend just on whether there was a verbatim

11     reading of the statement.

12          MR. PIROZOLLO:  So I think -- so I would say -- I

13     think the way I would answer that, Judge Saris, is that it

14     depends a little bit on what you mean by subject matter waiver.

15     So what's at issue here are the underlying memos, and there are

16     memos and other interviews of other people on other occasions,

17     okay?  And then there's a separate work product analysis here,

18     right?  So you've got underlying memoranda prepared by

19     attorneys in the context of what would be indisputably work

10:21 20     product protection.  And so taking this in steps, with regard

21     to -- this is my term -- a "readout" of a memorandum to the

22     government with regard to a witness interview, that would be a

23     waiver with regard to the underlying document that reports that

24     interview.  At least that's the position we're taking here.

25          Now, with regard to --

         1          THE COURT:  Can I ask you, with respect to Ms. Jones --

         2   I don't want to pick on her, she just happens to be the first

         3   one you list -- if in fact she told Baugh and Harville, "Go do

         4   these things," or if she said to them, "Don't do that, that's

         5   against the law," either way, to the extent you transmitted

         6   that information to the government, why isn't that a subject

         7   matter waiver with respect to her information?

         8          MR. PIROZOLLO:  It might be, but it didn't happen with

         9   Ms. Jones.  That's my point.

10:22   10          THE COURT:  I'm making that up.  I know there's press

        11   on this call.  I don't want to say that she said that, but I

        12   just think that I don't know enough to know what you exactly

        13   told the government because that would be subject to a waiver,

        14   even if you didn't do a substantially verbatim verbal download.

        15          MR. PIROZOLLO:  So we're clear, so two things.  First

        16   of all, and I would point you to the *In Re Grand Jury* case from

        17   the Sixth Circuit on this as well as the *Treacy* case that's

        18   briefed ad nauseam --

        19          THE COURT:  Judge Rakoff's, right.

10:23   20          MR. PIROZOLLO:  Yes, right.  And the analysis is, so

        21   there was never a readout of any interview with Wendy Jones.

        22   And the way Judge Rakoff analyzed that issue in the *Treacy* case

        23   was, if there wasn't a readout to the government of that

        24   individual's interview, then there is no waiver, even though --

        25          THE COURT:  I'm not going to go that way because

1  that's too easy to evade.  You know, like, if you gave them the

2  sum and substance -- I don't know what the right term would

3  be -- the sum and substance of what she told you but you didn't

4  literally read verbatim, that would still be a waiver of the

5  subject matter.  So I don't know the answer to what you, Morgan

6  Lewis, told the government or not, but I would have to say, I

7  may not go with the defendant to the extent that that wasn't

8  transmitted at all to the government.

9       MR. PIROZOLLO:  Your Honor, that's my point.  That's

10:24 10  my point, and I will want to go back and confirm this, but

11  speaking about Wendy Jones -- and certainly Mr. Kosto was there

12  and Morgan Lewis is on the line here -- with regard to certain

13  of those witnesses, I do not believe that -- I'll focus on

14  Ms. Jones -- I don't believe that they said, "This is what

15  Ms. Jones said," either in sum or substance or verbatim.  I

16  don't believe that happened.

17       THE COURT:  Well, that's useful to know for me.  For

18  example, they must have asked about the CEO, they must have.

19  They must have, I would assume.

10:24 20       Mr. Kosto, did you ask about the CEO?

21       MR. KOSTO:  Well, I don't want to step on

22  Mr. Pirozollo's time, but we did not ask for any questions

23  about Ms. Jones, and what we had was a request regarding the

24  internal investigators at eBay's questions to the people who

25  traveled to Boston in connection with the harassment of the

1    victims.  So that would include Ms. Popp, Ms. Zea,

2    Ms. Stockwell who supported it, Mr. Baugh, the defendant, and

3    Mr. Harville, the defendant.  At no time did we get a readout,

4    a verbatim readout --

5         THE COURT:  I'm not talking about a readout.  I get

6    that.  I'll trust you on that one.  But, I mean, to the extent

7    there was an exchange of information about people like

8    Ms. Jones -- I'll just pick on her, she may be listening, I

9    don't mean to pick on her -- it may have been a subject matter

10   waiver; and I think I don't have the record, from what I was

11   looking at, to know what happened with respect to the witness

12   statements that aren't being produced.

13        MR. KOSTO:  Correct, and we did not ask eBay what

14   Ms. Jones or Mr. Wenig said in their interviews with eBay

15   investigators.  We asked Mr. Vonsover what Mr. Baugh said; we

16   asked Mr. Vonsover what Mr. Harville said.  Mr. Vonsover also

17   described in that first window, when eBay was trying to figure

18   out what was going on, August 22, August 23, we asked what they

19   learned from Ms. Popp who had been in Boston, Ms. Stockwell who

20   was supporting the operation.

21        THE COURT:  So you never asked about what these other

22   people that were listed did or said?

23        MR. KOSTO:  Not in relation to the investigators.  We

24   certainly had emails from the company that had Mr. Wenig and

25   Ms. Jones on them, but not with respect to the questions that

1   eBay's investigators were asking of their witnesses, and no

2   communications about what Morgan Lewis asked in its follow-on

3   investigation.

4        There's two stages, one where the eBay folks are

5   asking what was the focus of our inquiry, and one where Morgan

6   Lewis was asking questions, and we never asked what these

7   witnesses told Morgan Lewis.

8        THE COURT:  And was it volunteered, "Hey, Ms. Jones

9   had nothing to do with this because we talked to her and she

10:27 10   didn't know anything about it"?

11        MR. KOSTO:  It was not, to my memory, your Honor.

12        THE COURT:  So that's what I need to know.  That's

13   where the record isn't helping me, let me just say that.  So to

14   the extent that there was a witness statement, you're saying,

15   from each one of these people that weren't produced, neither

16   was it read, nor was information from it provided to the

17   government?

18        MR. PIROZOLLO:  That is correct, but I do want to make

19   sure that we're clear.  I think Mr. Kosto is drawing an

10:27 20   important distinction here.  Underlying facts that preexisted --

21   so, for example, emails or other materials that were relevant

22   to the investigation -- were provided; but those underlying

23   documents, there's no independent claim of privilege, so there

24   can be no waiver of privilege when those documents are

25   produced.  So there may well -- there were documents that are

related to Mr. Wenig or Ms. Jones, but those were not of the

statements.  So that the analysis in terms of the privilege

waiver here is with regard to the statements that were made to

attorneys during the course of the internal investigation.

THE COURT:  Right, but there may have been information

transmitted -- this is what the record isn't clear about --

that wasn't either in an email but was relevant and specific

with respect to the alleged stalking of -- am I allowed to use

their names, is that well enough known at this point? -- the

people in Massachusetts that was transmitted to the government.

And so I need to make sure that that was not part of the

subject matter waiver, and I don't have that record.

MR. PIROZOLLO:  So to the extent it would be helpful

to the Court, what I would propose is, we could submit a

declaration that sets forth with more clarity than we have

done, which is apparently not clear enough, as to what was

provided to the government about these individuals --

THE COURT:  And not just --

MR. PIROZOLLO:  -- and what was not.

THE COURT:  And it's too technical to just simply say,

"We didn't verbally read it."  It has to be that nothing was

provided with respect to the substance of the interview with

Mr. Wenig or Ms. Jones or -- I don't know, you named seven or

eight other people.  So that's important because if it was,

there's a decent argument of waiver.  So I just want to make

1    sure I have that record.  And obviously I didn't actually focus

2    on the fact there's a two-step investigation -- I didn't quite

3    understand that -- but it's obviously both parts of that

4    investigation.  And maybe the government has notes that would

5    be helpful because it's inconceivable that there weren't

6    questions about his direct supervisor or Mr. Wenig.  It's

7    inconceivable.  But it could be just based on the emails rather

8    than from the interviews, so I just need to understand it.

9         MR. PIROZOLLO:  So, your Honor, with your permission,

10:30 10   we would offer to file a supplemental declaration that outlines

11   what was and was not provided to the government with regard to

12   these individuals.

13        THE COURT:  Just what information.

14        MR. PIROZOLLO:  I totally understand, yes -- I know

15   you don't want us to be narrow -- what information was

16   provided.

17        THE COURT:  Okay, that's great.  So let's assume for a

18   minute you're right that nothing was disclosed from these

19   interviews to the government, okay, and Mr. Kosto agrees and

10:30 20   Mr. Andrisani -- you know, it's unfair to me, Mr. Andrisani,

21   because you don't have your name on the little box.  It just

22   says "Nate," so I --

23        MR. ANDRISANI:  Sorry.  I don't know how to change

24   that.  I noticed that as well.

25        THE COURT:  I don't know if you want me to call you

 1    Nate, but -- I know the others actually.  I mean, I've seen

 2    them many times in court.  So I just want to make sure I get

 3    your name right.

 4          Okay, so, sorry.  So we've got that down to whether or

 5    not something is just a clear subject matter waiver.

 6          MR. PIROZOLLO:  Correct.

 7          THE COURT:  I think defense is making a broader

 8    argument.

 9          MR. PIROZOLLO:  Exactly.  So I think with regard to

10:31 10   that subject matter waiver, in terms of the structure, your

11    Honor, that you just set out in terms of what was or wasn't

12    given to the government about those communications, then we

13    catalog what it was, and then you can make a decision.  You're

14    right, the defendants' argument here goes well beyond that,

15    right?  So let's just, if we can cabin the interview memos,

16    those issues I think are clearly sort of well detailed here.

17          But there is no broader subject matter waiver of

18    privilege that goes beyond anything with regard to those memos

19    that may have been read out, so the communications with regard

10:32 20   to what people said during the investigation.

21          THE COURT:  Well, wait, can I ask this question

22    because you cite at length Judge Rakoff whom I have enormous

23    respect for, but we also have the *Lyndon LaRouche* case, one of

24    the ones when I first started as a judge a long time ago I

25    actually had a piece of that.  So the way the First Circuit cut

```
 1   it at that time I think was:  Okay, but if the person becomes a
 2   witness at trial -- let's say Mr. Kosto puts on the witness
 3   list Ms. Jones -- in fairness, does her interview -- it may be
 4   admissible to impeach, right, a prior inconsistent statement,
 5   arguably -- they basically said, all right, well, you know, you
 6   get the witness list and then you get the witness statement.
 7   It's admissible to impeach.
 8            MR. PIROZOLLO:  So that may be a question of
 9   admissibility, and I'd want to pull the LaRouche case myself
10   just because I want to remind me about --
11            THE COURT:  I think that's the case.
12            MR. PIROZOLLO:  Right, but that's a separate question,
13   it seems to me, with regard to the question of admissibility.
14   And I believe the LaRouche case was decided prior to the
15   Swidler case.
16            THE COURT:  But doesn't it overlap a bit in terms of
17   "in fairness"?  In other words, let's assume, and I'm not, one
18   of these people -- I shouldn't keep picking on Ms. Jones --
19   Mr. X gets on the stand and says something completely different
20   from what he told Morgan Lewis, it would probably be admissible
21   to impeach, says the Lyndon LaRouche case.  And then the
22   question is, in fairness, should it fall within the scope of
23   the waiver?
24            MR. PIROZOLLO:  So to me, the short answer to that
25   would be "no" if that privileged communication had never been
```

1    disclosed or the substance of the communication had never been

2    disclosed.  So I think if you're talking about sort of what we

3    were talking about early on in this argument, whether there was

4    some form of readout, then I think you do get traction, I

5    think, as to whether there might be a basis for any additional

6    statements that were made.

7         THE COURT:  Because my concern is -- I may be a little

8    premature in this -- I mean, whether -- it's sort of a long

9    shot on the constitutional arguments being preserved, but at

10:34  10    least with respect to the scope of the waiver and the

11    fairness -- I mean, like, Mr. Kosto, do you know what your

12    witness list is going to look like yet?

13         MR. KOSTO:  Only in broad outlines, your Honor.  I

14    don't expect Ms. Jones would be on it, if we're picking on her

15    again.

16         THE COURT:  What did you say?

17         MR. KOSTO:  I don't expect that Ms. Jones, for

18    example, would be on it.

19         THE COURT:  Right, one of these people is on it and we

10:35  20    find out, it's an awkward spot for a trial judge to be sitting

21    there trying to read her statement simultaneously with her

22    testimony to see if it's impeaching or not.  So I'm just trying

23    to understand how this would work.  I mean, if it's within the

24    scope of a waiver but I can't yet say -- let's assume for a

25    minute you discussed with the government what she said, you

1    know, what she did, but then I can't make the "in fairness"

2    evaluation until -- if she's not a witness, it may not be in

3    fairness.  But if she is a witness and she says something

4    totally contradictory to what she told you, then it may be, in

5    fairness, it should be part of the waiver.

6         MR. PIROZOLLO:  If I could be heard on that, I think

7    the fairness argument, I think it's important to understand the

8    lens with which fairness is evaluated in the context of a

9    privilege waiver.  The fairness concept is fairness in

10:36 10   connection with the privilege-holder.  The question is, was the

11   privilege-holder using the disclosure in an unfair or

12   misleading way?  And then that's the fairness analysis.  And if

13   the answer to that is "no," then there is no broader privilege

14   waiver.

15        THE COURT:  Can I say, this is an awkward spot,

16   though, because many of these cases -- I've done them many

17   times in the patent area or the civil suits, I mean, and you

18   can't use it as a sword and a shield, I get it, but this is

19   awkward because you're there trying -- I mean, I'm sure you do

10:36 20   a wonderful job, all of you, but you're there trying to defend

21   and represent eBay, and so that's not exactly the same as the

22   government's interests or the defendants' interests.  You're

23   representing a corporation and what possible liability the

24   corporation has.  And I assume you're not representing the CEO

25   or any of the individual employees, right?  You're representing

1    the corporation, true?

2              MR. PIROZOLLO:  Correct.

3              THE COURT:  But you're not necessarily aligned with

4    either party, but neither do you have your own -- you have your

5    own lens by which to view what "in fairness" means.

6              MR. PIROZOLLO:  In a sense, there is certainly -- eBay

7    has its own interests, there's no doubt about that, but I would

8    say, as a practical matter, it is not the case that it is in

9    eBay's interest to mislead the government as to what the

10:37 10   internal investigation may have shown, right?  So the

11   consequences of going in to the government and providing

12   misleading information as to different individual's

13   culpability, given particularly the ability of the government

14   to test and verify and have its own independent investigation

15   of those facts, is -- it's -- it's -- the presumption, which I

16   think it sounds like you have a presumption they're making,

17   that it's being skewed in some way is not a reasonable

18   presumption --

19             THE COURT:  I don't ever accuse you, Mr. Pirozollo,

10:38 20   having been once a First Assistant in the office, of doing

21   anything; but I do think you have a duty of loyalty to eBay,

22   and that may be your attorney's obligation, and it's not the

23   same as Mr. Kosto's or Mr. Fick's or Mr. Gelb's.  So I'm sort

24   of trying to figure it out through that lens.

25             MR. PIROZOLLO:  Right, and that's where the

1    fairness -- so that's where the question is, and I think this
2    is a fair question for the Court to ask is, was eBay in there
3    trying to skew or conceal or use this privileged information in
4    a way that was otherwise misleading and otherwise distorted the
5    information?  And if the answer to that is "no," then anything
6    that wasn't disclosed, the waiver wouldn't reach that, right?
7    And that's in fact why I don't really think it's necessary --

8            THE COURT:  But how do I know that without looking?  I
9    guess I'm struggling with that particular issue:  How do I
10   decide "in fairness" without looking?  And I think that *Lyndon*,
11   that old case essentially dealt with right up against trial
12   when people were listed as witnesses.  So I'm thinking through
13   that issue; let's put it that way.

14           MR. PIROZOLLO:  Of course, one interim step, your
15   Honor, would be of course for you to take a look at the
16   information that's being claimed as privileged with regard to
17   the witness interviews.  We don't really think it's necessary
18   here, but one interim step is looking at some of these materials
19   in camera, which I believe actually is what Judge Rakoff may
20   have done in *Treacy*, I think, and say, "Look, is there anything
21   unfair here?"  And certainly if it wasn't done in *Treacy* --

22           THE COURT:  Well, you'd sort of have to because
23   otherwise a judge couldn't decide "in fairness."  You really
24   couldn't because that's -- you couldn't.

25           MR. PIROZOLLO:  You're right, you're not buying a pig

1    in a poke, right?  Right, you can't.  So we understand that

2    issue.

3          But I think the more -- from our perspective, the

4    question of waiver here is -- what's happening is, the

5    defendant is taking that information about the witness

6    statements and saying, well, that has triggered a broader

7    waiver to things.  Just understand what they're asking for.  We

8    have the log here.  Board communications?  Privileged

9    communications about sort of reports to the Board about the

10:41 10   investigation?  That's what they're asking for here, your

11   Honor.

12         THE COURT:  Well, I understand that.  Can I ask one

13   other because we're now past the twenty minutes.  There's a

14   whole request for emails that are not asserted to be

15   privileged, and I know that the scope of it was narrowed to

16   2019, but they would perhaps pass the admissibility test of

17   *Nixon* because of the business records or some hearsay

18   exception.  So the question I have is, have those all been

19   produced?  Were you agreeing to produce all those within the

10:41 20   more limited time period?

21         MR. PIROZOLLO:  So we actually did agree -- so as an

22   accommodation --

23         THE COURT:  The nonprivileged ones, yes.

24         MR. PIROZOLLO:  Right, so can I give you the number?

25   That's just 140 total, 55 of which are meeting invites.

```
 1          THE COURT:  Are what?

 2          MR. PIROZOLLO:  Are meeting invites.  They're not

 3    substantive emails.  They're just outright meeting invites.

 4    And we offered to produce those, but the defendants said,

 5    "No, that's not good enough.  We want all of the privileged

 6    emails," of which the vast majority of emails requested in

 7    Request No. 6 are privileged.  The people who are listed there,

 8    all right -- so Marie Huber is the general counsel, Molly Finn,

 9    Chief Compliance Officer, Amir Vonsover, In-House Counsel,

10:42 10    Aaron Johnson is Chief Litigation Counsel -- these are

11    individuals, it's clearly privileged what they're looking for

12    here, and it goes way beyond the scope of what's appropriate in

13    terms of even a waiver analysis.

14          THE COURT:  There is no way I am personally reviewing

15    770 documents.  Now, that said, there may be a subset that

16    makes sense for me to review.  So to the extent, let's say, I

17    don't know, the emails were back and forth to the two

18    defendants and included them, have those been produced?

19          MR. PIROZOLLO:  I believe -- I don't want to

10:43 20    represent, your Honor, one way or the other and I will check,

21    but I think most of those have been produced.  There may be a

22    few others.  I just don't know.

23          THE COURT:  Or some of the witnesses, for example, if

24    the government puts them on the stand, or some of the witness

25    statements that you said there was a verbal download, it may be
```

that those fall within a subject matter waiver, and I would ask

you to look at those again.  Let's say that, I don't know, you

took Mr. X-Y-Z and you read the whole thing and there were some

emails that are relevant to that interview, that may fall

within a subject matter waiver.

MR. PIROZOLLO:  Okay, so perhaps maybe what I would

offer is that we provide all the parties essentially a

supplemental privilege log focusing on those categories, which

should be much smaller than the 700 that we've got.

THE COURT:  Yes.  Okay, good.

MR. PIROZOLLO:  Understand, your Honor, we had logged

those because that's what the defendants are asking for.  We

didn't want to log those, but that's what they're asking for.

THE COURT:  But it does strike me that the statements

are not independently admissible; they're just not.

MR. PIROZOLLO:  They're not.

THE COURT:  The admissibility thing is the threshold

prong, but the emails may well be.  And it's specific; it's

about the family, the couple.  And it's relevant, and it may be

subject to the waiver.  So, I mean, they may go "bingo," you

know, they may check all the boxes, and so someone needs to

look at that with that in mind.

MR. PIROZOLLO:  So the interview memos, if I could

just address *Nixon,* because I know I'm way over time, I

apologize, but on the interview memos, you're exactly right:

1    There is no way they're admissible.  They're just not coming

2    in, so --

3          THE COURT:  Well, can I say, except for that *LaRouche*

4    case that says you can use them to impeach, so that's when I

5    see a witness list.

6          MR. PIROZOLLO:  If you see a witness list, maybe it

7    can be visited at that time with regard to *Nixon*.  And at that

8    point, I don't know that there's a deadline in issuing new

9    Rule 17 subpoenas.  In fact, I think once there's a trial date,

10:45 10   you can issue them.  So you could defer to that.

11         THE COURT:  It's just on hold is the ruling, so, I

12   mean, I don't think it would be a timeliness issue.

13         Anyway, I just need to get to Mr. Fick.  This has been

14   the thorniest of it, so I'm glad you put it first.

15         MR. PIROZOLLO:  And I do want to say one thing.

16   Emails are not per se business records simply because they're

17   sitting in the company's files.  So I know lots of courts have

18   said this, but I think, as a matter of doctrine, as a matter of

19   rule, the question is whether it meets the elements of the

10:45 20   hearsay exception, not simply that it's sitting on --

21         THE COURT:  I know, but it's impossible to figure this

22   out right now.  I can't go through it email by email right now

23   and know they're admissible.  In general, many of them are

24   business records, and, in general, some of them may fit another

25   hearsay exception, like present-sense impression, like, "Oh, my

 1    God, what are those people doing to me?"  All right?  An

 2    excited utterance in an email or something like that.  So I

 3    just can't rule right now on whether they're admissible, but at

 4    least there's a plausible admissibility.

 5         MR. PIROZOLLO:  Thank you, your Honor.  And I know I

 6    went way over time, so I'll --

 7         THE COURT:  Okay, thank you.

 8         Mr. Fick, go for it.

 9         MR. FICK:  I think your Honor is right to be skeptical

10:46 10    of eBay's effort to say, "Well, waiver is limited to our

11    interviews that we read over the phone or described to the

12    government."  I mean, I think it's without question that those

13    materials are waived.  But if you just step back for a minute,

14    what we know here, eBay did a big internal investigation.  They

15    did a PowerPoint presentation which we haven't seen, but even

16    they don't claim is privileged, where they make a pitch to the

17    government.  The pitch to the government presumably was, "Don't

18    prosecute eBay.  Baugh and his subordinates are rogues, and the

19    C-suite had nothing to do with it."

10:47 20         So they make that pitch to the government in a

21    PowerPoint presentation.  I think the scope of waiver would be

22    much easier to assess if you could look at that PowerPoint

23    presentation because to date they haven't been required to sort

24    of show their work, as it were.  I mean --

25         THE COURT:  That will be part of my housekeeping

1   orders.  That will happen.

2            MR. FICK:  And that may well affect all of our

3   assessments of how broad a waiver may be, because to the extent

4   the pitch is based on what they learned in interviews, whether

5   or not they quote somebody, you know, the underlying information,

6   you can't sort of check their work unless there's access to the

7   underlying information, right?  So they're using the sword,

8   they're using the fruits of their investigation to make a pitch

9   to avoid prosecution, throw Mr. Baugh under the bus; but they

10:47 10   as a company have no Rule 16 obligation, they have no *Brady*

11   obligation, so we're left as an employee, as Mr. Baugh's

12   counsel, with a potentially very incomplete picture.

13            Meanwhile, we also know they make presentations to the

14   Board that results in Wenig, Wymer, other executives getting

15   fired, which seems inconsistent with their apparent pitch to

16   the government that, "Well, those guys had nothing to do with

17   anything."  And, frankly, I find it astonishing for the

18   government to sit here in this hearing if they never asked

19   those pointed questions or asked for the fruits of those --

10:48 20            THE COURT:  And all of that's irrelevant.  I

21   understand the emotional appeal of that, but right now we're

22   dealing with particular charges against your clients and

23   whether or not eBay and Morgan Lewis need to turn over witness

24   statements, emails, and the like.  And so the issue is --

25   what's hard for you is, many of the things you're asking for,

1    not all but many of them might not be admissible in court.

2    They may or may not be, depending on what witnesses the

3    government chooses to call, but at least they're not

4    independently admissible; a witness interview, for example, or

5    a report to the Board.  But it's not a business record, and I

6    have to go through the *Nixon* -- I'm assuming specificity and

7    relevance, but I need to get through admissibility.  And your

8    argument on the evidence wasn't persuasive, so other than the

9    emails, which are arguably very much admissible, I don't know

10   that you get them or the waiver.

11            MR. FICK:  I think your Honor was right, though, to

12   say that the *LaRouche* case does suggest that things like

13   interview memos and reports and statements are admissible or

14   could be potentially admissible for impeachment.  Sort of the

15   holding of *LaRouche* was, it's very hard to make that

16   determination in the abstract, but, you know, we're not going

17   to reverse the District Court's order to produce the stuff.

18   And I think it would be wrong to limit access to witnesses the

19   government wants to call.  I mean whether or not the government

20   wants to call Wendy Jones, Devin Wenig, or Steve Wymer,

21   Mr. Baugh I think very likely would ask those people pointed

22   questions about, you know, why they believed the Steiners to be

23   such a threat, what they told Mr. Baugh, and not only what they

24   knew but what they didn't want to know and expressly said they

25   didn't want to know about what measures --

```
 1            THE COURT:  I mean, maybe, but this is all very
 2    speculative right now, and I think the point is, we're so far
 3    away from trial, I don't know that this is the right timing for
 4    me to make these decisions.  It may be that you'll put them on
 5    a witness list, but right now it would be highly speculative
 6    because other than -- I was actually intellectually trying to
 7    figure out if impeachment materials were considered admissible.
 8    It's an interesting question, you know, like, "Didn't you say
 9    in this interview X?"  You're not literally introducing the
10:51 10    interview; you're just reading the prior inconsistent statement.
11    so that's an interesting question, but at least LaRouche seemed
12    to suggest that at that point, when someone is on a witness
13    list and is likely to be called, that may be the point at which
14    you'd allow in a statement.
15            MR. FICK:  And I think the point of sort of all of
16    Nixon and its progeny, the focus is really on the sort of
17    relevance and specificity.  I mean, yes, admissibility is
18    listed, but the courts have had a practical understanding that
19    admissibility is very hard to decide in the abstract in
10:51 20    advance.  If there is a plausible or strong theory of
21    admissibility, that may well be good enough to get the
22    information because you can't --
23            THE COURT:  You don't have one for most of it.
24            MR. FICK:  Well, except that impeachment under
25    LaRouche is a strong --
```

 1          THE COURT:  Right, right, but I have to wait and make

 2     sure some witness is coming on.

 3          But, anyway, I would like to move on to the scope of

 4     the waiver.  I spent a lot of time with Mr. Pirozollo on that

 5     because I didn't really understand how much had been discussed

 6     with the government and in what form.  So assume for a minute,

 7     though, that some of these witnesses they never even mentioned

 8     to the government, don't show up in the PowerPoint, and

 9     conveyed no information with respect to these people, I don't

10:52 10     know that the scope of the waiver would extend to them.

11          MR. FICK:  Well, I mean, first of all, we really have

12     to see the PowerPoint.  And just because eBay sort of

13     studiously avoids naming a witness in the PowerPoint, I mean,

14     if the information on which the conclusions they are selling in

15     the PowerPoint is based on what they learned from a witness,

16     it's, I would argue, clearly within the scope of an implied

17     waiver.  It's; like, the bases for the pitch they make are sort

18     of the components of the investigation, the interviews they

19     conducted.  And, interestingly, Judge Rakoff in the *Treacy* case

10:53 20     that everyone's talking about, he had not only in camera access

21     to the documents at issue, he had, if you read the opinion,

22     access to the government's notes of everything the corporation

23     told the government.  And we're not sort of, at least at this

24     point, asking you to order the government to turn over to you

25     all of its notes about its interactions with eBay, but

1    Judge Rakoff was making those determinations in that case based

2    on a much more broad and textured access to information.  I

3    think --

4         THE COURT:  Well, I should add that, of course, under

5    *Brady*, *Giglio*, and the local rules, the government will have to

6    preserve those notes in case there's a prior inconsistent

7    statement.  I mean, they'd probably have to alert you to it.

8    But you're not asking for that now, so --

9         MR. FICK:  And, again, I think what we want to avoid

10:53 10   in the first instance is this sort of artificially narrowed

11   argument by both the government and eBay about what the scope

12   of the waiver or use of the information as a sword is because

13   whether or not they named a witness or quoted them, they made

14   what we understand to be a pretty far-reaching presentation to

15   avoid prosecution, turn over Mr. Baugh and his subordinates,

16   and somehow let the CEOs and the C-suite executives skate with

17   the government while going to the Board and getting them fired.

18   And so that's a very strange posture for them to be in.

19   They've gathered all this information, they've done this

10:54 20   investigation privately, but they have no Rule 16 obligation,

21   no *Brady* obligation, so we're left in the dark.  And I'm not

22   suggesting that eBay necessarily skewed anything, but you're

23   exactly right to say their corporate interest is very different

24   from, you know, an objective fact-finder that has Rule 16 and

25   *Brady* obligations.

1          THE COURT:  Nonetheless, I'm stuck with the law the

2     way it is.  So under Rule 501, I need to see what the scope of

3     the subject matter waiver is, and also whether, in fairness, it

4     needs to be produced.  And I think you're both urging me, at

5     least with respect to the witness statements, to evaluate them

6     myself.  I think I will do that when I get a witness list.

7          But let me just go on.  You've raised a constitutional

8     argument.  Fair enough, you've preserved it, fair enough, but I

9     don't have anything -- even the Supreme Court said, "And if

10:55 10    anything exists to eviscerate the attorney-client privilege,

11    it's the rare case and should be exceptional," that sort of

12    thing.  I have not heard anything that would countermand it.

13    In other words, what is it that you think would be in these

14    notes that could be exculpatory?

15         MR. FICK:  Well, first of all, I think a brick is not

16    a wall, right?  So for the evidence to be accessible, it

17    doesn't have to necessarily be sort of a complete defense.

18    Evidence that suggests, that diminishes Mr. Baugh's

19    culpability, that helps explain why the corporation and the

10:56 20    executives were telling him to, quote/unquote, "take care of

21    the Steiners" or "take down the Steiners," all of that is very

22    important potentially exculpatory information in building his

23    trial defense --

24         THE COURT:  Do you have any basis for believing that

25    there was anything -- in other words, I've seen nothing.  It

1    was nothing other than an abstract constitutional argument

2    based on a possibility that somewhere down the road something

3    would be exculpatory.  But thinking about your best-case

4    scenario, that one of his bosses told him to go do these

5    things, I don't know why that's exculpatory.

6            MR. FICK:  Well, because exculpatory evidence is not

7    just evidence that provides a complete defense.  It's evidence

8    that diminishes a defendant's culpability is also deemed

9    exculpatory under *Brady* and the local rule.

10:56 10          Let me try to talk about this another way.

11   Mr. Pirozollo says over and over that underlying documents,

12   lots of underlying documents were produced in the investigation

13   including emails, but as the log reveals, any email that has an

14   eBay lawyer on the email is conspicuously not produced in his

15   log, right?  So what we have is, during the time before the

16   alleged acts of stalking in the case, you have people within

17   eBay, including Mr. Baugh at various times, you know, in email

18   discussions about, "Well, what's the problem the Steiners

19   present?  What do you do about the Steiners?"  Because a lawyer

10:57 20   is on the email, it hasn't been produced; it's being logged as

21   privileged.  Some of those conversations include Mr. Baugh;

22   some of them do not.  And so that sort of closes the window on

23   Mr. Baugh's ability to show what's going on, what his superiors

24   knew and ordered and why.  And all of those things are critical

25   to him being able to put on a defense and to be able to paint a

1    clear and accurate picture of his mens rea during all these

2    activities.

3              THE COURT:  So I'm just not sure it overrides the

4    attorney-client privilege.  I don't think I have enough.

5              MR. FICK:  I mean, I respectfully disagree, but --

6              THE COURT:  It's pure speculation at this point.  Even

7    if I thought it would sort of somehow paint him in a better

8    picture before a jury, I don't know that it's exculpatory.  I

9    might have a different situation if you knew for a fact that

10:58 10   they weren't informed by the lawyers, let's say "defense of

11   lawyer" defense, that they could do these things lawfully.  We

12   don't have any kind of proffer like that.  I have nothing,

13   nothing.

14             MR. FICK:  Well, what we have, and these are cited in

15   the papers, there's some evidence that the lawyers were

16   basically saying to everyone at eBay, "Well, there's nothing,

17   but normal legal methods can't be used to deal with this

18   problem."  And so then the executives turned to Mr. Baugh and

19   said, "Okay, you take care of it."  I mean, that's at a high

10:59 20   level what we --

21             THE COURT:  You've already got that email.  You've got

22   that email saying "DO ANYTHING, DO ANYTHING" in all caps, "DO

23   ANYTHING," right?

24             MR. FICK:  There are clearly additional conversations

25   among the executives that included internal lawyers where that

1    is sort of flushed out in more detail, and so, you know, to

2    really build that case.

3              THE COURT:  I do not believe, so I'll put it in an

4    opinion, but I do not believe you've overcome the attorney-client

5    privilege based on what I have right now.  I'm much more

6    focused on the scope of the waiver, as you've noticed.  And

7    also the emails that there's no claim of privilege to should be

8    produced if they're within the time period, if there's no claim

9    of privilege.  So I think they're admissible, at least arguably

10   admissible, and I don't know why they haven't been produced.

11             So I think at this point, I wanted to give the

12   government a chance to jump in at all.  Do you have a horse in

13   this race, I guess?

14             MR. KOSTO:  Your Honor, we have no horse in the waiver

15   race.  Whatever the Court orders with regard to the waiver is

16   going to result in the release of some documents and not

17   others.  And you've touched on the admissibility question.  The

18   only thing we would add, we agree with the Court that the

19   involvement of others at eBay and documents indicating that

20   higher-ups at eBay had some knowledge of this happening in

21   advance, or silently condoned it or blessed it, doesn't

22   exculpate Mr. Baugh.  It doesn't show that he was authorized to

23   do it.  It's not relevant under the *Nixon* standards, for one,

24   and it's not exculpatory --

25             THE COURT:  Well, it may be relevant.  Now, let's draw

1  a distinction between relevant and exculpatory.

2       MR. KOSTO:  Sure.

3       THE COURT:  You know, what's that expression when you

4  were a kid?  "If someone told you to jump off a bridge, would

5  you do it?"  So, I mean, I get that it may not be exculpatory,

6  but it's relevant to understand what happened here.  If in fact

7  the executives condoned it, it's relevant.  That's a broad

8  swarth, right, relevant?

9       So if you put on any of these witnesses -- let me ask

11:01 10  you, what do you view your obligation?  Let's say you put on

11  one of these witnesses and they said they didn't know anything,

12  hear no evil, see no evil, didn't do anything, would you say at

13  that point some of these statements may become relevant or

14  impeachable, be able to be used for impeachment?

15       MR. KOSTO:  If we have the statement, it's clearly

16  Jencks material.  If we have the statement and it's

17  inconsistent, it's clearly 21-day material, it's *Giglio*

18  material.

19       THE COURT:  Speaking of what you said, I think it was

11:01 20  Mr. Gelb's point that you agreed to produce all this Jencks

21  90 days in advance, right?

22       MR. KOSTO:  We will, yes.

23       THE COURT:  All right, so that's good.  All right,

24  that deals with that issue.

25       MR. KOSTO:  I mean, we do submit that when you look at

1    the definition of "relevance," what fact does a higher-up at

2    eBay make more or less likely with respect to Mr. Baugh's

3    activity?

4            THE COURT:  You might lose that battle.

5            MR. KOSTO:  Sure.

6            THE COURT:  But that's different from whether it's

7    *Brady* material.

8            MR. KOSTO:  Understood.  We don't have anything else

9    on this issue, your Honor.

11:02 10            THE COURT:  Okay.  Anything else anyone wants to say

11    on this issue because it is now five past 11:00.

12            MR. ANDRISANI:  Yes, your Honor.  This is Nate

13    Andrisani on behalf of Morgan Lewis.  If I may, we join in the

14    argument that Mr. Pirozollo made on behalf of eBay with respect

15    to the privilege and the scope of waiver.  I would just like to

16    add that with respect to the interview memos that you'll be

17    reviewing at some point in time, depending on witness lists and

18    the like, there is a work product protection for the lawyers'

19    mental impressions, notes, thought processes that are

11:02 20    separately protected.  eBay has an interest in that work product,

21    as do Morgan Lewis' attorneys.

22            THE COURT:  Well, let me ask you about that because to

23    the extent a paralegal or an attorney is just verbatim taking

24    down a witness statement, I'm less sympathetic.  To the extent

25    you put in a footnote "I thought this guy was a liar" or "This

 1   person really doesn't know anything," I mean, you may be right.

 2   It would just take a very granular read of the statement.

 3          MR. ANDRISANI:  That's correct, your Honor.  And with

 4   respect to the facts -- and Mr. Pirozollo argued this with

 5   respect to the scope of the waiver -- underlying facts are

 6   different than the work product/mental impressions that might

 7   be included in those memos as well.

 8          THE COURT:  Sure, sure.

 9          MR. ANDRISANI:  And then, secondly, with respect to

11:03 10   the subpoena to Morgan Lewis seeking work product that our

11   attorneys put together to present to the client, eBay, or to

12   its Board of Directors, that is straight attorney work product

13   and attorney-client communication that in this instance I would

14   think the investigation conducted by Morgan Lewis and eBay is

15   not what's relevant at trial, but, rather, what the government

16   investigated and charged the individuals with.  So I would

17   think that the privilege here and the work product would

18   supersede --

19          THE COURT:  It gets trickier, Mr. Andrisani, to the

11:04 20   extent that there is something potentially exculpatory of one

21   of the defendants here.  So, anyway --

22          MR. ANDRISANI:  Understood.  Thank you for allowing me

23   to be heard.

24          THE COURT:  All right, thank you.  Of course.  And I'm

25   very glad to see you've changed your name at the bottom there.

1    I got it right, though, even without that.

2          All right, so we're moving on to the motion to

3    dismiss, and I don't know who you want to go first.  There are

4    a number of separate issues, venue, multiplicity, obstruction.

5    Who wants to go first?

6          MR. MARX:  Your Honor, this is Daniel Marx for

7    Mr. Baugh.  I'm happy to start it.

8          THE COURT:  And before you do that, let me just stop

9    for a minute and ask my wonderful Court Reporter if she wants a

11:05 10   break now or whether we should just go till 12:00.

11         (Discussion off the record.)

12         THE COURT:  She has the hardest job here paying

13   attention.  All right, go ahead.

14         MR. MARX:  Thank you, your Honor.  So with respect to

15   the motion to dismiss for Mr. Baugh, it focuses exclusively on

16   what I'll broadly call the "obstruction charges."

17         THE COURT:  You're Mr. --

18         MR. MARX:  For Mr. Baugh.

19         THE COURT:  For Mr. Baugh?

11:05 20   MR. MARX:  For Mr. Baugh, yes, cocounsel with Mr. Fick

21   and Ms. Barsky.

22         THE COURT:  Okay.

23         MR. MARX:  So with respect to Mr. Baugh's motion to

24   dismiss, it focuses exclusively on what I'm going to broadly

25   call the "obstruction charges."  And at a prior hearing, you

1   know, the Court expressed some skepticism about the way in

2   which, you know, the government may have stretched the

3   obstruction statutes to reach some of the conduct in this case.

4   We think that skepticism was well founded, but in order to sort

5   of see exactly where the indictment comes up short, it's

6   important to be precise about these particular statutes.

7          So although they're broadly called "obstruction,"

8   there's really two separate statutes we're dealing with.  One

9   is 1512, which I'm going to call the tampering statute --

11:06 10   that's actually its title -- tampering of witnesses, either in

11   official proceedings or investigations.  Here the charge is

12   1512(b)(3), so tampering with a witness in connection with a

13   federal investigation, not an official proceeding but an

14   investigation.

15          That's separate from 1519 which is also charged here.

16   I think of that as the "shredding statute."  That's the statute

17   that comes in after Sarbanes-Oxley.  It's the statute that

18   became famous in the *Yates* case in the Supreme Court about the

19   fish stick that got thrown back into the ocean and whether that

11:06 20   was like shredding a document or not.  It covers essentially

21   destroying or falsifying documents in order to impede a federal

22   investigation.  So we have tampering and we have shredding;

23   that's how I think about it.

24          Let me start with 1512.  The statute clearly includes,

25   and I don't think there's any dispute about this, a conduct and

a specific intent element.  So in order to violate 1512, you

need to engage in either intimidation, threats, or in this case

the allegation is misleading conduct, okay?  That's the act you

have to commit.  The intent you need to have when you do that

is to prevent the communication of information to a federal

official.

Now, the indictment plainly alleges --

THE COURT:  On a possible federal crime?

MR. MARX:  Absolutely.  Absolutely, your Honor, though

that's not really an issue in the motion, but, yes, you're

absolutely correct.  And the indictment plainly alleges that

Mr. Baugh engaged in misleading conduct.  It says he lied to a

local police officer, a Natick police detective, and also to an

eBay investigator.  But what it doesn't allege, what it fails

to allege is that he did that with the specific intent to

prevent any communication.  And in fact, ironically, the

prosecution theory here is that what he was trying to do was

concoct a false cover story, presumably in the hope that that

word would get around, that it would be passed on to other

people.  So he may have engaged in misleading conduct, but he

did it with the intent to cause communication, not prevent,

hinder, or delay communication.  And because the indictment

doesn't --

THE COURT:  Can I just back up for a minute because we

went and looked at the most recent First Circuit cases to find

1    what the standard is for motion to an indictment, and it's

2    pretty minimalist.  All you have to do essentially is plead the

3    elements of the offense, literally repeat the statute, and give

4    enough notice as to what you're talking about so it's not

5    unfair.  Why hasn't it done that?  I mean, you may have certain

6    arguments later on about the sufficiency of the evidence,

7    et cetera, but this isn't an *Iqbal/Twombly* motion.  You know, I

8    have enough with what they call the "Twiqbal" motions on the

9    civil side.  I mean, all you have to do, I mean, it is so

11:09 10    minimalist, and a couple of my colleagues have been knocked

11    down recently when they tried to do more than that.

12              MR. MARX:  Right.

13              THE COURT:  So you --

14              MR. MARX:  I agree, your Honor.  Look, from a

15    defendant's perspective, the law is not great on this topic,

16    and it's ironic in the sense or paradoxical that a criminal

17    defendant is entitled to a less adequate pleading than a civil

18    defendant would be because *Twombly/Iqbal* don't apply here; and

19    the law does generally say that a recitation of the statutory

11:09 20    language is sufficient.  The problem is, it also says you have

21    to read the indictment as a whole.  And when the indictment

22    plainly spells out a theory of the case that's inconsistent

23    with what the statute requires -- the indictment here alleges

24    that Mr. Baugh did something.  It then says, incorporating all

25    those paragraphs, that was a violation of the statute.  But

 1   that thing is not a violation of the statute.  By its basic

 2   terms, that indictment would be failed.  And there's no First

 3   Circuit case that says you can somehow reverse the fact or

 4   immunize yourself for having alleged all these facts, which are

 5   inconsistent with the statute, by then just putting in the

 6   boilerplate, you know, under --

 7        THE COURT:  I think you can do that -- I mean, I hate

 8   to say it -- as long as you just sort of rubber-stamp, copy the

 9   statute.  I mean, there are certain things that perhaps could

11:10 10   prevail, say, it was plainly against the statute of

11   limitations, plainly, I don't know, there's a plain -- I know

12   we'll get to venue -- the plain venue issue, but it's basically

13   pretty darn straightforward.  I think it was the *Stefanik* case:

14   You outline the elements of the crime, and you give them the

15   nature of the charge so that you can prepare your defense and

16   avoid double jeopardy.  I mean, it's really minimal.

17        MR. MARX:  I agree, your Honor, it is minimal in the

18   sense --

19        THE COURT:  And *Brissette* was the other one.

11:11 20        MR. MARX:  Right, and in a sense it would be strange

21   to say that, you know, the less you put in the indictment, you

22   know, if you literally just quote the statute and put the

23   defendants' name in, that that's sufficient.

24        THE COURT:  Right, I see it every day of the week in a

25   drug case.  You get the date of the transaction and the name of

1  the guy and the fact it was in Massachusetts, bingo, you've

2  stated a claim.

3      MR. MARX:  That's right, your Honor, and I think the

4  case law certainly says that.  I'm certainly not disputing

5  that, nor am I disputing that if you actually look at the

6  indictment, for example, the 1512 charge in Paragraph 28, it

7  just copies the statutory language.  But I'm not aware of First

8  Circuit authority, and I've certainly looked and have been

9  reading the same cases, that says when an indictment so plainly

11:11 10  articulates the prosecution theory and that theory cannot

11  possibly meet the statutory definition of the crime, that that

12  is sufficient.

13      THE COURT:  So assuming your predicate, well, why

14  couldn't it possibly?  In other words, here are two very

15  sophisticated guys; by their own statements, worked for the

16  federal agents.  They're traveling from California to

17  Massachusetts across state lines to harass and stalk a couple.

18  At least that's what the government is alleging.  Why isn't

19  that a reasonable possibility of a federal prosecution, and why

11:12 20  weren't they trying to throw the Natick police officer off

21  course?

22      MR. MARX:  Okay, so it's a good question.  Let me

23  answer it directly, but that's really a separate issue than

24  what we're talking about right now, your Honor.  So the answer

25  to that question is, and it's a separate argument in the motion

1    to dismiss, is that a local harassment investigation by the

2    Natick Police Department, which was what was happening at the

3    time that the alleged lies were told, was not something that

4    was likely to become a subject of a federal criminal

5    investigation or a subject of international intrigue.

6         THE COURT:  Allegedly.  I mean, I understand there's

7    presumption of -- when you have multiple acts and you're

8    leaving death threats and funeral wreaths and pig heads and

9    live cockroaches and spiders, you don't think that somebody is

11:13 10  going to say "look into that," the threats, at a higher level?

11   It's at least reasonable to think it might happen.

12        MR. MARX:  Certainly it's possible that it might

13   happen, and that's one of the issues.  But, your Honor, I want

14   to be clear:  When I'm talking about the specific intent

15   problem in the indictment, it has nothing to do with the

16   likelihood of an investigation.  So let's just assume for the

17   moment it was likely the FBI would step in at some point and

18   conduct an investigation.  The issue is, what is Mr. Baugh

19   accused of doing when he supposedly lies to the Natick Police

11:13 20  and lies to an eBay investigator?  And let's assume that I'm

21   not disputing that a federal investigation was likely.  Let's

22   even assume, because it makes the hypothetical easier, there

23   was a pending investigation, which there wasn't yet.  The way

24   the indictment reads, it says very clearly his purpose is to

25   cause those people to communicate to the investigators a cover

1   story, when the statute says you've only tampered with a

2   witness.  In fact, that's what "tamper" means, is if you tried

3   to stop someone from talking to --

4          THE COURT:  "Tamper" just means to alter.

5          MR. MARX:  No, your Honor, I think that's incorrect,

6   and it's not what the statute says.  The statute says "to

7   prevent, hinder, or delay."

8          THE COURT:  All right, all right, prevent, hinder, or

9   delay the communication of the findings to a federal official.

11:14 10        MR. MARX:  But that's not what he was doing, right?

11  So if he was trying to stop the Natick Police from talking to

12  the FBI or stop eBay from talking to the FBI, that's tampering.

13  But giving someone false information in the hope they'll pass

14  it along, you know, maybe that's a false statement offense if

15  they can prove jurisdiction, maybe that's 1001, maybe it's some

16  kind of fraud, but it's not witness tampering.  The statute is

17  very specific about the prevention of communication.

18         THE COURT:  Or hinder, or hinder.

19         MR. MARX:  Which is another way of saying prevent,

11:15 20 prevent, delay, hinder.  It means to stop, to tamper, to keep

21  someone from --

22         THE COURT:  All right, I understand your argument.

23         MR. MARX:  Right.  The second statute that we're

24  dealing with is a slightly different problem.  So the argument

25  under 1512 is, there's a clear allegation of conduct; there

 1    isn't an allegation of inappropriate intent.

 2          We have the opposite problem with the shredding

 3    statute under 1519.  There the allegation is, there's this

 4    document, a personal interest list, which is a list of people

 5    that eBay is worried about maybe causing problems or related to

 6    other people causing problems; and that list was going to be

 7    used in order to kind of lead local investigators off the

 8    trail, as a device to mislead people as to why they were in

 9    Massachusetts, okay?

11:15 10          So now the indictment has the opposite problem.  It

11    very clearly alleges and accuses Mr. Baugh of having the intent

12    to mislead people and obstruct an investigation.  The problem

13    is, it doesn't accuse him of destroying a document or shredding

14    a document or falsifying a document in any way.

15          THE COURT:  Of falsifying, that they made up a

16    document to throw the investigation off source.

17          MR. MARX:  That's the problem, your Honor, is, the

18    document is not made up.  It's a real document, an accurate

19    document, a truthful document; and there's not a word in the

11:16 20    indictment to suggest anyone put any false information of any

21    kind in it.

22          THE COURT:  And this is where I go beyond the four

23    corners of the indictment and I have a problem with sort of

24    resolving it here now.

25          MR. MARX:  I don't think so, your Honor.  So take the

1    *Rowland* case which the government relies on.  Governor Rowland

2    falsifies a document and creates a sham contract which says,

3    "I'm giving business advice to this charity," when in fact what

4    he's doing is giving political campaign advice that he doesn't

5    want to disclose to the charity owner's spouse.  That's a false

6    document.  The *Normand* case which they also cite is a case in

7    which a cop takes money in a car stop and then writes a false

8    report that says "no money was taken" because the cop has put

9    it in his own pocket.  Those are false documents with the

11:17 10    intent to obstruct an investigation.

11         The creation of a true document or the use of a true

12    document for a misleading purpose simply doesn't have the

13    conduct element of the offense.  Nothing here was falsified.

14    The intent may have been to mislead someone, but you've got to

15    look at the document itself and ask, has anything been done

16    with this document to create a fiction?  And there's nothing,

17    there's not a word in the indictment that --

18         THE COURT:  And that's an *Iqbal/Twombly* or summary

19    judgment kind of argument.  I just can't do it here.

11:17 20         MR. MARX:  Okay, fair enough, your Honor.  That's our

21    argument about the problem with the indictment.  You know, it

22    cites the statute, and we respectfully disagree with the

23    ruling; but if the understanding is that's sufficient under

24    First Circuit law, we certainly understand that position.

25         THE COURT:  It's a hard area of law, at least in the

 1   First Circuit.

 2           MR. MARX:  It certainly is, your Honor, or at least

 3   hard for one side of the "v," your Honor.

 4           THE COURT:  Yes.

 5           MR. MARX:  So let me talk about venue because I think

 6   that was actually --

 7           THE COURT:  I know, can I just do one by one?

 8           So, Mr. Kosto, what I was confused about, do you have

 9   to prove that the defendants knew there was a reasonable

11:18 10   foreseeability of a federal investigation, or do you just have

11   to prove there was a reasonably foreseeable federal

12   investigation?

13           MR. KOSTO:  Under *Fowler* and what follows, that it was

14   reasonably foreseeable that communications to a federal

15   official would follow, not that the defendants knew anything

16   about a likely or pending federal matter.  What the defendants

17   have to know is that there's an inquiry into the conduct, here

18   the --

19           THE COURT:  So you have to prove beyond a reasonable

11:18 20   doubt that each of these defendants reasonably should have

21   foreseen a federal investigation?

22           MR. KOSTO:  No.  What we have to prove beyond a

23   reasonable doubt is that the defendants committed conduct about

24   which it was reasonable to believe there would be

25   communications to a federal official.

1       THE COURT:  Don't use the passive voice.  That they

2   reasonably foresaw?

3       MR. KOSTO:  What we will show and what we allege --

4       THE COURT:  Can I just say, is that with scienter, is

5   that they had to reasonably foresee that their conduct would --

6       MR. KOSTO:  No.  It's that the matter makes it likely

7   that there would be communications to a federal official.  What

8   they have to do -- I agree with Mr. Marx --

9       THE COURT:  They have to know that the matter was

11:19 10   reasonably likely?

11       MR. KOSTO:  No.  They have to know that there's an

12   inquiry into the matter, that the Natick Police Department is

13   looking into the stalking.

14       THE COURT:  I'm just not sure about that, whether they

15   personally have to reasonably -- it's not relevant to this

16   motion to dismiss, but in reading *Fowler*, there are two ways of

17   thinking about it -- it's interesting -- whether they had to

18   know it was reasonably foreseeable that there would be a

19   federal investigation, or whether or not the government just

11:19 20   has to prove in the abstract that it was reasonably foreseeable.

21       MR. KOSTO:  If the defendants don't need to know about

22   the existence of the investigation and the investigation

23   doesn't even have to exist --

24       THE COURT:  Right, it's a foreseeability issue,

25   whether or not they should have foreseen.

1        MR. KOSTO:  I think we need it either way, your Honor,

2    given many of the factors that you just described.  It's our

3    view that we don't have to prove that they knew a federal

4    investigation was coming.

5        THE COURT:  By the way, that's why I was interested in

6    your position on the role as government agents because I

7    thought that cut both ways.  I thought that wasn't a slam dunk

8    for either side, so -- but, anyway -- because it does go to the

9    reasonable foreseeability issue.  But, in any event, did you

11:20 10   want to respond at all to this argument on the obstruction and

11   tampering issues?

12       MR. KOSTO:  I'll go backwards from what Mr. Marx hit

13   second, which is, we allege that at Mr. Baugh's direction,

14   Ms. Stockwell falsified that document.  The eBay

15   person-of-interest document, it was created on August 21, 2019,

16   at Mr. Baugh's direction.  And the indictment, I think as the

17   Court recognizes in refusing to apply some kind of summary

18   judgment standard, that we allege it was falsified.  But what

19   it was, and what the evidence will show is, it was a classic

11:21 20   "round up the suspects" kind of moment.  There is no existing

21   person-of-interest document.  Ms. Stockwell created that

22   document from a group of usual suspects, people at eBay who had

23   given eBay problems and were in the database; but that document

24   itself is false because the people involved who created it left

25   out the one person who was the true person of interest, the

1  person that actually used that credit card, Veronica Zea.  So

2  it's not a true document.  It's not like they took the --

3       THE COURT:  Person of interest in what way?  I haven't

4  seen the documents.  A person of interest who they think is

5  hurting eBay?

6       MR. KOSTO:  So eBay kept a list in its ordinary course

7  of business in which if someone called a call center and

8  threatened to come down to the campus and beat somebody up, or

9  called the call center and were upset that they hadn't gotten

11:22 10  their refund over eBay, and say, "I'm going to go sit outside

11  the CEO's house with a sign until I get my money back," they go

12  into a person-of-interest database, a general geographic area.

13  But it's not like there was a document.  Like, sure, eBay has a

14  Form 10K once a year or once a quarter; that's a document.

15       What Ms. Stockwell did here was take a group of

16  persons of interest who they knew had nothing to do with this

17  offense because they knew that Ms. Zea, one of the

18  coconspirators, had used this debit card.  The Natick Police

19  said, "We're looking into who used this debit card," and

11:22 20  Mr. Baugh said, "We need to find someone to pin that debit card

21  on, round up the usual suspects," and that's what Ms. Stockwell

22  created and sent to Mr. Baugh.  It's a false document because

23  Ms. Zea isn't in it.

24       On the question of the act and the intent on

25  Section 1512(b)(3), there is the part of engaging in misleading

conduct, the false statements or admissions.  Both would
satisfy the elements of the offense.  And then there's the part
that Mr. Marx refers to, hinder and prevent the communication
of information.  The government's view of that statute will be
that it's "prevent and hinder the communication of truthful
information," so to keep truthful information from the federal
government, to keep witnesses from providing truthful
information.

So the *Bailey* case which we alluded to all the way
back at that first hearing is a situation simply where the
prison guard, he didn't do anything to prevent anyone from
communicating with the FBI.  He made a false statement to the
jail investigators about his role in the offense, and that
satisfied the element of hinder or prevent the communication of
information because that false statement, not the truthful
information, didn't get to the FBI.  The FBI was prevented from
getting truthful information.

So in offering up cover stories in a situation where
they know the Massachusetts police, the local police are
investigating, and they know that the local police are asking
questions of eBay, and they know eBay is responding to
questions from Detective Sutherland, who, by the way, is a
federal task force officer -- they don't need to know that, but
a federal task force officer is asking questions of eBay --
eBay makes the defendants aware.  And that's why our interviews

1    with Mr. Vonsover, for example, are very focused in on what the

2    defendants said in response to Mr. Vonsover's questions and not

3    what everybody else at eBay said in response to Mr. Vonsover's

4    questions.  It's the cover story that Mr. Baugh and Mr. Harville

5    were filtering back to the government through eBay that is the

6    false information that's just like the false information that

7    the prison guard in *Bailey* offered to the investigators in

8    *Bailey*.  And we've given the Court in our brief a couple of

9    examples where lawyers are given cover stories, and it's held

11:25 10   to be witness tampering because the lawyers are designed to

11   back up that cover story, make this all go away.

12         THE COURT:  That's the part that I was struggling with

13   a bit at our first hearing because, I mean, not every sexual

14   harassment or violation of company rule would necessarily lead

15   to a federal investigation.  So, you know, at what level?

16   That's why I kept pressing on the reasonable foreseeability

17   thing.

18         MR. KOSTO:  Yes, and that goes back to what the Court

19   recognized about the pigs head.  But here, again, it's really

11:25 20   important to know that the defendants know that Natick is

21   investigating because they were out in Natick and they saw, as

22   alleged, you know, they were listening to the radio broadcasts.

23   They know that eBay is responding to Natick's requests because

24   eBay tells them, "We're responding to Natick's requests."  It's

25   not a mystery to why these statements would have significance

1    to an investigation that became federal.

2         THE COURT:  Why the statements to Morgan Lewis where

3    Mr. Vonsover --

4         MR. KOSTO:  Not Morgan Lewis, but, yes, the internal

5    questioner at eBay.

6         THE COURT:  And so you're going to have to show, given

7    the timing and what was happening, that there was a reasonable

8    foreseeability at that point of a federal investigation.

9         MR. KOSTO:  Exactly.

11:26 10        THE COURT:  Or however we word the scienter, there at

11    least had to have been a reasonable foreseeability.  So that

12    means not every false statement to a company lawyer is going to

13    trigger obstruction charges.

14        MR. KOSTO:  I think that's correct, your Honor, not

15    every false statement to a company lawyer.  But in this

16    context, as the Court started out, when there is an

17    investigation afoot that the defendants know about into an

18    interstate harassment campaign that involved death threats and

19    on and on, that's not simply a false statement in a sexual

11:26 20    harassment case.

21        THE COURT:  Okay, good.  All right, so I just want to

22    make sure we hit everything before we hit our -- so the next,

23    there were two other issues, one -- well, maybe three, but

24    certainly there's the venue and then there's the multiplicity/

25    duplicity.  And was there another one?  I can't remember

1    whether there was.

2             MR. MARX:  Only venue for me, your Honor.

3             THE COURT:  All right, who wants to go first?

4             MR. MARX:  I'm happy to just finish my piece, your

5    Honor, and then pass to Attorney Gelb.

6             So the venue issue, your Honor, with respect to

7    Mr. Baugh, I think the same issues would apply to Mr. Harville

8    as well.  So we've already talked at some length about, you

9    know, the conduct and intent elements of 1512 and 1519.  Now,

11:27 10   it's critical to keep track of those because under First

11   Circuit law, venue is a conduct analysis.  That's *Seward* and

12   that's *Salinas*, and that's other cases we cite in our briefs.

13   You look at where the alleged criminal conduct occurred, not

14   what the defendant may have been alleged to cause in terms of

15   consequences in other places.

16             With respect to tampering, 1512, the alleged conduct

17   in Count 11 is lying to an eBay investigator.  That happened in

18   California.  There's no dispute that happened in California.

19   You can be prosecuted in California for that, to the extent we

11:28 20   solve the reasonable foreseeability problem and other things;

21   but as far as where the conduct occurred, it's totally in

22   California.  You lie to a Natick cop, that's in Massachusetts.

23   You lie to an eBay investigator in San Jose, that's in

24   California.

25             Now, the government says, oh, don't worry about it

because there is a specific venue provision in 1512, 1512(i).
The problem is, that specific venue provision is explicit that
it's about official proceedings.  This is not an official
proceeding case.

THE COURT:  Yes, but I'm a very official proceeding.
In other words, I'm about as official as it gets, for better or
worse, the seal behind me.  So why wouldn't it be tampering
with a reasonably foreseeable federal official proceeding?

MR. MARX:  Because the charge, your Honor, is
1512(b)(3), tampering with a witness in a federal investigation.
The charge is not (b)(1) or (b)(2), which are about official
proceedings.  They're different charges.

THE COURT:  I see.

MR. MARX:  If you charge someone with lying to the
grand jury or lying at the trial, that's (b)(1) and (b)(2), and
there's the specific venue provision, 1512(i), which says they
can be charged either where they tell the lie or where the
official proceeding is going on.  Makes complete sense, but
that only applies to (b)(1) and (b)(2), not (b)(3) which
relates to investigations.

The case the government cites, *Gonzalez*, which is,
like, a 30-year-old Second Circuit case, says, "Well, we
broadly read 'official proceedings' to include investigations."
The problem, that's totally inconsistent with the face of the
statute, and never been cited by the First Circuit.  And in our

brief we cite a whole bunch of much more recent Circuit and

District Court cases that say that's completely wrong; there's

official proceedings and there's investigations, and the

specific venue provision of 1512 only applies to official

proceeding charges.  That's not what we have.  The government

doesn't dispute that.  That's not what we have.  So you're only

looking at the conduct, the traditional venue rules, and that

conduct, lying to an eBay investigator, happened in California.

THE COURT:  Even if it's a multistate Massachusetts/

California investigation?

MR. MARX:  Absolutely, because it's just about what

the misleading conduct was.  It doesn't matter where you hope

the consequence would flow to.  It could flow to all sorts of

places.  I think Amir Vonsover may be even working --

THE COURT:  So is this apparent victory for you?  If

you win this, all it means is they try in the -- where's eBay?

I don't even know.

MR. MARX:  San Jose, your Honor.

THE COURT:  San Jose, so does that --

MR. MARX:  I mean, in a sense, venue is always

apparent victory for a defendant, but venue is clearly not

appropriate here, your Honor.  Whether the government would

bring this case in the Central District of California, I don't

know.

THE COURT:  I haven't done one of these in a really

```
 1   long time.  Let's say if I denied this, would you say that's
 2   something the government has to prove at trial?
 3        MR. MARX:  Yes, your Honor, but I believe the standard
 4   is by a preponderance.
 5        THE COURT:  I see.  I don't know if I've ever done one
 6   where it actually ended up going to --
 7        MR. MARX:  I'm not sure I've ever litigated it at
 8   trial myself, your Honor, but, yes, it is an element, but it's
 9   considered a different type of element with a lower standard of
10   proof.
11        THE COURT:  I see.
12        MR. MARX:  So that's the lying, the tampering thing.
13        THE COURT:  So even I took a different statutory
14   construction -- I don't know, this is a very technical point --
15   even if you lost it, it would still be part of our trial,
16   right?  That I would have to put it to a jury whether you've
17   proven that the obstruction happened --
18        MR. MARX:  Yes, if you denied the motion, yes, we
19   anticipate that this would have to be something the government
20   would prove at trial, and if we could attempt to prove that the
21   conduct did not occur here in Massachusetts.
22        THE COURT:  And I'd have to define for them what
23   "conduct" is.  All right, that --
24        MR. MARX:  Right, it could get complicated, yes, and a
25   little different standard of proof.  And, yes, so I think it
```

11:31 (line 10)
11:31 (line 20)

1      invites mischief for a charge where the conduct clearly

2      occurred someplace else, and under First Circuit law, the

3      intent is relevant.

4           THE COURT:  All right, thank you.

5           MR. MARX:  Now, under 1519, which is the shredding

6      statute about the falsification of this person-of-interest

7      list -- oh, excuse me, your Honor.  Under the 1519 with respect

8      to venue, the charge is that he goes back to California after

9      being in Massachusetts, Mr. Baugh, and wipes his phone.  Again,

11:32 10   there's no dispute that that happens in California.  The

11     government's argument is that, well, but the intent is to

12     affect the investigation that he knows is going on in

13     Massachusetts; but, again, you just apply straightforward First

14     Circuit law, and you look at the conduct alone -- the phrase in

15     the case law is "the essential conduct of the offense" -- and

16     ask where it occurred.  The cases they're citing, *Salamon*,

17     *Nixon,* all arise from a district outside the circuit; those are

18     cases that rely primarily on a Ninth Circuit case called

19     *Angotti*.  If you read *Salinas*, the First Circuit says, "Not

11:32 20   only is it not clear the Ninth Circuit follows *Angotti*, but

21     it's inconsistent with two Supreme Court cases, and we

22     expressly decline to follow it."  So --

23          THE COURT:  *Salinas* was the passport case?

24          MR. MARX:  Yes.  And it's interesting, your Honor, I

25     just want to point this out because it gets complicated.  This

is a technical issue:  There are some statutes that embed a
multi-jurisdictional element to them, and the examples that's
given in cases like *Salinas* are cases where the statute itself
says you have to commit a crime that affects interstate
commerce, right?  So then the question is, the statute itself
defines the conduct with respect to where its effects are, or
materiality provisions the courts interpret to mean the conduct
itself has to be material so you have to look at what the
impact of, for example, a 1001 violation is.  That's different
from, and *Salinas* draws this distinction nicely, I think,
different from 1512 and 1519 where the conduct is discrete, and
then there's a separate intent element.

THE COURT:  So, as I understand it, this is a case of
first impression in the First Circuit?

MR. MARX:  I believe so, your Honor, yes.

THE COURT:  Okay, thank you.

Mr. Kosto, have you found any cases either in D Mass.
or the First Circuit interpreting the language for these two
statutes?

MR. KOSTO:  Shall I take 1512 first, your Honor?

THE COURT:  Whatever you want.

MR. KOSTO:  Sure.  I think there's a very simple way
through the witness tampering venue provision because when
Mr. Marx reads it to you, he categorizes the venue as only
available in situations involving official proceedings, (b)(1)

1    and (b)(2).  But what it says is, a prosecution under this

2    section, which is 1512(b)(3), or any of 1512s, "may be brought

3    in the district in which the official proceeding (whether or

4    not pending or about to be instituted)."  And I think the Court

5    had it right when you referred to the seal over your shoulder.

6    Within a month of the Natick Police and eBay asking these

7    questions to which the defendants gave false answers, there's a

8    grand jury proceeding pending in the District of Massachusetts,

9    as of late September, early October 2019, just a month later,

11:34 10    and that's what led to the indictment in this case.

11            So there does not need to be an existing official

12    proceeding to satisfy this venue provision, simply one that was

13    either something -- it doesn't even need to be pending or about

14    to be instituted, and, quite frankly, we have an official

15    proceeding that was about to be instituted and became pending

16    within a month.  Whether or not you focus in on the conduct

17    element of the offense --

18            THE COURT:  And you think that analysis applies to the

19    tampering?  Does it apply to the straight-up --

11:35 20            MR. KOSTO:  As to the shredding statute?

21            THE COURT:  What do you call it, the shredding

22    statute, which is --

23            MR. KOSTO:  I'll borrow Mr. Marx's term.  I guess we

24    call it the "falsifying statute," but, no, because a venue

25    provision only covers the statute that it's mentioned in, so

1512's venue provision covers prosecutions under 1512.  As to

1519, we see the *Salinas* case a little bit differently than

Mr. Marx.  We certainly agree that just because there are other

properly venue charges here in the district, that doesn't mean

venue is proper under 1519.  But *Salinas* was a case where a

defendant in Brooklyn walks in with a passport application and

hands it to the person who's in power to receive it, and the

First Circuit concludes that the crime is done right then and

right there at that moment.  And the First Circuit was bothered

that that application could then be sent to New Hampshire,

where the State Department chose to have it sent, or Guam or

anywhere else, and all of a sudden the defendant would be

defending themselves in Guam or New Hampshire, anywhere but

where they were when they handed that document over.

THE COURT:  I understand *Salinas* is distinguishable,

but are there any cases that help me out on where the conduct

occurred?

MR. KOSTO:  Nothing in the First Circuit or the

district, your Honor.  We just think that the better analogy

than *Salinas* in this district is the false statement cases

because if the Court is willing to say that just because a

false statement is made in California, the fact that there's a

materiality element means that the place where the materiality

is felt, the investigator's district, can be used.  And this is

the same situation.  There's a requirement --

1          THE COURT:  What First Circuit case is that?

2          MR. KOSTO:  Oh, my goodness, I knew you would ask me

3    that.  Can I submit that after the hearing, your Honor?

4          THE COURT:  Yes.  Or there was so much paper, it's

5    possible I missed it.

6          MR. KOSTO:  I think it may be in Mr. Marx's brief

7    actually, but the point being that just like in a false

8    statements case, where you have to pay attention to where that

9    false statement was received because of the extra materiality

11:37 10   of it, there's an extra element in the falsifying and shredding

11   statute as well.  It requires that it be done in contemplation

12   of a federal matter.  And in an obstruction context, just like

13   you do with 1512 where Congress expressly said so, you have to

14   think about what's being obstructed.  These defendants knew

15   there was a Massachusetts investigation.  They know it's of the

16   conduct they're involved in; they've been in Massachusetts days

17   earlier; they know that eBay is asking questions of the police

18   and eBay is trying to respond.  This is --

19         THE COURT:  There's no doubt that there was enough

11:38 20   evidence to say they anticipated further law enforcement

21   proceedings in Massachusetts.  The question is, if it's a

22   conduct-based thing, as Mr. Marx says, whether or not that

23   trumps it.

24         MR. KOSTO:  And we don't think --

25         THE COURT:  It's very technical, and there's not much

 1    case law on it, and I have to think about it.

 2            MR. KOSTO:  Understood, your Honor.  I think that's it

 3    for us on venue.

 4            THE COURT:  Okay.

 5            Mr. Gelb, didn't you have something on venue too or

 6    not?

 7            MR. GELB:  I did, your Honor, but I wouldn't belabor

 8    the point, respectfully.

 9            THE COURT:  Okay, good.  So last but not least, to get

11:38 10   us to the 12:00 o'clock mark, isn't the last issue the

11    multiplicity/duplicity issue?

12            MR. GELB:  Yes, and I was going to touch upon the

13    obstruction as well --

14            THE COURT:  Fair enough.  You've been very quiet, so

15    it's always a good thing for a defense attorney to be off the

16    grid like you would, so that's fine.  All right, Mr. Gelb, go

17    ahead.

18            MR. GELB:  Thank you very much for your time, your

19    Honor.  So just to break things down, because there's a lot of

11:39 20   different statutes here and subsections, so I thought I would

21    sort of bullet-point this.  With respect to Mr. Harville's

22    position and the reason why he's moving to dismiss the

23    indictment is because as far as the duplicity argument is

24    concerned, it's the government's grouping of Section 2261(1)(b)

25    and 2261(a)(2)(B) into the single conspiracy charge, because as

1    the Court is aware, a conspiracy charge has to be a separate

2    and distinct offense charged from the substantive crime as

3    well.  So those are two separate crimes that are alleged into a

4    single conspiracy charge.

5            THE COURT:  One is a conspiracy and one is a

6    substantive crime, right?

7            MR. GELB:  Right, but the two substantive crimes are

8    grouped out, and I'll address the issues with that, separate

9    charged in the indictment.  2261(a)(1)(B) and 2261(a)(2)(B),

11:40 10  okay, you have the criminalize interstate travel to stalk,

11   that's the (a)(1)(B).

12           THE COURT:  You're moving into the multiplicity thing.

13   This isn't venue, right?

14           MR. GELB:  No, no.  I'm sorry, your Honor, this is --

15           THE COURT:  Right, right, I just didn't -- okay.

16           MR. GELB:  So the duplicity issue is grouping these

17   two subsections of the stalking statute into a single conspiracy

18   charge, and the multiplicity issue is the interchanging of

19   Victim 1 and Victim 2 in the indictment based on the definition

11:40 20  of Section 18 U.S.C. 115.

21           THE COURT:  But don't they say the appropriate unit of

22   punishment, aren't there several cases, is the victim, victim=

23   based?

24           MR. GELB:  It is, your Honor, but the issue here is

25   that because of the definition of Section 115, it's conceivable

that a jury could convict on -- you would not know whether or
not a jury could conceivably convict on substantial emotional
distress, if you will, to Victim 1 versus Victim 2 because of
the relationship under the statute.

THE COURT:  You mean whether there's a viability of
unanimity?

MR. GELB:  Right, because you have --

THE COURT:  Can't I just instruct them on that -- I
really have that instruction down pat -- that they'd have to
agree on the object of the conspiracy?

MR. GELB:  Well, not on just the object of the
conspiracy because the issue here, your Honor, is that the jury
could go into the room and deliberate, come back on a
convict- -- the way the indictment reads, you have both
Victim 1 and Victim 2 as the persons under both subsections of
the stalking statute; but at the same time, Section 115, your
Honor, allows an immediate family member, including a spouse,
to also be the -- there the victim set is interchangeable under
the statute.

THE COURT:  So if you sexually -- or not sexually --
if you harass Victim A and you harass Victim B, can't you
charge those in two separate counts?

MR. GELB:  They should be charged in two separate
counts.  They're charged in one count here in this indictment.

THE COURT:  Aren't there substantive as well as

1    conspiracy counts?  You're not trying to --

2            MR. GELB:  You're right.  So we have a conspiracy

3    count --

4            THE COURT:  You're only trying to knock out the

5    conspiracy count then.

6            MR. GELB:  No, the substantive count as well, your

7    Honor, see, because if I could draw the Court's attention --

8            THE COURT:  Well, this makes no sense.  I mean, you

9    just agreed with me that -- put aside the conspiracy count for

11:43 10   a minute -- that you'd separately charge with respect to

11   Victim A and separately charge with respect to Victim B.

12           MR. GELB:  No, the substantive counts, your Honor, if

13   I could draw your attention, for example, to Count 8 of the

14   indictment --

15           THE COURT:  Let me just get to the indictment.  So

16   help me on this.  Okay, I've got it.  Where do you want me to

17   look?

18           MR. GELB:  Okay, so Count 8 and Count 9 of the

19   indictment charges stalking through facilities of interstate

11:43 20   commerce, aiding and abetting.

21           THE COURT:  And Count 8 is Victim 1, and Count 9 is

22   Victim 2.

23           MR. GELB:  That's correct, your Honor, but based on

24   the definition of 18 U.S.C., Section 115(c)(2) --

25           THE COURT:  So read it.

1          MR. GELB:  I'm sorry, your Honor?

2          THE COURT:  Read 115(c)(2).  I don't remember it by

3     heart.

4          MR. GELB:  "Immediate family member of an individual

5     means, A, 2A is his spouse, parent, brother or sister, child,

6     or person to whom he stands in loco parentis; or, B, any other

7     person living in his household related to him by blood or

8     marriage."

9          THE COURT:  You're saying because it's such a broad

11:44 10   definition of victim --

11         MR. GELB:  Exactly, your Honor.

12         THE COURT:  -- Victim 1 also includes Victim 2?

13         MR. GELB:  Exactly, your Honor.

14         THE COURT:  But suppose you had directly -- as I

15    remember the allegations in the indictment, they separately

16    targeted each victim.  It wasn't only the -- it wasn't as if

17    they just sent it to the household.  They separately sent

18    Twitters to her, and separately didn't they send Twitters to

19    him?  No?

11:44 20        MR. GELB:  But they're still interchangeable because

21    of the statutory definition of "relationship," the nature of

22    the two victims, because they're husband and wife.

23         THE COURT:  All right, I understand the argument now.

24         How does the government want to respond?

25         MR. KOSTO:  I think the easiest way, your Honor, is

1   the Court looking at Page 19 of the indictment.  We've got one

2   count that alleges Victim 1 is the object of the harassment,

3   and one count that alleges Victim 2 is the object of the

4   harassment.  It's unlikely that the jury would mistakenly

5   conclude in Count 8 that Victim 2, by virtue of some kind of

6   family circumstance --

7          THE COURT:  You wouldn't ask me to give that statutory

8   definition that he just read?

9          MR. KOSTO:  I wouldn't.  And to the extent that it

11:45 10   would be helpful, one could even say, as to Count 8, the

11   government is not alleging that the spouse was harassed or that

12   the spouse was impacted; the government is alleging that

13   Victim 1 was harassed and impacted; and as to Count 9, Victim 2

14   was harassed and impacted.  The remedy for that kind of

15   duplicity is just an election, and that would be our election

16   as to how to instruct the jury on it.  We don't think that the

17   conduct as charged is duplicitous, but it could be remedied

18   pretty easily.

19          THE COURT:  Thank you.  And, of course, there's basic

11:45 20   case law that the conspiracy count is different than the

21   substantive.

22          MR. GELB:  Of course, your Honor.  But, your Honor,

23   with respect, the indictment facially doesn't read that way,

24   your Honor.  What the government just said, that's not how the

25   indictment reads.

1          THE COURT:  It does say Victim 1 and Victim 2.

2          MR. GELB:  Well, it says Victim 1 and Victim 2, but

3    there isn't specific conduct that is --

4          THE COURT:  There is in the front of it.

5          MR. GELB:  But in terms of the -- so it is still

6    possible, respectfully, your Honor, that a jury could

7    deliberate on this case, and as a result of the definition that

8    I just read --

9          THE COURT:  I wouldn't read it to them.

11:46 10       MR. GELB:  Okay.

11         THE COURT:  I'd name -- I don't know, I think at this

12   point everyone knows their names, but I'd name mister and I'd

13   name misses, or whatever they like to be called, but I

14   certainly wouldn't give that definition.  Okay, good, thank

15   you.

16         Is there anything else, Mr. Kosto?  Was there another

17   issue for you, Mr. Gelb?

18         MR. GELB:  Your Honor, with respect to the course of

19   conduct as well, your Honor, the definition of course of

11:47 20   conduct --

21         THE COURT:  You did raise that, yes, okay.

22         MR. GELB:  Yes, I raised that, and, your Honor, I'll

23   be fine with just relying on the papers on that issue, just in

24   the interest of time, because I could just raise one additional

25   issue with respect to the obstruction charge.

1          THE COURT:  Going back to the earlier issue?

2          MR. GELB:  Yes.

3          THE COURT:  Okay, go ahead.

4          MR. GELB:  With respect to the witness tampering and

5    obstruction, just also echoing what Attorney Marx referenced,

6    but in addition to that, what distinguishes Mr. Harville's

7    circumstances, your Honor, is that he has only been charged

8    with communicating with a private-sector internal eBay

9    investigator, different from Mr. Baugh with respect to the

11:47 10   allegation of communicating or allegedly misleading the Natick

11   Police Department.  So there's no allegation in the indictment

12   relative to Mr. Harville having an interaction with a law

13   enforcement agent.

14          In addition, your Honor, the indictment facially is

15   basically making the assumption that anything that is on an

16   employer-issued cellphone are per se items that could be

17   subject to the 1519 statute for, you know, I guess it's

18   shredding or falsification is being --

19          THE COURT:  Did he wipe clean his cellphone?  Is that

11:48 20   what he did?

21          MR. GELB:  That's what's being alleged, that the

22   entire interfacing is with an internal private-sector eBay

23   investigator.

24          THE COURT:  But was it -- I don't remember whether it

25   was alleged that he was asked for his cellphone and then he

1   wiped it clean?

2          MR. GELB:  And that it was handed in and that the

3   contents were wiped, but there isn't -- the foreseeability

4   issue here -- I guess, your Honor, to boil it down, it would be

5   that as a matter of law, a private-sector internal investigator

6   would have to be the same thing as a law enforcement agent, and

7   that's not the case here.  And, in addition, your Honor, the

8   *Bailey* case that the government has referenced and relied upon

9   is I think completely distinguishable because in that case you

11:49 10  have a government agent conducting an investigation, irrespective

11  of whether they're federal or state level, is completely

12  distinguishable from a private-sector internal investigator

13  that is investigating an issue within the corporation.

14          THE COURT:  Well, that's why I keep coming back to

15  scienter.  I mean, not every government investigation is going

16  to trigger an obstruction statute.  It could be sexual

17  harassment or looking into diversity practices.  I mean, it

18  could be all sorts of things.  That's why it comes down to

19  whether there's a possible federal crime or whether it's

11:49 20  reasonably foreseeable.  That's an essential piece of it, and

21  what he knew, you know, this gentleman knew, Mr. Harville, did

22  he know this?

23          So what would you say if he knew that, that there was

24  a potential -- or likely, I should say -- a likely federal

25  prosecution and he wipes his phone to get rid of anything

1    incriminating --

2          MR. GELB:  But the indictment isn't alleging facts

3    that he would have had knowledge of a criminal investigation,

4    or let alone even a federal --

5          THE COURT:  It doesn't after the Natick encounter

6    where they're listening on the Web to the what the Natick

7    Police were doing?

8          MR. GELB:  I believe, your Honor, that the time of the

9    communication that he had with the -- in -- I don't believe so,

11:50 10   your Honor, but I have to look back at the timeline.

11          THE COURT:  Anyway, it's all part of this minimalist --

12          MR. GELB:  It's the scienter issue, your Honor.  And

13    the fact that the indictment as to Mr. Harville just identifies

14    the term "eBay investigator," whereas with Mr. Baugh, it also

15    identifies the NPD detective.

16          THE COURT:  Okay, thank you.

17          Anything, Mr. Kosto, that you want to say at this

18    point?

19          MR. KOSTO:  The indictment makes clear that the

11:51 20   coconspirators, Mr. Baugh and Mr. Harville, were aware that the

21    Natick P.D. was investigating, were aware that the Natick P.D.

22    was investigating the incidents of harassment, and that eBay

23    was answering questions posed by the Natick Police Department

24    about the harassment.  That's the basis on which the statement

25    to an eBay investigator, private citizen or no, makes that

```
 1   person a witness.  There's no requirement that the recipient of
 2   the false and misleading information be a federal employee.
 3   It's not like a 1001 charge.  It's simply someone who later
 4   conveys information to the government.  So in the case of
 5   Mr. Vonsover who conveys information --
 6              THE COURT:  And one step more:  The person who's
 7   saying it has to know that's reasonably likely, that it's --
 8              MR. KOSTO:  Based on the facts and circumstances that
 9   the person is aware of that a federal investigation was
10   reasonably likely.
11              THE COURT:  Yes, yes, yes.
12              MR. KOSTO:  They don't need to know that a federal
13   investigation is reasonably likely; they need to know the facts
14   that make it reasonably likely.
15              THE COURT:  Yes, and it would be your burden at trial
16   on that.
17              So, okay, I think we're actually eight minutes ahead
18   of schedule, so what I would like to do is, rather than embark
19   on the next one -- we may actually finish a little early
20   here -- why don't we take a fifteen- -- why don't we come back
21   at, I don't know, you want to say 12:10 -- it's five of now --
22   come back at 12:10?  And then we'll go on to, A, the magistrate,
23   the appeal of her opinion, and, two, what I'll call generally
24   "housekeeping," like, when do we set a trial date?  What's
25   coming up next in this case, et cetera, et cetera?  So I'll see
```

 1    you at 12:10, okay?  Thank you.

 2              MR. KOSTO:  Thank you, your Honor.

 3              (A recess was taken, 11:53 a.m.)

 4              (Resumed, 12:08 p.m.)

 5              THE COURT:  So I think, other than housekeeping, the

 6    only thing left is the appeal of the Magistrate Judge's

 7    decision, and I don't know who wanted to start.

 8              MS. BARSKY:  Hi, your Honor.  Amy Barsky for

 9    Mr. Baugh.  I'll start.  So we asked for information about

12:09 10   Mr. Baugh's prior covert operations work with the U.S.

11    government at the behest of the government.  The information is

12    clearly relevant to the intent element of these charges, both

13    the stalking charges and the obstruction charges, which both

14    basically require corrupt intent.  So the stalking charges

15    require an intent to harm the victim, or malicious intent,

16    stated differently.  The obstruction, 1512(b), "Criminalizes

17    whoever knowingly uses intimidation, threatens, or corruptly

18    persuades another."

19              So if there is a history of Mr. Baugh having engaged

12:10 20   in similar acts as part of a mission in service of a greater

21    good, then that's relevant to the question of whether he can be

22    proven to have possessed a corrupt intent in carrying out a

23    similar sort of mission.

24              The Magistrate Judge's decision is concerning, in that

25    the standard that she applies is to essentially say, "Can the

1    government prove its case?  Has it shown enough evidence?"  And

2    she essentially looked at the evidence and says it's

3    sufficient, and that can't be the standard for discovery

4    because in a federal criminal case, one assumes that the

5    government generally has good evidence going in.

6         THE COURT:  I think the government has agreed with you

7    that, not to use too much Latin, that we should use an

8    ex ante rather than an ex post analysis, that we should be

9    thinking about what might be or what is material and favorable.

12:10 10   Isn't that the standard?  But that doesn't mean that anything

11   goes.  Let's even say I don't do the appellate, you know,

12   standard after a trial is over and I'm forward-looking, I'm

13   trying to understand why Mr. Baugh's service as a contractor

14   for the government under the auspices and handling of a

15   government agent is relevant to what he did privately.

16        MS. BARSKY:  So it's relevant in the sense the

17   government is required to prove that he undertook certain

18   actions with a corrupt intent in committing the current

19   charges.  So we're not making the argument that he was

12:11 20   authorized by the U.S. government to do what it's alleged that

21   he has done in this case in Natick, but the question is, the

22   government has to prove beyond a reasonable doubt that he had a

23   corrupt mens rea.

24        THE COURT:  Well, why does whatever he did for the

25   government under an FBI handler -- or I shouldn't say the

 1    FBI -- whoever the government agent was, why is that relevant

 2    to corrupt intent for a private venture without the authority

 3    of the federal government?

 4         MS. BARSKY:  Well, so the government is going to try

 5    to prove his intent by putting forward his action, right?  And

 6    some of these actions are things that would make people say,

 7    "Well, I wouldn't engage in that, I would bat an eye at that,"

 8    and the question is if a person has a history of having done

 9    similar operations.  And I don't know if the Court had a chance

12:12 10   to look at the New York Times article we cited, but it seems

 11   that this is part of a broader pattern wherein people who are

 12   engaged in covert operations then go into private practice,

 13   especially in Silicon Valley, and carry out the same sorts of

 14   operations, and it causes mischief.

 15        THE COURT:  You know, I'm reminded of an ancient case

 16   that perhaps only Mr. Pirozzolo remembers involving somebody

 17   who was in the U.S. Attorney's Office who went out to private

 18   practice -- I think it was Gary Crossen's case? -- and he goes

 19   out into private practice and essentially does the same things

12:13 20   he used to do as an Assistant U.S. Attorney but did it for a

 21   private client essentially.

 22        And I also think about the *Bulger* case where the First

 23   Circuit was pretty careful about, you know, you can't just say,

 24   "Oh, I was authorized to just murder someone."  There's a whole

 25   process that -- was it *Bulger* or *Flemmi*?  Part of that cluster

 1    of cases.

 2           So I'm just really wary of the argument that "Because

 3    I once did something because an FBI agent told me to do it for

 4    the government," that you can do it for eBay, that it's even

 5    relevant; in other words, that I'd even admit it.  That's

 6    what's worrying me here.

 7           MS. BARSKY:  Okay, I want to make a couple things very

 8    clear.  Number one is, we're not saying that he was authorized

 9    to then, after he did work for the government, to go out and do

12:14 10  anything he wanted.  We're saying it's relevant to his intent.

 11   And the second part is, this is not an admissibility question.

 12   It's a discovery question.  So the threshold is low for this

 13   stuff, and we have to show either that it's exculpatory or that

 14   it's material to the defense, and I think it's both those

 15   things.

 16          THE COURT:  Right, but, excuse me.  I have to find

 17   it's both favorable and material, right?

 18          MS. BARSKY:  So either it's exculpatory, meaning that

 19   it --

12:14 20        THE COURT:  Which it's not, right?  Because you just

 21   said it wasn't authorized by the federal government.

 22          MS. BARSKY:  Well, but a corrupt mens rea is an

 23   element of the offense.  So let's say he had worked in a

 24   different country, an authoritarian government where he was

 25   permitted to go and bug people's apartments, then he came here

1    and bugged people's apartments, that prior experience is

2    relevant to the question of what intent did the person have in

3    carrying out an action that they may have believed was

4    appropriate or they may have had experience carrying out within

5    a pattern of conduct that was part of a mission.

6           THE COURT:  So what are you looking for?  You've got

7    whatever he signed, right?  I think Judge Bowler asked that

8    that be produced, right?

9           MS. BARSKY:  She did, and it has not been produced.

12:15 10   And she also asked that summaries be produced, and those

11   summaries have not been produced.

12          THE COURT:  Summaries of what?

13          MS. BARSKY:  Summaries of the conduct.

14          THE COURT:  So what else are you looking for?

15          MS. BARSKY:  Well, so we're looking for instructions

16   that were given to him.  For instance --

17          THE COURT:  So if there was a clandestine or

18   surveillance operation, you're saying that that should be

19   admissible at the trial, like a private criminal matter?

12:15 20          MS. BARSKY:  No.

21          THE COURT:  Not private.  I didn't mean that.  Another

22   criminal matter, you're looking for whatever the undercover

23   operation was?

24          MS. BARSKY:  Yes, what information was given to him,

25   but, again, not because I'm saying it's admissible; because I'm

1    saying it's discoverable.  Supposing he was told --

2        THE COURT:  No, but I think you have to say "material

3    and --" I don't know if it's "and/or favorable" but -- I have

4    to get my head around that.  I think some of the opinions use

5    both conjunctive and some use disjunctive.  But, in any event,

6    it's got to either be relevant, material, you know, or it's got

7    to be favorable, exculpatory.

8        MS. BARSKY:  Yes, so exculpatory is defined as either

9    casting doubt on a main element, which I think it is, the

12:16 10   intent element, or diminishing his culpability, which I think

11   it clearly is, and I think the government concedes that.  Their

12   issue there is the timing of discoverability, and then or

13   material, which can be either favorable or unfavorable, but

14   material to preparing a defense.

15       THE COURT:  All right, who else -- would

16   Mr. Harville's lawyer like to jump in here?  Did you raise the

17   same issue, sir?  I can't remember.

18       MR. GELB:  I just referred to 302, your Honor, for the

19   cooperating witnesses.

12:17 20       THE COURT:  Say it again.  Oh, you just did the

21   cooperating --

22       MR. GELB:  The 302s, the cooperating witnesses.

23   That's it, your Honor.

24       THE COURT:  All right.  And, Mr. Kosto, as I

25   understand it, you agree that I should apply a somewhat

1    different standard rather than the appellate standard, right?

2         MR. KOSTO:  Yes, I think materiality assessed looking

3    backward is a hard way to do it before the trial has taken

4    place.  We are arguing to the Court, and I think I'm hearing

5    some agreement from the Court, that there's no relevance to --

6    there's certainly no exculpatory idea to something someone was

7    authorized by law to do as a government agent, and then stops

8    being a government agent and has no authority to do it, and

9    then goes out as a private citizen, and based on their own

12:18 10   say-so and not the say-so of anyone involved in the government,

11   undertakes acts that violate the law.  Their intent as a

12   private citizen and their intent as an operated, supervised

13   asset or confidential human source, they don't have any

14   relationship to one another.

15        You might say, for example, what he heard from his

16   supervisors at eBay is relevant -- I hear the Court on that --

17   but his experience from years earlier has no bearing on his

18   intent as a private citizen.  That would take every law

19   enforcement or military or intelligence employee and give them

12:18 20   a license to commit crimes after they retired and allow them to

21   say, "Oh, well, I learned this on the job, and I thought it

22   would be a good idea."

23        THE COURT:  Did you turn over yet, or are you in the

24   process of finding, whatever these gentlemen signed?

25        MR. KOSTO:  So we have a copy of Mr. Baugh's driver's

1    license which he signed and no other document --

2           THE COURT:  Well, yes, but, I mean, I think they

3    probably wanted some -- are you making a proffer that he signed

4    something with the government?  Is that it?  Is there some,

5    like, agreement or something, like a contractual agreement with

6    the government?

7           MR. KOSTO:  There's no document that we have that

8    bears his signature and his name.

9           THE COURT:  Okay.

12:19 10        MR. KOSTO:  On the question of -- and I think the

11   *Wilson* case we cite to in our brief, your Honor, you know, sets

12   forth the idea that it would be -- the Southern District said

13   it borders on the absurd that detailed testimony about a former

14   intelligence agent's activity during his service in the CIA

15   would be probative of something that happened after he left the

16   service of the government and committed crimes.  That is our

17   position on the question.  There's just no --

18          THE COURT:  In general, the review of a magistrate

19   judge's order is "clearly erroneous," but here, arguably, it's

12:20 20   contrary to law because it applied the wrong materiality

21   standard.  But I think I can just make this decision on my own

22   rather than send it back.

23          MR. KOSTO:  You can certainly apply the law de novo,

24   your Honor.  And Judge Bowler, for what it's worth, even though

25   her assessment of the question of materiality is different than

1    how we might phrase it, she does recognize the difference that

2    we're urging on the Court, which is a difference between

3    authorized action and unauthorized action.

4         THE COURT:  Yes, and she's done a lot of work on this

5    case and has a lot of experience, but I need to think through

6    the standard of review on the materiality thing.  But I think,

7    in general, I'm not going to send it back because I think I'm

8    not sure it matters here; let's put it that way.  I'm just not

9    seeing how it's exculpatory, whatever he did with the government,

12:21 10    or even material.

11         But they're saying that there is no such signed

12    documents or such document, so is there a way of helping them

13    with this if your client thinks there is?

14         MS. BARSKY:  I think we can discuss and try to come

15    back if we can identify anything with more specificity, but I

16    think the request is to the extent that he signed documents.

17         THE COURT:  All right.  Now, Mr. Gelb, I think that

18    the government has agreed to put Jencks materials 90 days in

19    advance, and that sort of seems reasonable.

12:21 20         MR. GELB:  Your Honor, I think that the concern is,

21    your Honor, is that producing the cooperation agreements

22    without producing the statements in exchange for that

23    cooperation, and whether or not the local rule should be

24    analyzed consistently with a post-trial *Brady* analysis.  That's

25    a concern that I have, your Honor.

1           THE COURT:  Well, for sure you're going to get --

2    anybody who's going to testify, you're going to get their

3    cooperating agreements --

4           MR. GELB:  Which we have.

5           THE COURT:  -- and prior statements.  And most of them

6    have pled, right, if not all of them?  I don't know, but I

7    guess you'll be ordering the transcripts of those, right?

8           MR. GELB:  Yes.

9           THE COURT:  Have any of them been sentenced yet?

12:22 10          MR. KOSTO:  Not the testifying witnesses, your Honor.

11   Mr. Cooke was sentenced by Judge Burroughs, but we don't

12   anticipate that he will testify at trial.

13          THE COURT:  What did he get?

14          MR. KOSTO:  Eighteen months in custody to be followed

15   by twelve months in home confinement, your Honor.

16          THE COURT:  And was there a sentencing transcript that

17   would be -- but you're not calling him to testify, right?

18          MR. KOSTO:  We don't believe we will.

19          THE COURT:  Okay.  So let's move to some housekeeping.

12:23 20   First, with respect to all the documents that eBay and Morgan

21   Lewis agreed to produce, they need to be produced.  I sort of

22   thought they would be by the time of the hearing, and I'm

23   worried that that will trigger another flurry of briefing, but

24   when can you produce all of them?

25          MR. PIROZOLLO:  We can produce them early next week,

 1    your Honor.  It's not a big problem.

 2           THE COURT:  You don't want to spend the blizzard going

 3    through them?

 4           MR. PIROZOLLO:  I was going to say over the weekend,

 5    but it may be a little tough.

 6           THE COURT:  No, I think it's much more fun to sit and

 7    watch the snow and drink hot cocoa.  So why don't we wait

 8    for -- just tell me.  I'm not here to have any associate

 9    spending the night anywhere.

12:23 10        MR. PIROZOLLO:  A week from today?  That should be

11    ample time.

12           THE COURT:  Okay, so Morgan Lewis and you should

13    produce whatever you agree to produce.  I am not going to

14    review witness statements now because I don't think that I know

15    yet they're admissible, but they should be created in a format

16    that I can look at them if anyone shows up on the witness list,

17    because I'm hoping that the witness list, because you're going

18    to get Jencks Act material -- this is why I want to go through

19    the housekeeping with you -- hopefully will be exchanged in

12:24 20        advance, and then at that point I'll probably want to do the

21    in camera.  I may want more in camera.  As you said,

22    Judge Rakoff looked in camera.  I may want more, but I just

23    need to walk through in my mind once I've seen from you all

24    declarations from Morgan Lewis and eBay about exactly what was

25    disclosed about the people whose statements you're withholding,

1  not limited to just whether there was a verbal download.  So if

2  you told them in sum and substance what somebody said, I view

3  that as potentially creating a subject matter waiver.

4         MR. PIROZOLLO:  We understand that request.

5         THE COURT:  Okay, so when can -- I understand that's

6  more detailed because you'll have to confer with one another,

7  and perhaps there was somebody else sitting in there.  And

8  Mr. Kosto, of course, has his own notes, my guess is, as to

9  what was said to make sure that everybody's memory is the same

12:25 10  about that, or at least if you have different memories, tell

11  me.  So when does that make sense, a month?

12         MR. PIROZOLLO:  Yes, maybe we put it down for 30 days

13  with for good-cause showing, we can come back to the Court if

14  we need more time.

15         THE COURT:  Okay.

16         MR. PIROZOLLO:  So maybe calendar it for 30 days.

17         THE COURT:  So today is the 28th, so by the 26th of

18  February, does that seem fair enough?  A full-blown -- so I can

19  understand the scope of the waiver.

12:25 20         And at this point let me just say, I will not be

21  dismissing the indictment.  I just think the standard is so

22  minimal.  I've very much appreciated the education I'm getting

23  on the law and the different points of view and how I'm going

24  to frame perhaps a jury instruction, but it's just a minimalist

25  standard, and I think they recited the elements from the

1    statute and gave you fair notice about what it's about.  So I'm
2    not sure yet whether I'll write on it, I'll have to think about
3    that, but --
4         I'm not ruling right now on the venue issue, which I
5    still view as pretty technical, and at least one of them is a
6    case of first impression in this district.  But I think that
7    that doesn't really affect a trial date, et cetera.
8         On the emails, I do think they all should be produced,
9    unless they're privileged, within the time framework you agreed
12:26 10  upon, as likely admissible, and so --
11        MR. PIROZOLLO:  Your Honor, for clarity -- I
12   apologize, your Honor.  For clarity, that's with regard to the
13   17(c) subpoena request, your Honor?
14        THE COURT:  Yes, yes.
15        MR. PIROZOLLO:  So the non-produced emails?
16        THE COURT:  Yes, yes.
17        MR. PIROZOLLO:  Okay, thank you.
18        THE COURT:  I forget how many you told me those were,
19   but those should be produced because they're potentially
12:27 20  admissible and they're not privileged.
21        Now, that brings us to a trial date and whether or
22   not -- I anticipate that this will go to -- I have to think
23   about that venue issue a little bit more, but let me just
24   simply say that when -- are there substantive motions?  Where
25   are you with the Magistrate Judge?  Lets start there.  Have you

1    had your final status conference?

2         MR. KOSTO:  Short of the motions that the Court is, I

3    think, about to address on the appeals from Judge Bowler's

4    decisions, we are done with Judge Bowler.  I know that counsel

5    for both defendants I think intend to file motions to suppress.

6    Certainly we'd be open to a calendar for that.  We would very

7    much ask the Court to set a trial date, given the age of the

8    indictment at this point and the age of the conduct,

9    particularly in the light of --

12:28 10        THE COURT:  Yes.  So I'm putting a lot of work on the

11   intervenors here, but I do think I'm about to shift the burden

12   to the defendants.  When can you file any motions to suppress

13   or any substantive -- I guess that's pretty much it, the

14   motions to suppress.  Is there anything else substantive I'm

15   not thinking of, like a *Daubert* motion or something like that?

16        MR. FICK:  A *Daubert* motion would probably be

17   triggered by a government expert disclosure that we don't have

18   yet, so I don't think we're even there yet.  I think at some

19   level, right, we need to sort of figure out what, if anything,

12:29 20   else we're getting discovery-wise before we're totally able to

21   go forward on dispositive, on the suppression-type motions.

22        THE COURT:  I don't know.  Well, tell me, what's the

23   motion to suppress?  If it's just a statement and whether or

24   not it was coerced or whether he got his warnings, no, you

25   don't.  If it's something else, maybe it is.  So what's the

1    motion to suppress?

2           MR. FICK:  I don't know that we had a definitive list.

3    We need to sort of circle back with our client and sort of --

4           THE COURT:  You send a chill down my back, a "list."

5    Do you know how much paper you filed?

6           MR. FICK:  It's an interesting and unusual case, your

7    Honor, and I think there's a lot of issues.  Just as a

8    practical matter, maybe it would make sense for counsel to talk

9    to the government about what we think a reasonable schedule

12:29 10   would look like.  I mean, part of the issue also is, candidly,

11   we have a number of other trials that keep getting bumped

12   because of COVID that have already been keyed up ahead of

13   this --

14          THE COURT:  I understand that, but on a motion to

15   suppress, you've got three lawyers on your team, at least,

16   four.  So I think we need a date.  Give me a date by which you

17   can file a motion to suppress.  Can we do March 1?  Is that a

18   real date?

19          MR. FICK:  That's a Tuesday.

12:30 20         THE CLERK:  It's a real date, Judge.

21          THE COURT:  Why don't we say March 1, you file a

22   motion to suppress, or you'll ask for a reasonable extension

23   with specifics about what you're planning.

24          MR. FICK:  That's fair.

25          THE COURT:  Okay, March 1, any motion to suppress.

Normally the government has 21.  And based on what you might
move to suppress, are you envisioning it would be something
like a voluntariness thing or failure to read Miranda rights or
anything like that?  I mean, will we need an evidentiary
hearing?

MR. FICK:  I don't want to rule it out, but it may
just be a straight-up legal issue from Mr. Baugh's point of
view.  I have to think about that also, but --

THE COURT:  Mr. Gelb, do you have a substantive motion
in mind?

MR. GELB:  Potentially, your Honor, but I don't think
it would be of an evidentiary nature, if we proceed with it.

THE COURT:  Let's assume for a minute that you do file
something, it's a narrow legal question, or even if it isn't,
the government will respond within what, 21 days, depending
on -- just because it's usually 14, but there may be two of
them.  And then we'll hold a hearing, which puts us at the end
of March, say, or beginning of April.  So are you planning on
having an expert, Mr. Kosto?

MR. KOSTO:  The only expert testimony we might
disclose out of an abundance of caution is, we're going to
introduce evidence from cellphones that were either turned in
by Mr. Harville to eBay upon his termination or an image of a
cellphone provided that Mr. Baugh turned in upon his
termination.  Sometimes testimony to explain how data gets out

1      of a cellphone and into an exhibit is about as close as we

2      would have to an expert.  I'm not sure that's expert testimony,

3      but we certainly are disclosing that now and will disclose it

4      with some more specifics.

5                THE COURT:  Do you have a particular agent and an

6      agent report on that?

7                MR. KOSTO:  There usually is a report from the agent

8      that did the extraction, and we'll get that disclosed, you

9      know, I think along with the Jencks and the so-called 21

12:32 10   days --

11               THE COURT:  No, no, no, no, no, no, no, because

12     then --

13               MR. KOSTO:  We're talking about 90 days out from

14     trial, your Honor.

15               THE COURT:  Well, that's fair because just the *Daubert*

16     motion itself can be complicated.  And this is not a child porn

17     case, I'm not saying it is, but given my experience in those

18     cases, it takes forever if there's a forensic challenge, so the

19     sooner the better.  Let's put it this way:  I don't know why

12:32 20   you couldn't do that by March 1 as well.

21               MR. KOSTO:  We'll find the documents relevant to the

22     extraction and we'll provide them to the defendants.

23               THE COURT:  And that way they can either hire their

24     own experts or they can just -- I don't know how harmful it is

25     even, but, in any event, it's their choice.

1          And then it sounds as if that a summer trial might be

2     possible.

3          MR. FICK:  We have a trial before Judge Burroughs,

4     your Honor, that's going to take up much of July at this point,

5     and that's assuming nothing else we have in the spring gets

6     bumped into the summer.

7          THE COURT:  I know, but this is pretty important too.

8     And, frankly, any date we have now depends on the availability

9     of juries and whether there's a second surge.  Just it's a

12:33 10   placeholder.

11          Mr. Kosto, how long do you think the trial would be?

12          MR. KOSTO:  I'd estimate two weeks, your Honor.

13          THE COURT:  Two weeks 9:00 to 1:00?

14          MR. KOSTO:  Yes.

15          THE COURT:  What do you think from the defense point

16     of view?

17          MR. FICK:  You know, maybe if there's a defense case,

18     it adds another couple of days, but I think --

19          THE COURT:  Does two to three weeks sound fair?

12:34 20   MR. FICK:  Sure.

21          THE COURT:  And what date is Judge Burroughs' trial?

22     It's criminal, I assume, right?

23          MR. FICK:  It's criminal.  It is the 5th through the

24     22nd is what it's scheduled for.  And I also have a preexisting

25     travel obligation from the 30th to the 6th of August.

 1           THE COURT:  This is why I want to do it because the

 2    summer is very tricky, and I believe strongly in attorney

 3    vacations.  So I myself will be gone for a week right around

 4    when you were talking about, Mr. Fick, on a vacation that's

 5    been bumped for three years, but who knows?  It could get

 6    bumped again.

 7           So the question is, as we're trying to figure this

 8    out, we could conceivably go right after the 4th if the

 9    Burroughs trial either pleads out or gets continued, or we

12:35 10    could go into later August, and I didn't -- my goal, selfishly

11    or not, is I've got a series of clerks who have been working on

12    this.  I don't want to start with brand-new clerks.  It's like

13    going to a hospital when the residents start.  I would like to

14    go -- how about -- Maryellen, do you remember, what do we look

15    like in June?

16           THE CLERK:  June looks okay.  We do have a trial in

17    May, that criminal trial.

18           THE COURT:  How about June?

19           THE CLERK:  I think it looks good if we can do it.

12:35 20           MR. KOSTO:  June works for the government, your Honor.

21           MR. GELB:  Your Honor, I apologize.  Mr. Gelb for

22    Mr. Harville.  I can't -- I have a family obligation in the

23    middle of June, your Honor, that is really immovable.

24           THE COURT:  So what does the middle of June mean?

25           MR. GELB:  I have my twin daughters' bat mitzvahs.

 1          THE COURT:  I'm not going to make you miss the bat

 2   mitzvahs.  So what does the middle mean, what date?

 3          MR. GELB:  It's on the 18th, your Honor.

 4          THE COURT:  So what if we were to do it right after

 5   Memorial Day?

 6          THE CLERK:  That's June 1, and actually, no, it would

 7   have to be -- I'm sorry, that's a Wednesday, June 1.  It would

 8   have to be the Tuesday after Memorial Day.

 9          THE COURT:  What about Tuesday after Memorial Day?

12:36 10  How does that sound?

11          THE CLERK:  May 31.

12          THE COURT:  Why don't we pencil that in, everyone

13   block the time, and we'll do it, ideally speaking, for two

14   weeks.  I totally get it that we could, A, have another surge,

15   B, somebody's trial could bump into it.  I will not make you

16   miss the bat mitzvah or make you be on trial the morning of the

17   Friday night.  I won't do that to you, so -- but let's just

18   talk in terms of those two weeks in there just to sort of

19   concentrate the mind.  We'll see what happens with

12:37 20  Judge Burroughs' trial, whether it pleads or has other

21   alternatives, you know, it gets bumped for some reason or

22   another.

23          Now, if that doesn't work, I myself am hopefully, the

24   third year in a row, going away for about a week or two.

25   Maryellen, do you have those dates when I'm theoretically away?

```
 1              THE CLERK:  In what month?

 2              THE COURT:  It was the end of July.  It was like

 3     July 21 for a week in there, something like that.  And so

 4     realistically what I would do is try and do it in August, but I

 5     think that's the hardest month in New England to get anyone

 6     because people with their Cape houses and whatever.  So we may

 7     lose it to September if I can't do it then.

 8              So right now I'm very eager to do it.  It's an older

 9     case, isn't it?  It's a '20 case, so it's not that old as some

12:38 10    I have, but it's still aging.  So we'll think about May as a

 11    date, the tail end of May, and it will be done well before the

 12    18th, and if I have to, I'll go full days.  That might be

 13    better anyway.

 14             THE CLERK:  Judge, and you're off the last week in

 15    July, the last week.

 16             THE COURT:  Yes, but --

 17             THE CLERK:  The 22nd.

 18             THE COURT:  So that's what my schedule looks like,

 19    and, as I said, I have a prejudice in favor of trying to do it

12:38 20    with my current group of law clerks who have been working on

 21    the case rather than start with brand-new people.  You have to

 22    show them which way to the Clerk's office, kind of thing, so I

 23    just would like to -- that's my goal, is to squeeze it in

 24    before they leave.

 25             THE CLERK:  Judge, do you want to do a pretrial
```

1    conference in May?

2           THE COURT:  Yes.  You'll send out a pretrial

3    conference --

4           THE CLERK:  I'll send out a notice.

5           THE COURT:  That now backs the government up quite a

6    bit to its 90-day obligation.

7           MR. KOSTO:  That would be -- late May would be --

8           THE COURT:  Soon.

9           MR. KOSTO:  Late February, just around that March 1.

12:39 10        THE COURT:  And at this point, is this a likely trial

11   from the government's point of view?

12          MR. KOSTO:  We'll be ready to go, your Honor.

13          THE COURT:  Yes, but it's likely to go?

14          MR. KOSTO:  You'd have to ask Mr. Gelb and Mr. Fick.

15          MR. FICK:  We have no agreement with the government as

16   of this time, and all this discovery litigation was geared

17   toward a trial, so that's our posture.

18          THE COURT:  We'll go full bore ahead.  Now, one other

19   thing is, after all of this is produced, you know, the

12:39 20   PowerPoint to the government and the additional emails,

21   et cetera, I anticipate there could be supplemental briefing,

22   but what I don't want is a brief and an opposition and a reply

23   and a surreply.  It will just go on forever.  So I think what

24   you'll need to do is, within a week of getting all this stuff,

25   file, if you need to, a supplemental brief that's no longer

1    than ten pages.

2           MR. FICK:  In light of that and just as I sat here

3    thinking about the fact we're going to be getting eBay

4    materials on the 26th of February, could we bump the

5    dispositive motion deadline at least, like, a couple of weeks

6    into March rather than the 1st?  It's just sort of a lot at

7    once, and in fact, some of the stuff we get could inform

8    motions.

9           THE COURT:  I'm going to say "no" right now because

12:40 10   you haven't yet told me what it is.  Quite candidly, if it's a

11   motion to suppress a confession -- I don't know this case.  You

12   know, I don't have it in my -- I don't know what the issues

13   are.  If it's a motion to suppress confession, I don't know why

14   it has anything to do with what they're going to be producing.

15   That's my concern.  I don't know if there is anything at all;

16   you've not given me anything; and, if it is, whether it's

17   anything to do with what might be produced.  So if you get this

18   stuff and you say, "Oh, this really makes a difference," that's

19   the most common motion I get in my court is a motion for an

12:41 20   extension of time, so you know where I am.

21           MR. FICK:  Understood.  Thank you, your Honor.

22           THE COURT:  You know where Maryellen is.  You'll find

23   me.  She's terrific, she gets back to people right away.  We'll

24   do it.  I just want to get this on a moving train to resolution

25   one way or another.

1          I hope you all stay safe in the blizzard and --

2          THE CLERK:  Judge, sorry to interrupt, but we didn't

3    set a hearing date.  Would you like me to do that after, or do

4    you want to set it now?

5          THE COURT:  A hearing date on what, the motion to

6    suppress?

7          THE CLERK:  Yes.

8          THE COURT:  If there is going to be one, so if they

9    want it when one comes in.

12:42 10          THE CLERK:  Okay.

11          THE COURT:  Okay, we don't even know if there is one.

12    And what they're telling me, Maryellen, is it's not likely to

13    be evidentiary, so it's likely to be, you know, like today, an

14    hour or two, not a full day, as I hear it.

15          THE CLERK:  Okay.  And all time excluded, Judge, till

16    May 31?

17          THE COURT:  All time excluded under the Speedy Trial

18    Act.  Thank you for reminding me.  And also I'm going to assume

19    that if we do have a dispositive motion trial, you're going to

12:42 20    have to let me know at that point whether or not you want it to

21    be in person or on Zoom.  This has been on Zoom, for the

22    record, which is appropriate for a purely legal thing, but I

23    personally prefer any evidentiary hearings to be in person.

24    And if we're talking about trials, there's a lot we have to

25    discuss about, do we want to make sure the jurors are

 1    vaccinated?  You know, like all the questions I've been asking

 2    for every trial.  And by then, maybe it won't matter, but at

 3    least it does right now, how we think about the case.

 4         Do you want to also talk about -- I know there are

 5    some witnesses from California.  I had another case which is

 6    civil, not criminal, but given the problems with airlines and

 7    the problems with COVID, talk about whether any of the

 8    witnesses could appear by Zoom?  If they're not important

 9    witnesses and you both agree, I'd be agreeable to that.  You

12:43 10   know, they might be from California, for whom it would be a big

 11   deal to get here.

 12        MR. KOSTO:  We'll certainly discuss with Mr. Gelb and

 13   Mr. Fick, your Honor.

 14        THE COURT:  Right.  I mean, I'm assuming the key

 15   witnesses, we're not talking about that, so -- okay, all right,

 16   thank you.  Thank you very much.  The briefing was excellent.

 17   Thank you, thank you.

 18        MR. PIROZOLLO:  Thank you very much, your Honor.

 19        MR. KOSTO:  Thank you, your Honor.

12:43 20        (Adjourned, 12:43 p.m.)

 21

 22

 23

 24

 25

1                   C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )

5

6

7          I, Lee A. Marzilli, Official Federal Court Reporter,

8  do hereby certify that the foregoing transcript, Pages 1

9  through 106 inclusive, was recorded by me stenographically at

10 the time and place aforesaid in Criminal No. 20-10263-PBS,

11 United States of America v. James Baugh and David Harville, and

12 thereafter by me reduced to typewriting and is a true and

13 accurate record of the proceedings.

14         Dated this 4th day of February, 2022.

15

16

17

18

19

20         /s/ Lee A. Marzilli
           _____
21         LEE A. MARZILLI, CRR
           OFFICIAL COURT REPORTER

22

23

24

25