UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 20-CR-10263-PBS |
| | ) | |
| JIM BAUGH and | ) | |
| DAVID HARVILLE | ) | |
| | ) | |
| Defendants | ) | |

## SENTENCING MEMORANDUM OF THE UNITED STATES

*"I still carry pepper spray when I leave the house – but for a long time I had carried it even inside the house."* - Victim 1

*"A stack of baking sheets was leaning against our back door so that we could hear anyone trying to break into our home. ... That day was our 31st wedding anniversary."* - Victim 2

From a suite of offices in Silicon Valley, Jim Baugh, David Harville, and their coconspirators unleashed the resources of a Fortune 500 company on a Natick couple, whose journalism had angered two of company's most senior executives. A three-week nightmare followed: anonymous and profane demands that the couple stop reporting on eBay; the publication of their home address on Twitter and threats to visit them there; the delivery of live insects and a book on surviving the loss of a spouse; Craigslist posts inviting all comers to sexual encounters at their home; a black van that followed the husband as he drove around Natick, and so much more.

Baugh and Harville knew better. Both were highly compensated, long-time security industry professionals. Each had significant government or military service. Both knew the impact that a fraction of this conduct would have on the victims. Each had ample chance to show basic human decency by putting a stop to it. Instead, the defendants set out on a cross-country

1

surveillance campaign, terrorized the victims and their neighbors, and then joked about it over drinks at a hotel bar.  Both then committed new crimes when they interfered with the investigations that followed.

The Probation Office correctly calculates Baugh's offense level at 25 (BPSR ¶ 168) and his Criminal History Category at I (BPSR ¶ 172), with a resulting Guidelines Sentencing Range of 57 to 71 months (BPSR ¶ 207).  For the trauma Baugh conceived of and caused his victims, for the contempt he demonstrated for the law, and for the reasons stated below, the United States requests that the Court sentence Baugh to 71 months' imprisonment, 3 years' supervised release, a $60,000 fine, and a $900 special assessment.

The Probation Office correctly calculates Harville's offense level at 21 (HPSR ¶ 166) and his Criminal History Category at I (HPSR ¶ 170), with a resulting Guidelines Sentence Range of 37 to 46 months (HPSR ¶ 202).  For his significant roles in the victims' terror and the obstruction that followed, the Court should sentence Harville to 41 months' imprisonment, 3 years' supervised release, a $25,000 fine, and a $500 special assessment.

## BACKGROUND[1]

In August 2019, Baugh was 44 years old and served as eBay's Senior Director of Safety and Security.  eBay paid him $275,000 per year, plus a bonus.  (BPSR at 3 & ¶ 10(a)). Baugh's friend, Harville, was 47 and earned $255,000 per year (plus bonus) as eBay's Director of Global Resiliency.  (HPSR at 3 & ¶ 9(b)).  For more than seven years, the two men had worked together at eBay and a Seattle security firm.  (BPSR ¶¶ 196-97; HPSR ¶¶ 194-95).

---

[1] The Presentence Investigation Reports ("PSR") set forth the defendants' and their coconspirators' conduct in greater detail.  All "¶" references are to either Baugh's ("BPSR") or Harville's ("HPSR").

2

Victims 1 and 2—wife and husband—lived in Natick. They were the reporter and publisher, respectively, of an online newsletter ("the Newsletter") that covered ecommerce companies, including eBay. (BPSR ¶¶ 11-12). Members of eBay's Executive Leadership Team, including the company's CEO and its Chief Communications Officer ("CCO"), were frustrated with both the Newsletter's reporting and with "Fidomaster", an online persona who was critical of eBay and the CEO in particular. (BPSR ¶¶ 24, 30).

By June 2019, Baugh was frustrated enough with the Victims to place a late-night "hang-up" phone call to them (BPSR ¶ 27), and to dispatch to Natick a member of his security team, Brian Gilbert. Late at night on June 8, 2019, Gilbert scrawled "Fidomaster" in permanent marker on the Victims' fence. (BPSR ¶ 26).

*The Harassment and Intimidation Campaign*

In August 2019, after Victim 1 reported in the Newsletter on a lawsuit between eBay and Amazon, the CEO sent the CCO a text message suggesting that it was time to "take her down". The CCO immediately sent Baugh the same text message, and another labeling Victim 1 a "biased troll who needs to get BURNED DOWN". (BPSR ¶ 30). In response, Baugh weaponized eBay's security department, targeting Victims 1 and 2 with a three-part harassment and intimidation campaign. (BPSR ¶¶ 31-87).

On August 7, 2019, at Baugh's direction, Victim 1 began to get anonymous, harassing messages on her Twitter account. (BPSR ¶ 36). The messages, which featured a skeleton mask intended to scare her, criticized the Newsletter's coverage of eBay ("What's your problem with eBay? You know that's how we pay rent."); were frequently vulgar ("Stop hiding behind ur computer screen u fucking cunt"); and at times threatened violence ("wen u hurt our bizness u hurt

3

our familiys…Ppl will do ANYTHING 2 protect family!!!!"). (BPSR ¶¶ 34, 36, 39, 54).

At the same time, again at Baugh's direction, the Victims also began to receive anonymous deliveries at their home. Some were gross, such as fly larvae, cockroaches, and spiders. (BPSR ¶¶ 40, 53). Others were embarrassing, including pornography addressed to Victim 2 at his neighbors' homes. (BPSR ¶ 41). The most concerning of them were threatening—a funeral wreath and a book entitled *Surviving the Loss of a Spouse*. (BPSR ¶¶ 49, 52). The Twitter messages escalated to include the publication of the Victims' home address on the internet, online advertisements for consensual sexual encounters there, and statements that the harasser was going to "pay [Victim 1] a visit". (BPSR ¶¶ 75, 79). The messages also made clear that their antagonist was responsible for the harassing deliveries. (BPSR ¶ 74) ("U get my gifts cunt!!??").

Victim 1's email inbox also began to overflow with dozens of bizarre emails from, among other groups: an Irritable Bowel Syndrome patient support group; *Scientology Today*; The Satanic Table; the Communist Party of the United States, a sex and relationship coaching website, the Submissive Guide, and Adam & Eve, an adult products website. Victim 2 later received a phone call from Adam & Eve responding to his purported interest in a sex toys franchise—an interest he had never expressed. (BPSR ¶ 38).

Baugh planned the threatening messages and deliveries in meetings with eBay employees and contractors who reported to him. (BPSR ¶¶ 31-32). He directed them to use prepaid debit cards, disguises, overseas email accounts, the encrypted messaging application WhatsApp, non-eBay computers, and Virtual Private Networks—all to assure that the campaign could not be traced back to him, to his coconspirators, or to eBay. (BPSR ¶¶ 16, 22, 33, 37, 40).

Harville did not participate in these initial meetings, but he was aware enough of the

4

harassment by the time he was in Boston to joke with Baugh about delivering a bag of human feces, a running chain saw, and a rat to the Victims' porch.   (HPSR ¶ 67).

On August 11, 2019, Baugh recruited Harville to travel with him (and eBay contractor Veronica Zea) to Boston on a surveillance "op" targeting Victim 1 and the Newsletter.  Baugh made the illegal purpose of the trip clear, telling Harville that Baugh had been ordered to "find and destroy", to "neutralize" Victim 1's website, and that the trip would have to take place "off the grid".   (HPSR ¶¶44-45).  Baugh, Harville and Zea also needed an alibi for the trip—a software development conference taking place in Boston—and they took with them an eBay document that falsely identified the Victims as a security threat—"in case we got stopped..that way would at least have something to show to PD".   (HPSR ¶¶ 54, 61, 82).

On August 15, 2019, Baugh, Harville, and Zea traveled to Boston.   (BPSR ¶ 59).   Before doing so, Harville downloaded an app to his phone that could be used to monitor the "Natick Police and Fire Live Audio Feed".   (BPSR ¶ 58).   Upon arriving, Baugh, Harville, and Zea went right to the Victims' home:   once late at night on August 15 in a failed attempt to install a GPS device on the Victims' car—it was locked in the garage—and again on August 16 to surveil the Victims and to follow Victim 2 as he drove in Natick.   (BPSR ¶¶ 61, 65).   After failing to install the GPS device, Harville purchased equipment at a local hardware store to break into the Victims' garage.   (BPSR ¶ 64).

Despite the surveillance team's precautions, Victim 2 was able to take a picture of their license plate, leading Baugh to return the "burned" rental van.   (BPSR ¶¶ 76, 82).  Baugh, Harville, and Zea returned to their hotel's bar, where Baugh and Harville joked about what else could be delivered to the Victims, including the bag of human feces.   Baugh also called Stephanie

Stockwell (a coconspirator back in California) and directed her to resume the harassing deliveries, even though Baugh already knew the Victims were terrified.  (BPSR ¶¶ 69).

Baugh appreciated the impact his campaign had on the Victims.  On August 20, after hearing a police dispatch regarding the failed surveillance, Baugh quipped: "now they are seeing ghosts, think everyone is following them and they call the police every 10 minutes".  (BPSR ¶ 82).  The next day, referring to a plan to harass "an idiot prosecutor in my hometown who brought a bullshit case against my Dad," Baugh added, "If I gave him an ounce of what we've been giving the [Victims], it would be devastating to him."  (BPSR ¶ 87).

*The Obstruction*

By August 21, 2019, with the Victims' help, the Natick Police Department ("NPD") had connected Zea and Harville to the surveillance.  An NPD detective went to the lobby of Boston's Ritz Carlton Hotel to interview Zea.  Baugh spoke to the detective by phone, falsely claimed to be Zea's husband, and (in Baugh's words) "played dumb".  (BPSR ¶ 88).  In response, the detective reached out to eBay for help investigating the harassment of the Victims.

Baugh then sent Gilbert (a retired Santa Clara police captain) all the way from California to Natick to meet with the NPD, and to report (falsely) that eBay was investigating the harassment of the Victims, not participating in it.  (BPSR ¶ 116).  To support this ruse, Baugh directed coconspirator Stephanie Popp to post more Twitter messages threatening the Victims, which Baugh shared with Harville.  (BPSR ¶¶ 95, 97).

After learning that the NPD was investigating the use of a prepaid debit card in the Bay Area to purchase one of the harassing deliveries to the Victims, Baugh directed Stockwell to prepare a document featuring eBay "Persons of Interest" that could be used to deflect attention

6

from Zea, who had used that debit card. (BPSR ¶¶ 102, 103). Stockwell created the document, "Bay Area POIs_August 2019.docx," and emailed it to Baugh, who passed it along to Gilbert to provide to the NPD. (BPSR ¶ 105). Zea, of course, was not listed.

Baugh, Harville, and their coconspirators were also aware that eBay was attempting to gather information in response to the NPD's request for assistance. (BPSR ¶ 108). Armed with this knowledge, on August 26, 2019, Harville, Baugh, and several coconspirators deleted evidence concerning the harassment of the Victims and the surveillance operation in Natick, including WhatsApp messages. (BPSR ¶ 125). Baugh, Harville, and Zea also sent to eBay's lawyers an altered email related to the software development conference—the alibi conference—so that their purported registration fit better the timeline of their travel. (BPSR ¶ 123).

Harville and Baugh lied to eBay investigators. Among other statements, Baugh falsely denied that eBay personnel had any role in the harassment of the Victims. (BPSR ¶ 120). Harville, for his part, falsely denied having been to Natick, or having had any interactions with the Victims or the NPD. (BPSR ¶¶ 118, 122).

On August 30, 2019, aware of both the NPD's investigation and an eBay order not to delete anything from his company phone, Harville asked Baugh if he should "wipe" the device, and then returned it to eBay with the evidence related to his trip to Natick deleted. (BPSR ¶¶ 131-32).

Baugh's obstruction continued past October 2019, when the government sent him and several of his coconspirators target letters. Baugh paid $5,000 in cash to Stockwell shortly before her meeting with federal investigators; "prepared" Stockwell for the meeting by suggesting she only discuss what she had seen personally (which was nothing in Boston or Natick); and instructed Stockwell to lie about the nature of her relationship with Baugh (which she did). (BPSR ¶¶ 134-

7

140).

## GUIDELINES CALCULATION

The Probation Office correctly increased Baugh and Harville's offense levels by two under U.S.S.G. § 2A6.2(b)(1)(E). That enhancement applies "(1) If the offense involved one of the following aggravating factors: … (E) a pattern of activity involving stalking, threatening, harassing, or assaulting the same victim."

Application Note 1 to § 2A6.2 defines a "pattern of activity" as:

> any combination of two or more separate instances of stalking, threatening, harassing, or assaulting the same victim, whether or not such conduct resulted in a conviction. For example, a single instance of stalking *accompanied by* a separate instance of threatening, harassing, or assaulting the same victim constitutes a pattern of activity for purposes of this guideline.

(emphasis supplied). Application Note 3 to § 2A6.2 makes clear that in determining whether subsection (b)(1)(E) applies, the court must consider, "under the totality of the circumstances, any conduct that occurred … during the offense".[2]

Here, the conduct that occurred "during the offense" included at least seven separate categories of conduct across approximately three weeks: (1) threatening tweets and Twitter direct messages; (2) signing Victim 1 up for unwanted email subscriptions; (3) twice "doxing" the Victims by publishing their home address; (4) online advertising of yard sales, parties, and sexual encounters at the Victims' home; (5) harassing deliveries; (6) an attempt to install a GPS device on the Victims' car while it was locked in their garage; and (7) two separate instances of surveillance that the Victims experienced. These at least constitute, in the words of Application

---

[2]It must also consider any conduct that occurred "prior to the offense" that is "substantially and directly connected to the offense." Baugh's June 2019 crank call and Gilbert's vandalism should be considered under this standard.

8

Note 1, instances of threatening and harassing "accompanied by" separate instances of stalking the same victims.

These facts warrant the pattern-of-activity enhancement. As an initial matter, the First Circuit held in *United States v. Lee* that "a series of [threatening] emails through the Spring of 2012" was "enough to sustain the pattern-of-activity enhancement." 790 F.3d 12, 19 (1st Cir. 2015). *Lee* refused to reach the question of whether older incidents of physical abuse could be considered as part of the pattern "because the more recent emails suffice". 790 F.3d at 19 n.3; *see also United States v. Lloyd*, 809 Fed App'x 750 (11th Cir. 2020) (two extortionate threats to publish photos of a victim warranted a pattern-of-activity enhancement).[3]

Baugh and Harville's arguments that this series of threats, harassment, and stalking is not "separate instances of activity" because it took place over several weeks with the same basic purpose is inconsistent with both the holding in *Lee* and the language of Application Note 1, which speaks to instances that "accompany" each other. The defendants' interpretation would illogically punish defendants who harassed, threatened, *and* stalked at the same offense level as defendants who engaged in just one of behaviors listed in the enhancement.

Harville also suggests incorrectly that because all of the conspiracy's conduct had the same goal—harassing and intimidating the Victims—that the offense involved only one "instance", not "separate instances" that constitute a pattern. This argument is not only inconsistent with *Lee*, which imposed the enhancement based only on a series of emails with a single harassing purpose, but also with *United States v. Freeman*, where the First Circuit held

---

[3]The remaining cases defendants cite in their objections to the draft PSRs predate *Lee*'s controlling holding. That these cases found patterns of activity based on longer-term harassment does not foreclose the enhancement's application here.

9

that repetitive conduct evidencing just one purpose did not constitute a "single instance" within the meaning of a companion Guidelines provision, USSG § 2A6.1(b)(2).[4]  176 F.3d 575, 578 (1st Cir. 1999) (eight threatening phone calls over two days to a hotline dedicated to locating missing children did not constitute a "single instance").

Nor does the pattern-of-activity enhancement impermissibly double count the "course of conduct" element already present in the base offense level for violations of 18 U.S.C. § 2261A. *See United States v. Fiume*, 708 F.3d 59, 60 (1st Cir. 2013) ("We hold that the use in tandem of a base offense level dictated by §2A6.2(a), and an upward adjustment under § 2A6.2(b)(1)(A), does not constitute impermissible double counting").  In *Fiume*, a defendant subject to a no-contact order attempted to communicate with his estranged wife by telephone, mail, e-mail, text, message, Facebook, and through a message left on a tree at the wife's childhood home.  708 F.3d at 60-61.  The defendant received two, 2-level enhancements, both for violating a court order (§ 2A6.2(b)(1)(A)) and for his "pattern of activity" (§ 2A6.2(b)(1)(E)).  The First Circuit rejected his argument that the sentencing court used his violation of a court order twice,[5] finding that: (1) § 2A6.2 and its associated commentary, "the most helpful aid in the task of separating permissible double counting from its impermissible counterpart," did not forbid it; and (2) § 2A6.2 targeted three separate crimes under the rubric of "Stalking or Domestic Violence"—interstate domestic violence (18 U.S.C. § 2261); stalking (18 U.S.C. § 2261A); and interstate violation of protection orders (18 U.S.C. § 2262).  Where only the last of these three

---

[4] USSG § 2A6.1(b)(2) provides for a four-level reduction if, in a case indexed to § 2A6.1, the offense involved "a single instance" that also evidences "little or no deliberation".

[5] The Defendant did not challenge the imposition of the "pattern of activity" enhancement based on his series of attempts to contact her.

10

statutes contained as an element the violation of a protection order, the "most logical conclusion is that the defendant's base offense level accounts for the general nature of the offense of conviction as one of stalking or domestic violence, but does not account specifically for the violation of a court protection order." *Id.* at 62. *Fiume* controls here, as the Sentencing Commission is not shy about proscribing double counting when it means to, and only one of the three statutes referenced to § 2A6.2—18 U.S.C. § 2261A(2)—contains a "course of conduct" element. *See id*.

A district court in South Dakota reached the same result on the same reasoning in *United States v. Ogden*, rejecting both a defendant's argument that eight Craigslist posts over five weeks inviting men to the victim's home for sex was "one incident of stalking", and his claim that a "pattern of activity" enhancement impermissibly double-counted. *United States v. Ogden*, 4:16-cr-40082-KES (D.S.D. April 25, 2017) (Sent. Tr. at 1-7, Exh. A hereto), *aff'd on other grounds*, 725 Fed. App'x 421 (8th Cir. 2017).[6]

Finally, even if the surveillance was the extent of Harville's actions, the pattern-of-

---

[6] It is also not clear (as Baugh and Harville argue) that a "course of conduct" that 18 U.S.C. § 2261A punishes is always a "pattern of activity" under § 2A6.2. One could imagine the following scenario, in response to Judge Burroughs' hypothetical question at Philip Cooke's sentencing about what "course of conduct" would not be "separate instances" of harassment. A frustrated husband, who receives notice that the IRS has levied his wife's paycheck as she lies in a hospital bed with lung cancer, places a threatening phone call to the IRS, and an hour later visits the IRS office and states in the waiting room that he is going to blow it up. *See United States v. Pacione*, 950 F.2d 1348 (7th Cir. 1991). The call and the threat are a "pattern of conduct composed of two or more acts, evidencing a continuity of purpose", and thus a "course of conduct" within the meaning of 18 U.S.C. § 2261A. But the call and threat within a single hour might, under the logic of *Freeman*, be just one "instance" of threatening behavior. While there may be considerable overlap between a "course of conduct" and a "pattern of activity", the hypothetical is inapt in this case, where the Victims were targeted over weeks with dozens of different kinds of acts.

11

activity enhancement is tied to what the "offense involved", not the defendant's own conduct. § 2A6.2(b)(1). The offense involved harassing and threatening messages, harassing and threatening deliveries, and harassing physical surveillance—all of which terrified the Victims. In a case involving "jointly undertaken criminal activity," Harville is responsible for "acts and omissions of others" that are within the scope and in furtherance of the conspiracy, and "reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). Where Harville and Baugh joked about the delivery of a bag of human feces, a running chain saw, and a rat to the Victims (BPSR ¶ 69), and where Baugh gave Harville a copy of the threats that were to be passed to the NPD (BPSR ¶ 97), it is clear that Harville appreciated the other components of the campaign, and that what happened to the Victims was reasonably foreseeable to him, at least after he arrived in Boston to participate in the surveillance.[7]

For all of these reasons, the Court should include the two-level enhancement under U.S.S.G. § 2A6.2(b)(1)(E) in both Baugh and Harville's total offense levels.

REQUESTED SENTENCES – BAUGH AND HARVILLE

After considering each of the factors set forth at 18 U.S.C. § 3553(a), the Court should sentence Baugh to 71 months' imprisonment, and Harville to 41 months of imprisonment.

*Nature and Circumstances of the Offense*

The Court should begin its analysis of the defendants' conduct with the entirely predictable effect it had on the Victims. The deliveries, threats, and surveillance were not simply late-night hijinks. They combined to terrorize the Victims, who experienced the defendants' conduct

---

[7] That Harville "wiped" the contents of his cell phone leaves both him and the government without more specific evidence of the "what" and "when" of his knowledge.

physically. Victim 1 describes having trouble breathing and losing both weight and sleep. In the wake of the August 16 surveillance, Victim 2 appeared nauseous to his wife—sweating and without any color in his face. Victim 1 was afraid that her husband of 31 years was going to have a heart attack right in front of her.

Beyond the visceral response the defendants caused, the offense also impacted Victims 1 and 2 professionally and financially. Victim 1 went from being a reporter and expert on ecommerce to being an "eBay critic". When she is contacted online—by a potential source or an eBay seller—Victim 1 now wonders if someone involved in their harassment (or inspired by it) is back at it. The defendants' conduct has diminished the Victims' ability to do their jobs.

Victim 2, for his part, laments the impact the defendants' crimes had on the Newsletter's business. He describes in his Victim Impact Statement necessary and painful steps that have affected the couple's future income potential—the financial legacy of the defendants' harassment and intimidation campaign.

As cyberstalking frequently does, Baugh and Harville's offense also cut the Victims off from their communities. Victim 1 was afraid to go out in public. Concerned neighbors were coming by asking about the strange behavior outside their home. The Victims cancelled social engagements and a trip to see family and friends out of town, fearful that their stalkers would follow, and become others' stalkers. They even turned away offers of help and places to stay, afraid of putting well-meaning friends at risk. Until the NPD put an end to the campaign, the Victims experienced it alone.

Nor has their fear abated with time. More than three years later, the Victims continue to memorize car license plates in public, carry pepper spray outside their home, and remain alert for

signs of unusual activity in their neighborhood. Victim 2 relates sleepless nights, anxiety, anger, depression, and insecurity about the couple's future.

It also shocks the conscience that Baugh, Harville, and their coconspirators targeted the Victims for what they had written and published ("What's your problem with eBay"), and for making space for others to publish comments beneath the Newsletter's articles. Journalism about public companies, especially the world's largest ecommerce brands, is important to investors, merchants, and customers alike. That Baugh targeted the Victims based on his and others' disagreement with the Newsletter's coverage is abhorrent to First Amendment values.[8]

Finally, Baugh and Harville's offenses are more serious because both men willfully obstructed the investigations into the harassment. Baugh, in particular, appears to have reveled in interfering with the NPD investigation. When he snuck Veronica Zea out of the Ritz Carlton after lying to the NPD, Baugh derided the police to his coconspirators: "the detective was a big fat guy sitting right by [the] elevator. He didn't even look up when I walked by and got on." (BPSR ¶ 93). Harville hampered the investigation by lying to eBay; falsifying email headers; and wiping the contents of his phone. (*e.g.*, BPSR ¶¶ 123, 126, 131). These second wrongs made things even worse—for the Victims, for investigators, and the public.

The seriousness of Baugh and Harville's offenses accordingly counsels a significant term of imprisonment for each defendant.

---

[8]The Court should not accept Harville's invitation to vary its sentence because Harville harassed Victims 1 and 2 in the same episodes. The Victims' Impact Statements show poignantly that the couple experienced the defendants' harassment very differently. For example, Victim 2 saw Baugh, Harville, and Zea following him through his rear view mirror; Victim 1 had to watch alone in horror after her husband had already pulled away. It would be counterintuitive to punish Harville as if he had only terrorized one of them.

*Deterrence*

The requested prison terms will also promote deterrence. Every large company in the United States has a security department. Most of these companies get critical press from time to time; have detractors online; and—like eBay—will be the object of unflattering (and likely profane) comments. Companies value their corporate images, and with good reason track the public's perception of them. But companies and their security organizations are not law enforcement agencies. Security and "brand protection" are not the same. Senior employees at public companies cannot run "ops" against people who say things they dislike on the internet. They cannot engage in illegal self-help instead of reporting a perceived threat to law enforcement, or using the courts to seek relief. The requested sentences will reinforce the difference between actual corporate security and what happened in this case. And if Baugh and Harville are ever again entrusted with positions of responsibility in the security industry, these sentences will remind them what the law forbids.

*Similarly Situated Defendants*

Cyberstalking cases are each horrifying in their own way. Within this District, defendants have stalked roommates and both former and current intimate partners; and they have threatened and extorted intimate photos from complete strangers. Sentences of incarceration for these types of crimes routinely follow nationwide. In fiscal 2021 alone, 219 convictions for "Stalking/Harassing"—crimes referenced to either USSG §§ 2A6.1 and 2A6.2—led to sentences of imprisonment 88.6 percent of the time. For the fiscal years 2015 through 2021, in 359 cases nationwide where courts imposed prison sentences using USSG § 2A6.2—the primary Guideline in this case—the average length of imprisonment was 39 months. In the First Circuit, 15 such

15

cases similarly led to an average length of imprisonment of 35 months. For five cases in this District, the average was 30 months. https://ida.ussc.gov/analytics/saw.dll?Dashboard (visited Sept. 21, 2022). Harville's sentence is consistent with these national, Circuit, and District norms. Baugh's is too, because it is only his four-level enhancement for being an organizer and leader—an unusual feature of a cyberstalking conviction to be sure—that takes his Guidelines Sentencing Range from the national average of 39 months up to a range of 57 to 71 months.

*The History and Characteristics of the Defendants*

Baugh and Harville had normal childhoods and experienced no abuse. (BPSR ¶ 178; HPSR ¶ 175). Neither abused drugs. (BPSR ¶ 191; HPSR ¶ 189) Both are highly educated. (BPSR ¶ 195; HPSR ¶ 190). Each regularly made more than $250,000 per year in annual salary (with even more in bonus) in a booming sector of the economy. (BPSR ¶¶ 10(a), (b)). Except for a two-year stint in government service, Baugh had worked in corporate security almost without interruption since 2002 (BPSR ¶¶ 196-201); Harville since at least August 2007. (HPSR ¶¶ 194-95). To his credit, Harville served in the national guard, earning the rank of First Lieutenant over a decade. (HPSR ¶ 191).

In a country where there are admittedly wide gaps in power and opportunity, Baugh and Harville sat among society's top earners. That power came with responsibility that the defendants ignored with their virtual and real-world acts. It is commendable that Baugh has attempted to address his alcoholism, (BPSR ¶ 188, 191-92), but the combination of alcohol and the powerful tools that Baugh had at his disposal are an aggravating factor in his offense, not a mitigating one. The history and characteristics of these defendants does not weigh against a significant prison sentence for either of them.

*Harville's Sentence*

The government has requested a lower sentence for Harville (41 months) than Baugh (71 months). The difference stems from Baugh's organization and leadership of the entire harassment and intimidation campaign. Harville, who had knowledge of but no proven role in the harassing messages and deliveries, is not as culpable as Baugh. He is also less culpable than other coconspirators who participated in multiple parts of the conspiracy. But he did more than enough to warrant a sentence within the Guidelines range applicable to him. Harville once swore an oath to uphold and defend the Constitution, *see* 32 U.S.C. § 304, and worked in corporate security for more than a decade. (HPSR ¶¶ 194-195). He had the experience to know right from wrong. He was not in his 20s and in a first job out of college. And as a friend of Baugh's for years before their time at eBay, Harville was uniquely situated among the coconspirators to stand up to Baugh. He instead went all in on an "off-the-grid" "find and destroy" mission that he couldn't even tell his wife or other colleagues about. (Notably, one of Baugh's young employees (Analyst 1) quit rather than travel to Boston; Baugh fired a second (Analyst 2) who refused to go. (BPSR ¶ 77)).

Harville is also more culpable than Phil Cooke, whom Judge Burroughs sentenced to serve 18 months in prison (and 12 months of home confinement). Like Cooke, who planned the harassing messages, Harville had a significant role in only one of the three aspects of the campaign. Unlike Cooke, who spent most of August 2019 on a business trip in Asia, Harville was on the ground in Natick. Harville participated in the surveillance and brought the harassment to the threshold of the Victims' home. Like Cooke, Harville became aware of the harassing deliveries, and he failed to walk away. Unlike Cooke, Harville participated directly in the obstruction of eBay's investigation—lying to investigators; deleting the contents of his phone; and directing to

17

eBay a forged email that supported his and Zea's alibi.  A low-to-mid-range Guidelines sentence is thus appropriate to Harville's role.

*Fines*

Where the Victims do not seek restitution and there is no basis for forfeiture, fines are an appropriate component of both defendants' punishments.  Judge Burroughs imposed a $15,000 fine on Cooke, who (like the defendants) had the means to pay one.  Both Baugh and Harville generated substantial assets over the course of their careers, and can afford (in installments) to pay a meaningful fine that is both within the advisory Guidelines range and proportional to their role in the offense.  In Baugh's case, a fine of $60,000 would double the *pro rata* salary and bonus he received during August 2019 while harassing the Victims and obstructing the investigation.  For Harville, a $25,000 fine approximates his salary, bonus, and relative culpability over that same period.

CONCLUSION

For all of the reasons stated above, the United States requests that the Court sentence Jim Baugh to 71 months' imprisonment,[9] to pay a $60,000 fine, to serve three years' supervised release, and to pay a $900 mandatory special assessment.

The Court should sentence David Harville to 41 months' imprisonment, to pay a $25,000 fine, to serve three years' supervised release, and to pay a $500 mandatory special assessment.

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

SETH B. KOSTO
Assistant U.S. Attorney

September 23, 2022

CERTIFICATE OF SERVICE

I hereby certify that a copy of this document will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/Seth B. Kosto
SETH B. KOSTO
Assistant U.S. Attorney

September 23, 2022

---

[9] The United States defers to the Court on the composition of Baugh's cumulative sentence, but it could sentence Baugh to concurrent sentences of 60 months on the five stalking counts (1-3 and 6-7), followed consecutively by 21 month concurrent terms on the four obstruction counts (10-11, 13-14).

19